## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| PERGO (EUROPE) AB<br>Strandridaregatan 8<br>Box 1010<br>231 25 Trelleborg<br>Sweden,<br><br>     Plaintiff,<br><br>          v.<br><br>UNILIN BEHEER B.V.<br>Hoogeveenenweg 28<br>2913 LV Nieuwerkerk Ad Ijssel<br>Netherlands,<br><br>     Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 1:08-cv-00659 |

### ANSWER AND COUNTERCLAIMS OF DEFENDANT UNILIN BEHEER B.V.

Defendant Unilin Beheer B.V. ("Unilin Beheer"), by and through its undersigned counsel, responds to the allegations in Plaintiff's First Amended Complaint for Interference ("Complaint") filed by Pergo (Europe) AB, Inc. ("Pergo" or "Plaintiff") as follows: specific responses corresponding to the Plaintiff's averments are set forth below, but except as otherwise specifically admitted, qualified or denied herein, all of the averments of the Complaint are denied.

### THE PARTIES

1.     Upon information and belief, Unilin Beheer admits the allegations in paragraph 1 of the Complaint.

2.     Upon information and belief, Unilin Beheer admits the allegations in paragraph 2 of the Complaint.

3.     Unilin Beheer admits the allegations in paragraph 3 of the Complaint.

4.    Unilin Beheer admits the allegations in paragraph 4 of the Complaint.

## JURISDICTION AND VENUE

5.    The allegations of paragraph 5 of the Complaint state a legal claim to which no response is required.  Unilin Beheer admits that Plaintiff apparently purports to base subject matter jurisdiction on 28 U.S.C. §§ 1331 and 1338(a) and pursuant to 35 U.S.C. § 291, and that this action purports to arise under 35 U.S.C. § 101, *et seq*.  Unilin Beheer otherwise denies the allegations of paragraph 5 of the Complaint.

6.    The allegations of paragraph 6 of the Complaint state a legal claim to which no response is required.  Unilin Beheer admits that Plaintiff apparently purports to base personal jurisdiction on 35 U.S.C. § 293.  Unilin Beheer otherwise denies the allegations of paragraph 6 of the Complaint.

7.    Unilin Beheer admits that Plaintiff apparently purports to base personal jurisdiction on 35 U.S.C. § 293.  Unilin Beheer otherwise denies the allegations of paragraph 7 of the Complaint.

8.    The allegations of paragraph 8 of the Complaint state a legal claim to which no response is required.  Unilin Beheer admits that Plaintiff apparently purports to base venue on 35 U.S.C. § 293 and 28 U.S.C. §§ 1391 and 1400.  Unilin Beheer otherwise denies the allegations of paragraph 8 of the Complaint.

## DEVELOPMENT OF PERGO'S PATENTED TECHNOLOGY

9.    Unilin Beheer is without sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 9 of the Complaint and therefore denies same.

10. Unilin Beheer is without sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 10 of the Complaint and therefore denies same.

11. Unilin Beheer is without sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 11 of the Complaint and therefore denies same.

12. Unilin Beheer is without sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 12 of the Complaint and therefore denies same.

13. Unilin Beheer admits the allegations in paragraph 13 of the Complaint.

14. Unilin Beheer is without sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 14 of the Complaint and therefore denies same.

15. Unilin Beheer is without sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 15 of the Complaint and therefore denies same.

16. Unilin Beheer is without sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 16 of the Complaint and therefore denies same.

17. Unilin Beheer denies the allegations in paragraph 17 of the Complaint.

18. Unilin Beheer denies the allegations in paragraph 18 of the Complaint.

19. Upon information and belief, Unilin Beheer admits that the SE '810 appln. was filed on March 7, 1995. Unilin Beheer is without sufficient knowledge or information to

form a belief as to the truth of the rest of the allegations in paragraph 19 of the Complaint and therefore denies same.

20.    Upon information and belief, Unilin Beheer admits that the PCT '721 appln. was filed on March 7, 1995. Unilin Beheer is without sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 20 of the Complaint and therefore denies same.

### THE PERGO PATENTS AT ISSUE

21.    Upon information and belief, Unilin Beheer admits that the PTO issued Patent No. 6,101,778 (the "'778 patent"), entitled "Flooring Panel or Wall Panel and Use Thereof," and on its face the '778 patent lists its issue date as August 15, 2000 and identifies Goran Martensson as the inventor. Unilin Beheer otherwise denies the allegations of paragraph 21 of the Complaint.

22.    Upon information and belief, Unilin Beheer admits that the PTO issued Patent No. 6,397,547 (the "'547 patent"), entitled "Flooring Panel or Wall Panel and Use Thereof," and on its face the '547 patent lists its issue date as June 4, 2002 and identifies Goran Martensson as the inventor. Unilin Beheer otherwise denies the allegations of paragraph 22 of the Complaint.

23.    Upon information and belief, Unilin Beheer admits that the PTO issued Patent No. 6,418,683 (the "'683 patent"), entitled "Flooring Panel or Wall Panel and Use Thereof," and on its face the '683 patent lists its issue date as July 16, 2002 and identifies Goran Martensson and Magnus Kulik as the inventors. Unilin Beheer otherwise denies the allegations of paragraph 23 of the Complaint.

24.     Upon information and belief, Unilin Beheer admits that the PTO issued Patent No. 6,421,970 (the "'970 patent"), entitled "Flooring Panel or Wall Panel and Use Thereof," and on its face the '970 patent lists its issue date as July 23, 2002 and identifies Goran Martensson and Magnus Kulik as the inventors. Unilin Beheer otherwise denies the allegations of paragraph 24 of the Complaint.

25.     Upon information and belief, Unilin Beheer admits that the '778, '547, '683 and '970 patents, on their faces, identify a claim of priority to the SE '810 appln and the '721 PCT. Unilin Beheer otherwise denies the allegations of paragraph 25 of the Complaint.

## UNILIN'S SUBSEQUENT DEVELOPMENT OF SUBSTANTIALLY THE SAME TECHNOLOGY

26.     Unilin Beheer admits that one or more Unilin employees attended the 1996 Domotex flooring trade show in Hannover, Germany. To the extent that paragraph 26 contains any other allegations, Unilin Beheer denies same.

27.     Unilin Beheer denies the allegations in paragraph 27 of the Complaint.

28.     Unilin Beheer denies the allegations in paragraph 28 of the Complaint.

29.     Unilin Beheer denies the allegations in paragraph 29 of the Complaint.

30.     Unilin Beheer denies the allegations in paragraph 30 of the Complaint.

31.     Unilin Beheer admits that Unilin Beheer filed Belgian Patent Application No. 9700344 (the "BE '344 appln.") on April 15, 1997 and Belgian Patent Application No. 9600527 (the "BE '527 appln.") on June 11, 1996. To the extent that paragraph 31 contains any other allegations, Unilin Beheer denies same.

32.     Unilin Beheer denies the allegations in paragraph 32 of the Complaint.

## THE UNILIN PATENTS AT ISSUE

33.     Unilin Beheer admits the allegations in paragraph 33 of the Complaint.

34.     Unilin Beheer admits the allegations in paragraph 34 of the Complaint.

35.     Unilin Beheer admits the allegations in paragraph 35 of the Complaint.

36.     Unilin Beheer admits the allegations in paragraph 36 of the Complaint.

37.     Unilin Beheer admits the allegations in paragraph 37 of the Complaint.

38.     Unilin Beheer admits the allegations in paragraph 38 of the Complaint.

39.     Unilin Beheer admits the allegations in paragraph 39 of the Complaint.

40.     Unilin Beheer admits the allegations in paragraph 40 of the Complaint.

41.     Unilin Beheer admits that the Unilin patents claim priority to the BE '527

appln. and the BE '344 appln.  To the extent that paragraph 41 contains any other allegations,

Unilin Beheer denies same.

## THE PERGO AND UNILIN PATENTS ARE DIRECTED TO
## SUBSTANTIALLY THE SAME SUBJECT MATTER

42.     Unilin Beheer denies the allegations in paragraph 42 of the Complaint.

43.     Unilin Beheer denies the allegations in paragraph 43 of the Complaint.

44.     Unilin Beheer denies the allegations in paragraph 44 of the Complaint.

45.     Unilin Beheer denies the allegations in paragraph 45 of the Complaint.

46.     Unilin Beheer denies the allegations in paragraph 46 of the Complaint.

47.     Unilin Beheer denies the allegations in paragraph 47 of the Complaint.

48.     Unilin Beheer denies the allegations in paragraph 48 of the Complaint.

49.     Unilin Beheer denies the allegations in paragraph 49 of the Complaint.

## RELATED PRODUCTS

50.     Unilin Beheer admits that certain of its affiliates market mechanically

locking floorboards.  To the extent that paragraph 50 contains any other allegations, Unilin

Beheer denies same.

51.     Unilin Beheer denies the allegations of paragraph 51 of the Complaint.

52.     Upon information and belief, Unilin Beheer admits that Pergo LLC manufactures and sells glueless mechanically locking floor panels. Unilin Beheer is without sufficient knowledge or information to form a belief as to the truth of the rest of the allegations in paragraph 52 of the Complaint and therefore denies same.

53.     Upon information and belief, Unilin Beheer admits that Pergo LLC sells flooring products under the brand names Everyday, Accolade, Accolade Tiles, Vintage Home, Select, American Cottage and Casual Living. Unilin Beheer is without sufficient knowledge or information to form a belief as to the truth of the rest of the allegations in paragraph 53 of the Complaint and therefore denies same.

54.     Unilin Beheer admits that Unilin Flooring NC LLC manufactures and sells laminated floor panels in the United States. To the extent that paragraph 54 contains any other allegations, Unilin Beheer denies same.

55.     Unilin Beheer admits that Quick-Step is a proprietary brand name of products manufactured and sold by Unilin Flooring NC LLC. To the extent that paragraph 55 contains any other allegations, Unilin Beheer denies same.

**UNTIL NOW, LICENSING RELATIONS OBVIATED THE NEED FOR A JUDICIAL DETERMINATION OF INVALIDITY OF THE UNILIN PATENTS**

56.     Unilin Beheer denies the allegations in paragraph 56 of the Complaint.

57.     Upon information and belief, Unilin Beheer admits that a license agreement was entered into between Flooring Industries Ltd. and Pergo Holding AB on June 22, 2000. Unilin Beheer is without sufficient knowledge or information to form a belief as to the truth of the rest of the allegations in paragraph 57 of the Complaint and therefore denies same.

58.     Upon information and belief, Unilin Beheer admits that according to the License Agreement, Flooring Industries granted Pergo Holding AB a non-exclusive and non-transferable license to the '486 patent for the use, manufacture and sale of the Uniclic profile. Unilin Beheer is without sufficient knowledge or information to form a belief as to the truth of the rest of the allegations in paragraph 58 of the Complaint and therefore denies same.

59.     Upon information and belief, Unilin Beheer admits the allegations in paragraph 59 of the Complaint.

60.     Upon information and belief, Unilin Beheer admits that under the Cross-License, Pergo granted the Unilin Group a non-exclusive, royalty-free, non-sublicensable license to certain Pergo intellectual property, including the Pergo Patents.  To the extent that paragraph 60 contains any other allegations, Unilin Beheer denies same.

61.     Upon information and belief, Unilin Beheer admits the allegations in paragraph 61 of the Complaint.

62.     Upon information and belief, Unilin Beheer admits the allegations in paragraph 62 of the Complaint.

63.     Unilin Beheer denies the allegations in paragraph 63 of the Complaint.

## COUNT I
## (INTERFERENCE PURSUANT TO 35 U.S.C. § 291)

64.     Unilin Beheer incorporates by reference its responses to Paragraphs 1-63 of the Complaint.  Unilin Beheer denies the remaining allegations in paragraph 64 of the Complaint.

65.     Unilin Beheer denies the allegations in paragraph 65 of the Complaint.

66.     Unilin Beheer denies the allegations in paragraph 66 of the Complaint.

67.     Unilin Beheer denies the allegations in paragraph 67 of the Complaint.

68.     Unilin Beheer denies the allegations in paragraph 68 of the Complaint.

**COUNT II**
**(INTERFERENCE PURSUANT TO 35 U.S.C. § 291)**

69.     Unilin Beheer incorporates by reference its responses to Paragraphs 1-63 of the Complaint.  Unilin Beheer denies the remaining allegations in paragraph 69 of the Complaint.

70.     Unilin Beheer denies the allegations in paragraph 70 of the Complaint.

71.     Unilin Beheer denies the allegations in paragraph 71 of the Complaint.

72.     Unilin Beheer denies the allegations in paragraph 72 of the Complaint.

73.     Unilin Beheer denies the allegations in paragraph 73 of the Complaint.

74.     Unilin Beheer denies the allegations in paragraph 74 of the Complaint.

75.     Unilin Beheer denies the allegations in paragraph 75 of the Complaint.

76.     Unilin Beheer denies the allegations in paragraph 76 of the Complaint.

77.     Unilin Beheer denies the allegations in paragraph 77 of the Complaint.

78.     Unilin Beheer denies the allegations in paragraph 78 of the Complaint.

79.     Unilin Beheer denies the allegations in paragraph 79 of the Complaint.

80.     Unilin Beheer denies the allegations in paragraph 80 of the Complaint.

81.     Unilin Beheer denies the allegations in paragraph 81 of the Complaint.

82.     Unilin Beheer denies the allegations in paragraph 82 of the Complaint.

83.     Unilin Beheer denies the allegations in paragraph 83 of the Complaint.

84.     Unilin Beheer denies the allegations in paragraph 84 of the Complaint.

85.     Unilin Beheer denies the allegations in paragraph 85 of the Complaint.

86.     Unilin Beheer denies the allegations in paragraph 86 of the Complaint.

87.     Unilin Beheer denies the allegations in paragraph 87 of the Complaint.

88.    Unilin Beheer denies the allegations in paragraph 88 of the Complaint.

89.    Unilin Beheer denies the allegations in paragraph 89 of the Complaint.

90.    Unilin Beheer denies the allegations in paragraph 90 of the Complaint.

91.    Unilin Beheer denies the allegations in paragraph 91 of the Complaint.

92.    Unilin Beheer denies the allegations in paragraph 92 of the Complaint.

93.    Unilin Beheer denies the allegations in paragraph 93 of the Complaint.

94.    Unilin Beheer denies the allegations in paragraph 94 of the Complaint.

95.    Unilin Beheer denies the allegations in paragraph 95 of the Complaint.

96.    Unilin Beheer denies the allegations in paragraph 96 of the Complaint.

97.    Unilin Beheer denies the allegations in paragraph 97 of the Complaint.

98.    Unilin Beheer denies the allegations in paragraph 98 of the Complaint.

99.    Unilin Beheer denies the allegations in paragraph 99 of the Complaint.

100.    Unilin Beheer denies the allegations in paragraph 100 of the Complaint.

101.    Unilin Beheer denies the allegations in paragraph 101 of the Complaint.

102.    Unilin Beheer denies the allegations in paragraph 102 of the Complaint.

103.    Unilin Beheer denies the allegations in paragraph 103 of the Complaint.

104.    Unilin Beheer denies the allegations in paragraph 104 of the Complaint.

105.    Unilin Beheer denies the allegations in paragraph 105 of the Complaint.

106.    Unilin Beheer denies the allegations in paragraph 106 of the Complaint.

107.    Unilin Beheer denies the allegations in paragraph 107 of the Complaint.

108.    Unilin Beheer denies the allegations in paragraph 108 of the Complaint.

109.    Unilin Beheer denies the allegations in paragraph 109 of the Complaint.

110.    Unilin Beheer denies the allegations in paragraph 110 of the Complaint.

111.    Unilin Beheer denies the allegations in paragraph 111 of the Complaint.

112.    Unilin Beheer denies the allegations in paragraph 112 of the Complaint.

113.    Unilin Beheer denies the allegations in paragraph 113 of the Complaint.

114.    Unilin Beheer denies the allegations in paragraph 114 of the Complaint.

115.    Unilin Beheer denies the allegations in paragraph 115 of the Complaint.

## COUNT III
## (INTERFERENCE PURSUANT TO 35 U.S.C. § 291)

116.    Unilin Beheer incorporates by reference its responses to Paragraphs 1-63 of the Complaint.  Unilin Beheer denies the remaining allegations in paragraph 116 of the Complaint.

117.    Unilin Beheer denies the allegations in paragraph 117 of the Complaint.

118.    Unilin Beheer denies the allegations in paragraph 118 of the Complaint.

119.    Unilin Beheer denies the allegations in paragraph 119 of the Complaint.

120.    Unilin Beheer denies the allegations in paragraph 120 of the Complaint.

121.    Unilin Beheer denies the allegations in paragraph 121 of the Complaint.

122.    Unilin Beheer denies the allegations in paragraph 122 of the Complaint.

123.    Unilin Beheer denies the allegations in paragraph 123 of the Complaint.

124.    Unilin Beheer denies the allegations in paragraph 124 of the Complaint.

125.    Unilin Beheer denies the allegations in paragraph 125 of the Complaint.

## COUNT IV
## (INTERFERENCE PURSUANT TO 35 U.S.C. § 291)

126.    Unilin Beheer incorporates by reference its responses to Paragraphs 1-63 of the Complaint.  Unilin Beheer denies the remaining allegations in paragraph 126 of the Complaint.

127.    Unilin Beheer denies the allegations in paragraph 127 of the Complaint.

128.    Unilin Beheer denies the allegations in paragraph 128 of the Complaint.

129.    Unilin Beheer denies the allegations in paragraph 129 of the Complaint.

130.    Unilin Beheer denies the allegations in paragraph 130 of the Complaint.

131.    Unilin Beheer denies the allegations in paragraph 131 of the Complaint.

132.    Unilin Beheer denies the allegations in paragraph 132 of the Complaint.

133.    Unilin Beheer denies the allegations in paragraph 133 of the Complaint.

134.    Unilin Beheer denies the allegations in paragraph 134 of the Complaint.

135.    Unilin Beheer denies the allegations in paragraph 135 of the Complaint.

136.    Unilin Beheer denies the allegations in paragraph 136 of the Complaint.

137.    Unilin Beheer denies the allegations in paragraph 137 of the Complaint.

138.    Unilin Beheer denies the allegations in paragraph 138 of the Complaint.

139.    Unilin Beheer denies the allegations in paragraph 139 of the Complaint.

140.    Unilin Beheer denies the allegations in paragraph 140 of the Complaint.

141.    Unilin Beheer denies the allegations in paragraph 141 of the Complaint.

142.    Unilin Beheer denies the allegations in paragraph 142 of the Complaint.

143.    Unilin Beheer denies the allegations in paragraph 143 of the Complaint.

144.    Unilin Beheer denies the allegations in paragraph 144 of the Complaint.

145.    Unilin Beheer denies the allegations in paragraph 145 of the Complaint.

146.    Unilin Beheer denies the allegations in paragraph 146 of the Complaint.

147.    Unilin Beheer denies the allegations in paragraph 147 of the Complaint.

148.    Unilin Beheer denies the allegations in paragraph 148 of the Complaint.

149.    Unilin Beheer denies the allegations in paragraph 149 of the Complaint.

150.    Unilin Beheer denies the allegations in paragraph 150 of the Complaint.

151.    Unilin Beheer denies the allegations in paragraph 151 of the Complaint.

## COUNT V
## (INTERFERENCE PURSUANT TO 35 U.S.C. § 291)

152.    Unilin Beheer incorporates by reference its responses to Paragraphs 1-63 of the Complaint. Unilin Beheer denies the remaining allegations in paragraph 152 of the Complaint.

153.    Unilin Beheer denies the allegations in paragraph 153 of the Complaint.

154.    Unilin Beheer denies the allegations in paragraph 154 of the Complaint.

155.    Unilin Beheer denies the allegations in paragraph 155 of the Complaint.

156.    Unilin Beheer denies the allegations in paragraph 156 of the Complaint.

157.    Unilin Beheer denies the allegations in paragraph 157 of the Complaint.

158.    Unilin Beheer denies the allegations in paragraph 158 of the Complaint.

159.    Unilin Beheer denies the allegations in paragraph 159 of the Complaint.

160.    Unilin Beheer denies the allegations in paragraph 160 of the Complaint.

161.    Unilin Beheer denies the allegations in paragraph 161 of the Complaint.

## COUNT VI
## (INTERFERENCE PURSUANT TO 35 U.S.C. § 291)

162.    Unilin Beheer incorporates by reference its responses to Paragraphs 1-63 of the Complaint. Unilin Beheer denies the remaining allegations in paragraph 162 of the Complaint.

163.    Unilin Beheer denies the allegations in paragraph 163 of the Complaint.

164.    Unilin Beheer denies the allegations in paragraph 164 of the Complaint.

165.    Unilin Beheer denies the allegations in paragraph 165 of the Complaint.

166.    Unilin Beheer denies the allegations in paragraph 166 of the Complaint.

167.    Unilin Beheer denies the allegations in paragraph 167 of the Complaint.

168.    Unilin Beheer denies the allegations in paragraph 168 of the Complaint.

169.    Unilin Beheer denies the allegations in paragraph 169 of the Complaint.

**COUNT VII**
**(INTERFERENCE PURSUANT TO 35 U.S.C. § 291)**

170.    Unilin Beheer incorporates by reference its responses to Paragraphs 1-63 of the Complaint.  Unilin Beheer denies the remaining allegations in paragraph 170 of the Complaint.

171.    Unilin Beheer denies the allegations in paragraph 171 of the Complaint.

172.    Unilin Beheer denies the allegations in paragraph 172 of the Complaint.

173.    Unilin Beheer denies the allegations in paragraph 173 of the Complaint.

174.    Unilin Beheer denies the allegations in paragraph 174 of the Complaint.

175.    Unilin Beheer denies the allegations in paragraph 175 of the Complaint.

176.    Unilin Beheer denies the allegations in paragraph 176 of the Complaint.

177.    Unilin Beheer denies the allegations in paragraph 177 of the Complaint.

178.    Unilin Beheer denies the allegations in paragraph 178 of the Complaint.

**COUNT VIII**
**(INTERFERENCE PURSUANT TO 35 U.S.C. § 291)**

179.    Unilin Beheer incorporates by reference its responses to Paragraphs 1-63 of the Complaint.  Unilin Beheer denies the remaining allegations in paragraph 179 of the Complaint.

180.    Unilin Beheer denies the allegations in paragraph 180 of the Complaint.

181.    Unilin Beheer denies the allegations in paragraph 181 of the Complaint.

182.    Unilin Beheer denies the allegations in paragraph 182 of the Complaint.

183.    Unilin Beheer denies the allegations in paragraph 183 of the Complaint.

184.    Unilin Beheer denies the allegations in paragraph 184 of the Complaint.

185.    Unilin Beheer denies the allegations in paragraph 185 of the Complaint.

186.    Unilin Beheer denies the allegations in paragraph 186 of the Complaint.

187.    Unilin Beheer denies the allegations in paragraph 187 of the Complaint.

**COUNT IX**
**(INTERFERENCE PURSUANT TO 35 U.S.C. § 291)**

188.    Unilin Beheer incorporates by reference its responses to Paragraphs 1-63 of the Complaint.  Unilin Beheer denies the remaining allegations in paragraph 188 of the Complaint.

189.    Unilin Beheer denies the allegations in paragraph 189 of the Complaint.

190.    Unilin Beheer denies the allegations in paragraph 190 of the Complaint.

191.    Unilin Beheer denies the allegations in paragraph 191 of the Complaint.

192.    Unilin Beheer denies the allegations in paragraph 192 of the Complaint.

193.    Unilin Beheer denies the allegations in paragraph 193 of the Complaint.

194.    Unilin Beheer denies the allegations in paragraph 194 of the Complaint.

195.    Unilin Beheer denies the allegations in paragraph 195 of the Complaint.

196.    Unilin Beheer denies the allegations in paragraph 196 of the Complaint.

197.    Unilin Beheer denies the allegations in paragraph 197 of the Complaint.

198.    Unilin Beheer denies the allegations in paragraph 198 of the Complaint.

199.    Unilin Beheer denies the allegations in paragraph 199 of the Complaint.

200.    Unilin Beheer denies the allegations in paragraph 200 of the Complaint.

201.    Unilin Beheer denies the allegations in paragraph 201 of the Complaint.

202.    Unilin Beheer denies the allegations in paragraph 202 of the Complaint.

203.    Unilin Beheer denies the allegations in paragraph 203 of the Complaint.

204.    Unilin Beheer denies the allegations in paragraph 204 of the Complaint.

205.    Unilin Beheer denies the allegations in paragraph 205 of the Complaint.

206.    Unilin Beheer denies the allegations in paragraph 206 of the Complaint.

207.    Unilin Beheer denies the allegations in paragraph 207 of the Complaint.

208.    Unilin Beheer denies the allegations in paragraph 208 of the Complaint.

209.    Unilin Beheer denies the allegations in paragraph 209 of the Complaint.

210.    Unilin Beheer denies the allegations in paragraph 210 of the Complaint.

211.    Unilin Beheer denies the allegations in paragraph 211 of the Complaint.

212.    Unilin Beheer denies the allegations in paragraph 212 of the Complaint.

213.    Unilin Beheer denies the allegations in paragraph 213 of the Complaint.

214.    Unilin Beheer denies the allegations in paragraph 214 of the Complaint.

**COUNT X**
**(INTERFERENCE PURSUANT TO 35 U.S.C. § 291)**

215.    Unilin Beheer incorporates by reference its responses to Paragraphs 1-63 of the Complaint.  Unilin Beheer denies the remaining allegations in paragraph 215 of the Complaint.

216.    Unilin Beheer denies the allegations in paragraph 216 of the Complaint.

217.    Unilin Beheer denies the allegations in paragraph 217 of the Complaint.

218.    Unilin Beheer denies the allegations in paragraph 218 of the Complaint.

219.    Unilin Beheer denies the allegations in paragraph 219 of the Complaint.

220.    Unilin Beheer denies the allegations in paragraph 220 of the Complaint.

221.    Unilin Beheer denies the allegations in paragraph 221 of the Complaint.

222.    Unilin Beheer denies the allegations in paragraph 222 of the Complaint.

223.    Unilin Beheer denies the allegations in paragraph 223 of the Complaint.

**COUNT XI**
**(INTERFERENCE PURSUANT TO 35 U.S.C. § 291)**

224.    Unilin Beheer incorporates by reference its responses to Paragraphs 1-63 of the Complaint.  Unilin Beheer denies the remaining allegations in paragraph 224 of the Complaint.

225.    Unilin Beheer denies the allegations in paragraph 225 of the Complaint.

226.    Unilin Beheer denies the allegations in paragraph 226 of the Complaint.

227.    Unilin Beheer denies the allegations in paragraph 227 of the Complaint.

228.    Unilin Beheer denies the allegations in paragraph 228 of the Complaint.

229.    Unilin Beheer denies the allegations in paragraph 229 of the Complaint.

230.    Unilin Beheer denies the allegations in paragraph 230 of the Complaint.

231.    Unilin Beheer denies the allegations in paragraph 231 of the Complaint.

232.    Unilin Beheer denies the allegations in paragraph 232 of the Complaint.

**COUNT XII**
**(INTERFERENCE PURSUANT TO 35 U.S.C. § 291)**

233.    Unilin Beheer incorporates by reference its responses to Paragraphs 1-63 of the Complaint.  Unilin Beheer denies the remaining allegations in paragraph 233 of the Complaint.

234.    Unilin Beheer denies the allegations in paragraph 234 of the Complaint.

235.    Unilin Beheer denies the allegations in paragraph 235 of the Complaint.

236.    Unilin Beheer denies the allegations in paragraph 236 of the Complaint.

237.    Unilin Beheer denies the allegations in paragraph 237 of the Complaint.

238.    Unilin Beheer denies the allegations in paragraph 238 of the Complaint.

239.    Unilin Beheer denies the allegations in paragraph 239 of the Complaint.

240.    Unilin Beheer denies the allegations in paragraph 240 of the Complaint.

241.    Unilin Beheer denies the allegations in paragraph 241 of the Complaint.

## COUNT XIII
## (INTERFERENCE PURSUANT TO 35 U.S.C. § 291)

242.    Unilin Beheer incorporates by reference its responses to Paragraphs 1-63 of the Complaint.  Unilin Beheer denies the remaining allegations in paragraph 242 of the Complaint.

243.    Unilin Beheer denies the allegations in paragraph 243 of the Complaint.

244.    Unilin Beheer denies the allegations in paragraph 244 of the Complaint.

245.    Unilin Beheer denies the allegations in paragraph 245 of the Complaint.

246.    Unilin Beheer denies the allegations in paragraph 246 of the Complaint.

247.    Unilin Beheer denies the allegations in paragraph 247 of the Complaint.

248.    Unilin Beheer denies the allegations in paragraph 248 of the Complaint.

249.    Unilin Beheer denies the allegations in paragraph 249 of the Complaint.

250.    Unilin Beheer denies the allegations in paragraph 250 of the Complaint.

## COUNT XIV
## (INTERFERENCE PURSUANT TO 35 U.S.C. § 291)

251.    Unilin Beheer incorporates by reference its responses to Paragraphs 1-63 of the Complaint.  Unilin Beheer denies the remaining allegations in paragraph 251 of the Complaint.

252.    Unilin Beheer denies the allegations in paragraph 252 of the Complaint.

253.    Unilin Beheer denies the allegations in paragraph 253 of the Complaint.

254.    Unilin Beheer denies the allegations in paragraph 254 of the Complaint.

255.    Unilin Beheer denies the allegations in paragraph 255 of the Complaint.

256.    Unilin Beheer denies the allegations in paragraph 256 of the Complaint.

257.    Unilin Beheer denies the allegations in paragraph 257 of the Complaint.

258.    Unilin Beheer denies the allegations in paragraph 258 of the Complaint.

259.    Unilin Beheer denies the allegations in paragraph 259 of the Complaint.

260.    Unilin Beheer denies the allegations in paragraph 260 of the Complaint.

261.    Unilin Beheer denies the allegations in paragraph 261 of the Complaint.

262.    Unilin Beheer denies the allegations in paragraph 262 of the Complaint.

263.    Unilin Beheer denies the allegations in paragraph 263 of the Complaint.

264.    Unilin Beheer denies the allegations in paragraph 264 of the Complaint.

265.    Unilin Beheer denies the allegations in paragraph 265 of the Complaint.

266.    Unilin Beheer denies the allegations in paragraph 266 of the Complaint.

267.    Unilin Beheer denies the allegations in paragraph 267 of the Complaint.

268.    Unilin Beheer denies the allegations in paragraph 268 of the Complaint.

269.    Unilin Beheer denies the allegations in paragraph 269 of the Complaint.

270.    Unilin Beheer denies the allegations in paragraph 270 of the Complaint.

271.    Unilin Beheer denies the allegations in paragraph 271 of the Complaint.

272.    Unilin Beheer denies the allegations in paragraph 272 of the Complaint.

273.    Unilin Beheer denies the allegations in paragraph 273 of the Complaint.

274.    Unilin Beheer denies the allegations in paragraph 274 of the Complaint.

275.    Unilin Beheer denies the allegations in paragraph 275 of the Complaint.

276.    Unilin Beheer denies the allegations in paragraph 276 of the Complaint.

277.    Unilin Beheer denies the allegations in paragraph 277 of the Complaint.

278.    Unilin Beheer denies the allegations in paragraph 278 of the Complaint.

279.    Unilin Beheer denies the allegations in paragraph 279 of the Complaint.

**COUNT XV**
**(INTERFERENCE PURSUANT TO 35 U.S.C. § 291)**

280.    Unilin Beheer incorporates by reference its responses to Paragraphs 1-63 of the Complaint.  Unilin Beheer denies the remaining allegations in paragraph 280 of the Complaint.

281.    Unilin Beheer denies the allegations in paragraph 281 of the Complaint.

282.    Unilin Beheer denies the allegations in paragraph 282 of the Complaint.

283.    Unilin Beheer denies the allegations in paragraph 283 of the Complaint.

284.    Unilin Beheer denies the allegations in paragraph 284 of the Complaint.

285.    Unilin Beheer denies the allegations in paragraph 285 of the Complaint.

286.    Unilin Beheer denies the allegations in paragraph 286 of the Complaint.

287.    Unilin Beheer denies the allegations in paragraph 287 of the Complaint.

288.    Unilin Beheer denies the allegations in paragraph 288 of the Complaint.

289.    Unilin Beheer denies the allegations in paragraph 289 of the Complaint.

290.    Unilin Beheer denies the allegations in paragraph 290 of the Complaint.

291.    Unilin Beheer denies the allegations in paragraph 291 of the Complaint.

292.    Unilin Beheer denies the allegations in paragraph 292 of the Complaint.

293.    Unilin Beheer denies the allegations in paragraph 293 of the Complaint.

294.    Unilin Beheer denies the allegations in paragraph 294 of the Complaint.

295.    Unilin Beheer denies the allegations in paragraph 295 of the Complaint.

296.    Unilin Beheer denies the allegations in paragraph 296 of the Complaint.

297.    Unilin Beheer denies the allegations in paragraph 297 of the Complaint.

298.    Unilin Beheer denies the allegations in paragraph 298 of the Complaint.

299.    Unilin Beheer denies the allegations in paragraph 299 of the Complaint.

300.    Unilin Beheer denies the allegations in paragraph 300 of the Complaint.

301.    Unilin Beheer denies the allegations in paragraph 301 of the Complaint.

302.    Unilin Beheer denies the allegations in paragraph 302 of the Complaint.

303.    Unilin Beheer denies the allegations in paragraph 303 of the Complaint.

304.    Unilin Beheer denies the allegations in paragraph 304 of the Complaint.

305.    Unilin Beheer denies the allegations in paragraph 305 of the Complaint.

306.    Unilin Beheer denies the allegations in paragraph 306 of the Complaint.

307.    Unilin Beheer denies the allegations in paragraph 307 of the Complaint.

308.    Unilin Beheer denies the allegations in paragraph 308 of the Complaint.

309.    Unilin Beheer denies the allegations in paragraph 309 of the Complaint.

310.    Unilin Beheer denies the allegations in paragraph 310 of the Complaint.

311.    Unilin Beheer denies the allegations in paragraph 311 of the Complaint.

312.    Unilin Beheer denies the allegations in paragraph 312 of the Complaint.

313.    Unilin Beheer denies the allegations in paragraph 313 of the Complaint.

314.    Unilin Beheer denies the allegations in paragraph 314 of the Complaint.

315.    Unilin Beheer denies the allegations in paragraph 315 of the Complaint.

316.    Unilin Beheer denies the allegations in paragraph 316 of the Complaint.

317.    Unilin Beheer denies the allegations in paragraph 317 of the Complaint.

318.    Unilin Beheer denies the allegations in paragraph 318 of the Complaint.

319.    Unilin Beheer denies the allegations in paragraph 319 of the Complaint.

320.    Unilin Beheer denies the allegations in paragraph 320 of the Complaint.

321.    Unilin Beheer denies the allegations in paragraph 321 of the Complaint.

322.    Unilin Beheer denies the allegations in paragraph 322 of the Complaint.

## COUNT XVI
## (INTERFERENCE PURSUANT TO 35 U.S.C. § 291)

323.    Unilin Beheer incorporates by reference its responses to Paragraphs 1-63 of the Complaint.  Unilin Beheer denies the remaining allegations in paragraph 323 of the Complaint.

324.    Unilin Beheer denies the allegations in paragraph 324 of the Complaint.

325.    Unilin Beheer denies the allegations in paragraph 325 of the Complaint.

326.    Unilin Beheer denies the allegations in paragraph 326 of the Complaint.

327.    Unilin Beheer denies the allegations in paragraph 327 of the Complaint.

328.    Unilin Beheer denies the allegations in paragraph 328 of the Complaint.

329.    Unilin Beheer denies the allegations in paragraph 329 of the Complaint.

330.    Unilin Beheer denies the allegations in paragraph 330 of the Complaint.

331.    Unilin Beheer denies the allegations in paragraph 331 of the Complaint.

332.    Unilin Beheer denies the allegations in paragraph 332 of the Complaint.

333.    Unilin Beheer denies the allegations in paragraph 333 of the Complaint.

334.    Unilin Beheer denies the allegations in paragraph 334 of the Complaint.

335.    Unilin Beheer denies the allegations in paragraph 335 of the Complaint.

336.    Unilin Beheer denies the allegations in paragraph 336 of the Complaint.

337.    Unilin Beheer denies the allegations in paragraph 337 of the Complaint.

338.    Unilin Beheer denies the allegations in paragraph 338 of the Complaint.

339.    Unilin Beheer denies the allegations in paragraph 339 of the Complaint.

340.    Unilin Beheer denies the allegations in paragraph 340 of the Complaint.

341.    Unilin Beheer denies the allegations in paragraph 341 of the Complaint.

342.    Unilin Beheer denies the allegations in paragraph 342 of the Complaint.

343.    Unilin Beheer denies the allegations in paragraph 343 of the Complaint.

344.    Unilin Beheer denies the allegations in paragraph 344 of the Complaint.

345.    Unilin Beheer denies the allegations in paragraph 345 of the Complaint.

346.    Unilin Beheer denies the allegations in paragraph 346 of the Complaint.

347.    Unilin Beheer denies the allegations in paragraph 347 of the Complaint.

348.    Unilin Beheer denies the allegations in paragraph 348 of the Complaint.

349.    Unilin Beheer denies the allegations in paragraph 349 of the Complaint.

## COUNT XVII
### (INTERFERENCE PURSUANT TO 35 U.S.C. § 291)

350.    Unilin Beheer incorporates by reference its responses to Paragraphs 1-63 of the Complaint.  Unilin Beheer denies the remaining allegations in paragraph 350 of the Complaint.

351.    Unilin Beheer denies the allegations in paragraph 351 of the Complaint.

352.    Unilin Beheer denies the allegations in paragraph 352 of the Complaint.

353.    Unilin Beheer denies the allegations in paragraph 353 of the Complaint.

## COUNT XVIII
### (INTERFERENCE PURSUANT TO 35 U.S.C. § 291)

354.    Unilin Beheer incorporates by reference its responses to Paragraphs 1-63 of the Complaint.  Unilin Beheer denies the remaining allegations in paragraph 354 of the Complaint.

355.    Unilin Beheer denies the allegations in paragraph 355 of the Complaint.

356.    Unilin Beheer denies the allegations in paragraph 356 of the Complaint.

357.    Unilin Beheer denies the allegations in paragraph 357 of the Complaint.

358.    Unilin Beheer denies the allegations in paragraph 358 of the Complaint.

359.    Unilin Beheer denies the allegations in paragraph 359 of the Complaint.

## COUNT XIX
## (INTERFERENCE PURSUANT TO 35 U.S.C. § 291)

360.    Unilin Beheer incorporates by reference its responses to Paragraphs 1-63 of the Complaint.  Unilin Beheer denies the remaining allegations in paragraph 360 of the Complaint.

361.    Unilin Beheer denies the allegations in paragraph 361 of the Complaint.

362.    Unilin Beheer denies the allegations in paragraph 362 of the Complaint.

363.    Unilin Beheer denies the allegations in paragraph 363 of the Complaint.

364.    Unilin Beheer denies the allegations in paragraph 364 of the Complaint.

365.    Unilin Beheer denies the allegations in paragraph 365 of the Complaint.

366.    Unilin Beheer denies the allegations in paragraph 366 of the Complaint.

367.    Unilin Beheer denies the allegations in paragraph 367 of the Complaint.

368.    Unilin Beheer denies the allegations in paragraph 368 of the Complaint.

369.    Unilin Beheer denies the allegations in paragraph 369 of the Complaint.

370.    Unilin Beheer denies the allegations in paragraph 370 of the Complaint.

## **AFFIRMATIVE DEFENSES**

### **First Affirmative Defense**
### **(No interference-in-fact)**

No interference-in-fact exists between the claims alleged to interfere in Counts I to XIX of the Complaint.

## Second Affirmative Defense
### (Priority)

The claims of the '486, '836, '292, '779, '020, '877, '068 and '536 patents that are alleged to interfere are entitled to an earlier priority than the claims asserted by Pergo in Counts I to XIX of the Complaint.

## Third Affirmative Defense
### (Invalidity)

There can be no interference because the claims of the '778, '547, '683 and '970 patents are invalid for, *inter alia*, failure to comply with the conditions of patentability as specified in Title 35 U.S.C. §§ 101, *et seq.*, including but not limited to 35 U.S.C. §§ 101, 102, 103, 112, and/or 116.

## Fourth Affirmative Defense
### (Failure To State A Claim)

Counts I through XIX of the Complaint fail to state a claim on which relief can be granted.

## Fifth Affirmative Defense
### (Inequitable Conduct: '778 and '547 Patents)

There can be no interference with the asserted claims of the '778 and '547 patents because the '778 and '547 patents are unenforceable for at least the reason that the applicant and/or other individuals associated with the filing or prosecution of the '778 and '547 patents repeatedly, and with deceptive intent, failed to disclose to the PTO under 37 C.F.R. § 1.56 information known to be material to the patentability of claims pending during prosecution of the '778 and '547 patents, including at least information concerning the Pervan patent applications, the Piodi and Aoki patent references, the Pervan ITC litigation and Pergo's European opposition against Pervan, as set forth below:

a.        The PCT patent application that issued as the '778 patent was filed on February 29, 1996, and claims priority to a Swedish patent application, N. 09500810, filed on March 7, 1995. On its face the '778 patent lists the issue date as August 15, 2000.

b.        The U.S. patent application that issued as the '547 patent was filed on August 10, 2000. The '547 patent is a continuation of the '778 patent and claims the same priority as the '778 patent. On its face the '547 patent lists the issue date as June 4, 2002.

c.        Upon information and belief, on or about November, 1994, Plaintiffs' in-house patent counsel, Yngve Stenberg, among others, became aware of the existence of PCT patent application No. PCT/SE94/00386, naming Tony Pervan as inventor ("the Pervan PCT application") (Exhibit A), as well as Mr. Pervan's related Swedish patent application, No. 9301595-6, (the "Pervan Swedish application") (Exhibit B).

d.        The Pervan patent applications show and describe a glueless mechanically locking system for laminate flooring panels. On or about November, 1994, Mr. Pervan and/or his father, Darko Pervan, disclosed the patent applications to Plaintiffs, including Mr. Stenberg, in connection with a potential relationship for the manufacture of mechanically locking laminate flooring panels.

e.        The Pervan PCT application was published on November 24, 1994, and prior to the earliest priority date claimed for the '778 and '547 patents, March 7, 1995.

f.        The Pervan Swedish Application was published on October 17, 1994, and prior to the earliest priority date claimed for the '778 and '547 patents, March 7, 1995.

g.        Mr. Stenberg participated in and/or was associated with the filing and/or prosecution of the '778 and '547 patents.

h.        Mr. Stenberg had a duty to disclose material prior art to the PTO in connection with the '778 and '547 patent application.

i.        Mr. Stenberg never disclosed the Pervan PCT application or the Pervan Swedish application to the PTO during prosecution of the '778 and '547 patents.

j.        A reasonable patent examiner would have considered the Pervan PCT application and Pervan Swedish application to be material to the prosecution of the '778 and '547 patents.

k.        For example, the Pervan PCT application and Pervan Swedish application are among the prior art used by the jury to invalidate the asserted claims of the '547 patent in the co-pending Eastern District of Wisconsin litigation, No. 02-cv-00736-JPS ("the Wisconsin Litigation").

l.        Also, Plaintiffs have alleged infringement of the '547 patent by laminate flooring products developed by Pervan and licensed under the Pervan patent applications and counterpart U.S. patents, including asserting that such products have a "tight joint" as recited in the '547 and '970 patent claims.  Plaintiffs made these allegations in the Wisconsin Litigation, asserting the '547 and '970 patents against Alloc, Inc., Armstrong World Industries and Berry Finance N.V. (collectively "Alloc").

m.        On or about December, 2000, Alloc filed a Complaint in the International Trade Commission ("the Pervan ITC Litigation") alleging that Pergo, Inc., a subsidiary of Pergo AB, infringed the Pervan U.S. patents by importation of mechanically locking laminate flooring products.

n.     The Pervan ITC Litigation included a week-long trial in July 2001, which was attended by Mr. Stenberg as well as Plaintiff's outside patent counsel, Mr. Thomas Pavelko of Steven, Davis, Miller & Mosher LLP.

o.     Mr. Pavelko prosecuted the '547 and '970 patents before the PTO.

p.     Mr. Pavelko had a duty to disclose material information to the PTO in connection with the prosecution of the '547 and/or '970 patents.

q.     Following trial, the International Trade Commission issued a final determination in May 2002, and the U.S. Court of Appeals for the Federal Circuit issued a decision on appeal in September 2003.

r.     Mssrs. Stenberg and Pavelko had an obligation to disclose the Pervan ITC Litigation and related rulings to the PTO during the pendency of the application leading to the '547 and '970 patents.  MPEP § 2001.06(c).

s.     In May 2001, just before trial in the Pervan ITC Litigation, Pergo submitted an extensive list of prior art that it intended to rely upon at trial.  This list, entitled "Respondent Pergo, Inc.'s Identification of Prior Art" (Exhibit C), included the Pervan PCT and Swedish patent applications.

t.     The document entitled "Respondent Pergo, Inc.'s Identification of Prior Art" was never disclosed to the PTO while the patent applications that issued as the '547 and '970 patents were pending before the PTO.

u.     By at least May, 2001, Plaintiffs were aware of two additional prior art patents that were not disclosed to the PTO.

v.        The document entitled "Respondent Pergo, Inc.'s Identification of Prior Art" lists two prior art patents: GB 812,671 ("Piodi") (Exhibit D), and JP 6-320510 ("Aoki") (Exhibit E).

w.        Piodi is prior art to the '547 patent because it was published April 29, 1959, well prior to the earliest priority date claimed for the '547 patent, March 7, 1995.

x.        Aoki was published November 22, 1994, and is also prior art.

y.        The Piodi and Aoki references are among the prior art relied upon by the jury in the Wisconsin Litigation to invalidate the '547 patent.

z.        In addition, the Piodi reference was cited as prior art in the closely related and co-pending '970 patent application.

aa.        During prosecution of the '547 patent, Mr. Pavelko did not disclose the Piodi reference or any office actions from the co-pending '970 patent application to the Examiner or to anyone else at the PTO.

bb.        In addition, Mssrs. Stenberg and Pavelko, and other representatives of Plaintiffs, attended the Pervan ITC Litigation trial, where the Piodi reference, in particular, was extensively discussed.

cc.        Plaintiffs did not disclose Piodi or Aoki during prosecution of the '547 patent.

dd.        On June 28, 2000, only a few months before Pergo filed the applications which eventually issued as the '547 and '970 patents, Pergo filed a Notice of Opposition to Pervan's European patent, EP 0855842 (Exhibit F), which claims priority to the Pervan PCT and Swedish applications.

ee.      Yngve Stenberg was aware of Pergo's Opposition to the Pervan European patent at least as early as June 28, 2000.

ff.      In the Notice of Opposition, Pergo argued that the claims of the Pervan European patent are invalid on the basis of several prior art references, including DE 1212275, the German counterpart of the Piodi reference.

gg.      With regard to Piodi, the Notice of Opposition states that:

[Piodi] describes such a snap-in connection in which the receiving recess spreads to allow the passage of a barbed connection tongue into the recess.

(Exhibit F at AL 5405.)

hh.      Mr. Stenberg did not provide a copy of Pergo's Notice of Opposition to the PTO during prosecution of the '547 patent.  Nor did he provide the PTO a copy of the German Piodi reference cited in Pergo's Notice of Opposition.

## Sixth Affirmative Defense
### (Inequitable Conduct: '683 and '970 Patents)

There can be no interference with the asserted claims of the '683 and '970 patents because the '683 and '970 patents are unenforceable for at least the reason that the applicant and/or other individuals associated with the filing or prosecution of the '683 and '970 patents repeatedly, and with deceptive intent, failed to disclose to the PTO under 37 C.F.R. § 1.56 information known to be material to the patentability of claims pending during prosecution of the '683 and '970 patents, including at least information concerning the Pervan patent applications, the Piodi patent reference, the Pervan ITC litigation and Pergo's European opposition against Pervan, as set forth below:

Unilin Flooring realleges and incorporates herein by reference the factual allegations set forth in the Seventh Affirmative Defense above (¶¶ a-hh).

a.    The patent application that matured into the '683 patent was filed on August 11, 2000, and claims priority at least in part to a Swedish patent application, No. 9500810, filed on March 7, 1995. On its face the '683 patent lists the issue date as July 16, 2002.

b.    The patent application that matured into the '970 patent was filed on November 6, 2000, and claims priority at least in part to a Swedish patent application, No. 9500810, filed on March 7, 1995. On its face the '970 patent lists the issue date as July 23, 2002.

c.    Mr. Yngve Stenberg, Plaintiffs' in-house patent counsel, and Mr. Thomas Pavelko of Steven, Davis, Miller & Mosher LLP, were associated with filing and prosecution of the '683 and '970 patents.

d.    Mr. Pavelko had a duty to disclose material information to the PTO in connection with the prosecution of the '683 and/or '970 patents.

e.    Mr. Stenberg also had a duty to disclose material information to the PTO in connection with the prosecution of the '683 and/or '970 patents.

f.    During the pendency of the applications that matured to the '683 and '970 patents, Mssrs. Stenberg and Pavelko never disclosed the highly material Pervan PCT or Pervan Swedish applications to the PTO.

g.    Mssrs. Stenberg and Pavelko also failed to disclose the Pervan ITC Litigation and related rulings to the Examiner during the pendency of the applications leading to the '683 and '970 patents. MPEP § 2001.06(c).

h.    In addition, during prosecution of the '683 and '970 patent applications, Mssrs. Stenberg and Pavelko never cited to the PTO the prior art Aoki patent, JP 6-

320510, which was identified in the document entitled "Respondent Pergo, Inc.'s Identification of Prior Art" that Pergo filed in the Pervan ITC Litigation.

      i.      Upon information and belief, during development of the subject matter of at least claim 1 of the '683 patent and claims 1 and 4 of the '970 patent, the first named inventor, Goran Mårtensson, became aware of the existence of a flooring product named "Celleten."

      j.      Claim 1 of the '683 patent and claims 1 and 4 of the '970 patent require a "tight joint."

      k.      "Celleten" was made from plastic material integrated with wood particles.

      l.      During the Wisconsin Litigation, Mr. Mårtensson testified that he discovered that "Celleten" was the best way to make a tight joint. In fact, Mr. Mårtensson said on the record at trial many times that Celleten was superior to other materials he had used, for a variety of reasons such as strength, water resistance, and "snapping."

      m.      Mr. Mårtensson also testified that Pergo hired the developer of "Celleten", Mr. Raimo Wuorela, to work with Mr. Mårtensson on the development of the laminate flooring joint that was claimed in the '970 patent.

      n.      In view of the overwhelming record evidence that Mr. Mårtensson believed "Celleten" was the best material for making and using his invention, the jury in the Wisconsin Litigation found claims 1 and 4 of the '970 patent invalid for failure to disclose "Celleten" as the best mode.

      o.      Mr. Mårtensson had a duty under 37 C.F.R. § 1.56 to disclose the highly material "Celleten" product to the PTO during pendency of the '683 and '970 patents.

However, with intent to deceive, Mr. Mårtensson withheld from the Examiner his knowledge of "Celleten," and any patents or publications by Mr. Wuorela, the developer of "Celleten."

**Seventh Affirmative Defense**

**(Laches and Equitable Estoppel)**

Plaintiffs' claims of interference are barred in whole or part by laches and/or the doctrine of equitable estoppel from claiming that an interference exists between the '778, '547, '683 and '970 patents and any of the Unilin patents.

**COUNTERCLAIM FOR DECLARATORY JUDGMENT**

371.    As and for its Counterclaim against Plaintiff and Counterclaim Defendant Pergo, Defendant and Counterclaim Plaintiff Unilin Beheer alleges:

372.    Unilin Beheer is a Dutch corporation with its principal place of business at Hoogeveenenweg 28, 2913 LV Nieuwerkerk Ad Ijssel, Netherlands.

373.    Upon information and belief, Counterclaim Defendant Pergo (Europe) AB is a corporation organized and existing under the laws of Sweden and having its principal place of business in Trelleborg, Sweden.

374.    Upon information and belief, Counterclaim Defendant Pergo (Europe) AB owns the '778, '547, '683 and '970 patents.

375.    This Counterclaim arises under the Declaratory Judgment Act and the Patent Laws of the United States, more particularly under 28 U.S.C. §§ 2201 and 2202 and 35 U.S.C. §§ 100 et seq., respectively.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1338 and 2201.

376.    An actual and justiciable controversy exists between Counterclaim Plaintiff Unilin Beheer, on the one hand, and Counterclaim Defendant Pergo, on the other hand,

as to the subject matter, validity and enforceability of the '778, '547, '683 and '970 patents, as evidenced, *inter alia*, by the Complaint and Answer in this action.

## COUNT I
### (Invalidity of the '778 Patent)

377.    Unilin Flooring realleges and incorporates herein by reference the Paragraphs 371 through 376 as set forth above.

378.    There can be no interference with the asserted claims of the '778 patent because the '778 patent is invalid for failure to comply with the requirements of Title 35 of the United States Code, including without limitation, sections 101, 102, 103 and/or 112.

## COUNT II
### (Invalidity of the '547 Patent)

379.    Unilin Flooring realleges and incorporates herein by reference the Paragraphs 371 through 376 as set forth above.

380.    There can be no interference with the asserted claims of the '547 patent because the '547 patent is invalid for nonjoinder of inventorship and/or failure to comply with the requirements of Title 35 of the United States Code, including without limitation, sections 101, 102, 103, 112 and/or 116.

381.    Claims 1 and 32 of the '547 patent have been found invalid by the jury in the Alloc litigation on December 12, 2007.

## COUNT III
### (Invalidity of the '683 Patent)

382.    Unilin Flooring realleges and incorporates herein by reference the Paragraphs 371 through 376 as set forth above.

383.    There can be no interference with the asserted claims of the '683 patent because the '683 patent is invalid for nonjoinder of inventorship and/or failure to comply with

the requirements of Title 35 of the United States Code, including without limitation, sections 101, 102, 103, 112 and/or 116.

## COUNT IV
### (Invalidity of the '970 Patent)

384.    Unilin Flooring realleges and incorporates herein by reference the Paragraphs 371 through 376 as set forth above.

385.    There can be no interference with the asserted claims of the '970 patent because the '970 patent is invalid for failure to comply with the requirements of Title 35 of the United States Code, including without limitation, sections 101, 102, 103 and/or 112.

386.    Claims 1, 4, 7, 10, 11 and 12 of the '970 patent have been found invalid by the jury in the Alloc litigation on December 12, 2007.

## COUNT V
### (Unenforceability of the Martensson '778 Patent)

387.    Unilin Flooring realleges and incorporates herein by reference the Paragraphs 371 through 376 as set forth above.

388.    There can be no interference with the asserted claims of the '778 patent because, on information and belief, the '778 Patent is unenforceable for at least the reason that the applicant, and/or other individuals associated with the filing and prosecution of the application leading to the '778 patent, failed to disclose certain prior art references, which were material to patentability under 37 C.F.R. § 1.56, as set forth in the Fifth Affirmative Defense, above, incorporated herein by reference (¶¶ a-gg).

## COUNT VI
### (Unenforceability of the Martensson '547 Patent)

389.    Unilin Flooring realleges and incorporates herein by reference the Paragraphs 371 through 376 as set forth above.

390. There can be no interference with the asserted claims of the '547 patent because, on information and belief, the '547 Patent is unenforceable for at least the reason that the applicant, and/or other individuals associated with the filing and prosecution of the application leading to the '547 patent, failed to disclose certain prior art references, which were material to patentability under 37 C.F.R. § 1.56, as set forth in the Fifth Affirmative Defense, above, incorporated herein by reference (¶¶ a-hh).

## COUNT VII
### (Unenforceability of the Martensson '683 Patent)

391. Unilin Flooring realleges and incorporates herein by reference the Paragraphs 371 through 376 as set forth above.

392. There can be no interference with the asserted claims of the '683 patent because, on information and belief, the '683 patent is unenforceable for at least the reason that the applicant, and/or other individuals associated with the filing and prosecution of the application leading to the '683 patent, failed to disclose certain prior art references, which were material to patentability under 37 C.F.R. § 1.56, as set forth in the Sixth Affirmative Defense, above, incorporated herein by reference (¶¶ a-o).

## COUNT VIII
### (Unenforceability of the Martensson '970 Patent)

393. Unilin Flooring realleges and incorporates herein by reference the Paragraphs 371 through 376 as set forth above.

394. There can be no interference with the asserted claims of the '970 patent because, on information and belief, the '970 patent is unenforceable for at least the reason that the applicant, and/or other individuals associated with the filing and prosecution of the application leading to the '970 patent, failed to disclose certain prior art references, which were

material to patentability under 37 C.F.R. § 1.56, as set forth in the Sixth Affirmative Defense, above, incorporated herein by reference (¶¶ a-o).

WHEREFORE, Counterclaim Plaintiff Unilin Flooring requests that the Court deny the relief requested by Counterclaim Defendants Pergo in the Complaint and enter judgment against Counterclaim Defendants as follows:

(i)     Dismissing the Complaint with prejudice;

(ii)    Declaring that the claims of the '778, '547, '683 and '970 patents are invalid;

(iii)   Declaring the claims of the '778, '547, '683 and '970 patents unenforceable;

(iv)    Declaring that no interference-in-fact exists between the '778, '547, '683 and '970 patents and the '486, '836, '292, '779, '020, '877, '068 and '536 patents;

(v)     Declaring the '486, '836, '292, '779, '020, '877, '068 and '536 patents valid over the '778, '547, '683 and '970 patents;

(vi)    Declaring this case exceptional under 35 U.S.C. § 285, and awarding Counterclaim Plaintiff Unilin Flooring its reasonable attorneys fees and expenses of this action;

(vii)   Awarding Counterclaim Plaintiff Unilin Flooring the costs of this action; and

(viii)  Awarding Counterclaim Plaintiff Unilin Flooring such other and further relief as this Court shall deem just and proper.

## JURY DEMAND

Unilin Beheer and Flooring Industries hereby demand trial by jury on all issues triable to a jury.

Respectfully submitted, this the 26th day of June, 2008.

/s/ David P. Murray
David P. Murray (D.C. Bar No. 401158)
WILLKIE FARR & GALLAGHER LLP
1875 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 303-1000
Facsimile: (202) 303-2000
E-mail: dmurray@willkie.com

John M. DiMatteo
Eugene L. Chang
Leslie M. Spencer
David D. Lee
Ketan Pastakia
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
jdimatteo@willkie.com
echang@willkie.com
lspencer@willkie.com
dlee1@willkie.com
kpastakia@willkie.com

**ATTORNEYS FOR DEFENDANT UNILIN BEHEER B.V.**

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of June, 2008, I caused a copy of the Answer of Defendant Unilin Beheer B.V. to be sent by hand and First Class Mail to the following persons:

> Richard L. Brusca
> SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
> 1440 New York Avenue, N.W.
> Washington, D.C. 20005

> By: /s/ David. P. Murray
>      For Defendant Unilin Beheer B.V.



**PCT**

WORLD INTELLECTUAL PROPERTY ORGANIZATION
International Bureau

INTERNATIONAL APPLICATION PUBLISHED UNDER THE PATENT COOPERATION TREATY (PCT)

| (51) International Patent Classification 5 : <br> E04F 15/14, 15/02, 13/08 | A1 | (11) International Publication Number: **WO 94/26999** <br> (43) International Publication Date: 24 November 1994 (24.11.94) |
|---|---|---|

(21) International Application Number: PCT/SE94/00386

(22) International Filing Date: 29 April 1994 (29.04.94)

(30) Priority Data:
9301595-6      10 May 1993 (10.05.93)      SE

(71) Applicant (for all designated States except US): VÄLINGE ALUMINIUM AB [SE/SE]; Vångavägen 48, S-260 40 Viken (SE).

(72) Inventor; and
(75) Inventor/Applicant (for US only): PERVAN, Tony [SE/SE]; Rådjursstigen 32, S-170 72 Solna (SE).

(74) Agent: AWAPATENT AB; P.O. Box 5117, S-200 71 Malmö (SE).

(81) Designated States: AT, AU, BB, BG, BR, BY, CA, CH, CN, CZ, DE, DK, ES, FI, GB, HU, JP, KG, KP, KR, KZ, LK, LU, LV, MD, MG, MN, MW, NL, NO, NZ, PL, PT, RO, RU, SD, SE, SK, TJ, UA, US, UZ, VN, European patent (AT, BE, CH, DE, DK, ES, FR, GB, GR, IE, IT, LU, MC, NL, PT, SE), OAPI patent (BF, BJ, CF, CG, CI, CM, GA, GN, ML, MR, NE, SN, TD, TG).

Published
*With international search report.*
*In English translation (filed in Swedish).*

(54) Title: SYSTEM FOR JOINING BUILDING BOARDS

(57) Abstract

The invention relates to a system for laying and mechanically joining building panels, especially thin, hard, floating floors. Adjacent joint edges (3, 4) of two panels (1, 2) engage each other to provide a first mechanical connection locking the joint edges (3, 4) in a first direction (D1) perpendicular to the principal plane of the panels. In each joint, there is further provided a strip (6) which is integrated with one joint edge (3) and which projects behind the other joint edge (4). The strip (6) has an upwardly protruding locking element (8) engaging in a locking groove (14) in the rear side (16) of the other joint edge (4) to form a second mechanical connection locking the panels (1, 2) in a second direction (D2) parallel to the principal plane of the panels and at right angles to the joint. Both the first and the second mechanical connections allow mutual displacement of joined panels (1, 2) in the direction of the joint.



## FOR THE PURPOSES OF INFORMATION ONLY

Codes used to identify States party to the PCT on the front pages of pamphlets publishing international applications under the PCT.

| | | | | | |
|---|---|---|---|---|---|
| AT | Austria | GB | United Kingdom | MR | Mauritania |
| AU | Australia | GE | Georgia | MW | Malawi |
| BB | Barbados | GN | Guinea | NE | Niger |
| BE | Belgium | GR | Greece | NL | Netherlands |
| BF | Burkina Faso | HU | Hungary | NO | Norway |
| BG | Bulgaria | IE | Ireland | NZ | New Zealand |
| BJ | Benin | IT | Italy | PL | Poland |
| BR | Brazil | JP | Japan | PT | Portugal |
| BY | Belarus | KE | Kenya | RO | Romania |
| CA | Canada | KG | Kyrgystan | RU | Russian Federation |
| CF | Central African Republic | KP | Democratic People's Republic | SD | Sudan |
| CG | Congo | | of Korea | SE | Sweden |
| CH | Switzerland | KR | Republic of Korea | SI | Slovenia |
| CI | Côte d'Ivoire | KZ | Kazakhstan | SK | Slovakia |
| CM | Cameroon | LI | Liechtenstein | SN | Senegal |
| CN | China | LK | Sri Lanka | TD | Chad |
| CS | Czechoslovakia | LU | Luxembourg | TG | Togo |
| CZ | Czech Republic | LV | Latvia | TJ | Tajikistan |
| DE | Germany | MC | Monaco | TT | Trinidad and Tobago |
| DK | Denmark | MD | Republic of Moldova | UA | Ukraine |
| ES | Spain | MG | Madagascar | US | United States of America |
| FI | Finland | ML | Mali | UZ | Uzbekistan |
| FR | France | MN | Mongolia | VN | Viet Nam |
| GA | Gabon | | | | |

WO 94/26999                                    PCT/SE94/00386

1

## SYSTEM FOR JOINING BUILDING BOARDS

### Technical Field

The invention generally relates to a system for pro-
viding a joint along adjacent joint edges of two building
panels, especially floor panels.

5      More specifically, the joint is of the type where
the adjacent joint edges together form a first mechanical
connection locking the joint edges to each other in
a first direction at right angles to the principal plane
of the panels, and where a locking device forms a second

10     mechanical connection locking the panels to each other in
a second direction parallel to the principal plane and at
right angles to the joint edges, the locking device com-
prising a locking groove which extends parallel to and
spaced from the joint edge of one of the panels, and said

15     locking groove being open at the rear side of this one
panel.

The invention is especially well suited for use in
joining floor panels, especially thin laminated floors.
Thus, the following description of the prior art and of

20     the objects and features of the invention will be focused
on this field of use. It should however be emphasised
that the invention is useful also for joining ordinary
wooden floors as well as other types of building panels,
such as wall panels and roof slabs.

25

### Background of the Invention

A joint of the aforementioned type is known e.g.
from SE 450,141. The first mechanical connection is
achieved by means of joint edges having tongues and

30     grooves. The locking device for the second mechanical
connection comprises two oblique locking grooves, one in
the rear side of each panel, and a plurality of spaced-
apart spring clips which are distributed along the joint

2

and the legs of which are pressed into the grooves, and
which are biased so as to tightly clamp the floor panels
together. Such a joining technique is especially useful
for joining thick floor panels to form surfaces of a con-
5    siderable expanse.

Thin floor panels of a thickness of about 7-10 mm,
especially laminated floors, have in a short time taken
a substantial share of the market. All thin floor panels
employed are laid as "floating floors" without being
10   attached to the supporting structure. As a rule, the
dimension of the floor panels is 200 x 1200 mm, and their
long and short sides are formed with tongues and grooves.
Traditionally, the floor is assembled by applying glue in
the groove and forcing the floor panels together. The
15   tongue is then glued in the groove of the other panel. As
a rule, a laminated floor consists of an upper decorative
wear layer of laminate having a thickness of about 1 mm,
an intermediate core of particle board or other board,
and a base layer to balance the construction. The core
20   has essentially poorer properties than the laminate, e.g.
in respect of hardness and water resistance, but it is
nonetheless needed primarily for providing a groove and
tongue for assemblage. This means that the overall
thickness must be at least about 7 mm. These known
25   laminated floors using glued tongue-and-groove joints
however suffer from several inconveniences.

First, the requirement of an overall thickness of at
least about 7 mm entails an undesirable restraint in con-
nection with the laying of the floor, since it is easier
30   to cope with low thresholds when using thin floor panels,
and doors must often be adjusted in height to come clear
of the floor laid. Moreover, manufacturing costs are
directly linked with the consumption of material.

Second, the core must be made of moisture-absorbent
35   material to permit using water-based glues when laying
the floor. Therefore, it is not possible to make the
floors thinner using so-called compact laminate, because

WO 94/26999

PCT/SE94/00386

3

of the absence of suitable gluing methods for such non-moisture-absorbent core materials.

Third, since the laminate layer of the laminated floors is highly wear-resistant, tool wear is a major
5    problem when working the surface in connection with the formation of the tongue.

Fourth, the strength of the joint, based on a glued tongue-and-groove connection, is restricted by the properties of the core and of the glue as well as by the
10   depth and height of the groove. The laying quality is entirely dependent on the gluing. In the event of poor gluing, the joint will open as a result of the tensile stresses which occur e.g. in connection with a change in air humidity.

15   Fifth, laying a floor with glued tongue-and-groove joints is time-consuming, in that glue must be applied to every panel on both the long and short sides thereof.

Sixth, it is not possible to disassemble a glued floor once laid, without having to break up the joints.
20   Floor panels that have been taken up cannot therefore be used again. This is a drawback particularly in rental houses where the flat concerned must be put back into the initial state of occupancy. Nor can damaged or worn-out panels be replaced without extensive efforts, which would
25   be particularly desirable on public premises and other areas where parts of the floor are subjected to great wear.

Seventh, known laminated floors are not suited for such use as involves a considerable risk of moisture
30   penetrating down into the moisture-sensitive core.

Eighth, present-day hard, floating floors require, prior to laying the floor panels on hard subfloors, the laying of a separate underlay of floor board, felt, foam or the like, which is to damp impact sounds and to make
35   the floor more pleasant to walk on. The placement of the underlay is a complicated operation, since the underlay

WO 94/26999                                                              PCT/SE94/00386

4

must be placed in edge-to-edge fashion. Different under-
lays affect the properties of the floor.

There is thus a strongly-felt need to overcome the
above-mentioned drawbacks of the prior art. It is however
5   not possible simply to use the known joining technique
with glued tongues and grooves for very thin floors, e.g.
with floor thicknesses of about 3 mm, since a joint based
on a tongue-and-groove connection would not be suffi-
ciently strong and practically impossible to produce for
10  such thin floors. Nor are any other known joining tech-
niques usable for such thin floors. Another reason why
the making of thin floors from e.g. compact laminate
involves problems is the thickness tolerances of the
panels, being about 0.2-0.3 mm for a panel thickness of
15  about 3 mm. A 3-mm compact laminate panel having such a
thickness tolerance would have, if ground to uniform
thickness on its rear side, an unsymmetrical design,
entailing the risk of bulging. Moreover, if the panels
have different thicknesses, this also means that the
20  joint will be subjected to excessive load.

Nor is it possible to overcome the above-mentioned
problems by using double-adhesive tape or the like on
the undersides of the panels, since such a connection
catches directly and does not allow for subsequent
25  adjustment of the panels as is the case with ordinary
gluing.

Using U-shaped clips of the type disclosed in the
above-mentioned SE 450,141, or similar techniques, to
overcome the drawbacks discussed above is no viable
30  alternative either. Especially, biased clips of this type
cannot be used for joining panels of such a small thick-
ness as 3 mm. Normally, it is not possible to disassemble
the floor panels without having access to their
undersides. This known technology relying on clips suf-
35  fers from the additional drawbacks:
-    Subsequent adjustment of the panels in their longi-
     tudinal direction is a complicated operation in con-

5

nection with laying, since the clips urge the panels
tightly against each other.

- Floor laying using clips is time-consuming.

5
- This technique is usable only in those cases where
the floor panels are resting on underlying joists
with the clips placed therebetween. For thin floors
to be laid on a continuous, flat supporting struc-
ture, such clips cannot be used.

10
- The floor panels can be joined together only at
their long sides. No clip connection is provided
on the short sides.


Technical Problems and Objects of the Invention

A main object of the invention therefore is to pro-
15    vide a system for joining together building panels, espe-
cially floor panels for hard, floating floors, which
allows using floor panels of a smaller overall thickness
than present-day floor panels.

A particular object of the invention is to provide a
20    panel-joining system which

- makes it possible in a simple, cheap and rational
way to provide a joint between floor panels without
requiring the use of glue, especially a joint based
primarily only on mechanical connections between the

25    panels;

- can be used for joining floor panels which have a
smaller thickness than present-day laminated floors
and which have, because of the use of a different
core material, superior properties than present-day

30    floors even at a thickness of 3 mm;

- makes it possible between thin floor panels to pro-
vide a joint that eliminates any unevennesses in the
joint because of thickness tolerances of the panels;

- allows joining all the edges of the panels;

35    - reduces tool wear when manufacturing floor panels
with hard surface layers;

6

- allows repeated disassembly and reassembly of a
  floor previously laid, without causing damage to the
  panels, while ensuring high laying quality;
- makes it possible to provide moisture-proof floors;
5 - makes it possible to obviate the need of accurate,
  separate placement of an underlay before laying the
  floor panels; and
- considerably cuts the time for joining the panels.
  These and other objects of the invention are achiev-
10 ed by means of a panel-joining system having the features
  recited in the appended claims.

Thus, the invention provides a system for making a
joint along adjacent joint edges of two building panels,
especially floor panels, in which joint:

15      the adjacent joint edges together form a first
mechanical connection locking the joint edges to each
other in a first direction at right angles to the prin-
cipal plane of the panels, and

a locking device arranged on the rear side of the
20 panels forms a second mechanical connection locking the
panels to each other in a second direction parallel to
the principal plane and at right angles to the joint
edges, said locking device comprising a locking groove
which extends parallel to and spaced from the joint edge
25 of one of said panels, termed groove panel, and which is
open at the rear side of the groove panel, said system
being characterised in

that the locking device further comprises a strip
integrated with the other of said panels, termed strip
30 panel, said strip extending throughout substantially the
entire length of the joint edge of the strip panel and
being provided with a locking element projecting from the
strip, such that when the panels are joined together, the
strip projects on the rear side of the groove panel with
35 its locking element received in the locking groove of the
groove panel,

7

that the panels, when joined together, can occupy a relative position in said second direction where a play exists between the locking groove and a locking surface on the locking element that is facing the joint edges and 5 is operative in said second mechanical connection,

that the first and the second mechanical connection both allow mutual displacement of the panels in the direction of the joint edges, and

that the second mechanical connection is so conceiv- 10 ed as to allow the locking element to leave the locking groove if the groove panel is turned about its joint edge angularly away from the strip.

The term "rear side" as used above should be consi- dered to comprise any side of the panel located behind/ 15 underneath the front side of the panel. The opening plane of the locking groove of the groove panel can thus be located at a distance from the rear surface of the panel resting on the supporting structure. Moreover, the strip, which in the invention extends throughout substantially 20 the entire length of the joint edge of the strip panel, should be considered to encompass both the case where the strip is a continuous, uninterrupted element, and the case where the "strip" consists in its longitudinal direction of several parts, together covering the main 25 portion of the joint edge.

It should also be noted (i) that it is the first and the second mechanical connection as such that permit mutual displacement of the panels in the direction of the joint edges, and that (ii) it is the second mechanical 30 connection as such that permits the locking element to leave the locking groove if the groove panel is turned about its joint edge angularly away from the strip. Within the scope of the invention, there may thus exist means, such as glue and mechanical devices, that can 35 counteract or prevent such displacement and/or upward angling.

8

The system according to the invention makes it possible to provide concealed, precise locking of both the short and long sides of the panels in hard, thin floors. The floor panels can be quickly and conveniently dis-

5 assembled in the reverse order of laying without any risk of damage to the panels, ensuring at the same time a high laying quality. The panels can be assembled and disassembled much faster than in present-day systems, and any damaged or worn-out panels can be replaced by taking

10 up and re-laying parts of the floor.

According to an especially preferred embodiment of the invention, a system is provided which permits precise joining of thin floor panels having, for example, a thickness of the order of 3 mm and which at the same time

15 provides a tolerance-independent smooth top face at the joint. To this end, the strip is mounted in an equalising groove which is countersunk in the rear side of the strip panel and which exhibits an exact, predetermined distance from its bottom to the front side of the strip panel. The

20 part of the strip projecting behind the groove panel engages a corresponding equalising groove, which is countersunk in the rear side of the groove panel and which exhibits the same exact, predetermined distance from its bottom to the front side of the groove panel.

25 The thickness of the strip then is at least so great that the rear side of the strip is flush with, and preferably projects slightly below the rear side of the panels. In this embodiment, the panels will always rest, in the joint, with their equalising grooves on a strip. This

30 levels out the tolerance and imparts the necessary strength to the joint. The strip transmits horizontal and upwardly-directed forces to the panels and downwardly-directed forces to the existing subfloor.

Preferably, the strip may consist of a material

35 which is flexible, resilient and strong, and can be sawn. A preferred strip material is sheet aluminium. In an

WO 94/26999                                                PCT/SE94/00386

9

aluminium strip, sufficient strength can be achieved with
a strip thickness of the order of 0.5 mm.

In order to permit taking up previously laid, joined
floor panels in a simple way, a preferred embodiment of
5   the invention is characterised in that when the groove
panel is pressed against the strip panel in the second
direction and is turned anglularly away from the strip,
the maximum distance between the axis of rotation of the
groove panel and the locking surface of the locking
10  groove closest to the joint edges is such that the lock-
ing element can leave the locking groove without contact-
ing the locking surface of the locking groove. Such a
disassembly can be achieved even if the aforementioned
play between the locking groove and the locking surface
15  is not greater than 0.2 mm.

According to the invention, the locking surface of
the locking element is able to provide a sufficient lock-
ing function even with very small heights of the locking
surface. Efficient locking of 3-mm floor panels can be
20  achieved with a locking surface that is as low as 2 mm.
Even a 0.5-mm-high locking surface may provide sufficient
locking. The term "locking surface" as used herein
relates to the part of the locking element engaging the
locking groove to form the second mechanical connection.

25      For optimal function of the invention, the strip and
the locking element should be formed on the strip panel
with high precision. Especially, the locking surface of
the locking element should be located at an exact dis-
tance from the joint edge of the strip panel.

30      Furthermore, the extent of the engagement in the
floor panels should be minimised, since it reduces the
floor strength.

By known manufacturing methods, it is possible to
produce a strip with a locking pin, for example by
35  extruding aluminium or plastics into a suitable section,
which is thereafter glued to the floor panel or is
inserted in special grooves. These and all other tradi-

WO 94/26999                                      PCT/SE94/00386

10

tional methods do however not ensure optimum function and
an optimum level of economy. To produce the joint system
according to the invention, the strip is suitably formed
from sheet aluminium, and is mechanically fixed to the
5    strip panel.
     The laying of the panels can be performed by first
placing the strip panel on the subfloor and then moving
the groove panel with its long side up to the long side
of the strip panel, at an angle between the principal
10   plane of the groove panel and the subfloor. When the
joint edges have been brought into engagement with each
other to form the first mechanical connection, the groove
panel is angled down so as to accommodate the locking
element in the locking groove.
15        Laying can also be performed by first placing both
the strip panel and the groove panel flat on the subfloor
and then joining the panels parallel to their principal
planes while bending the strip downwards until the lock-
ing element snaps up into the locking groove. This laying
20   technique enables in particular mechanical locking of
both the short and long sides of the floor panels. For
example, the long sides can be joined together by using
the first laying technique with downward angling of the
groove panel, while the short sides are subsequently
25   joined together by displacing the groove panel in its
longitudinal direction until its short side is pressed on
and locked to the short side of an adjacent panel in the
same row.
     In connection with their manufacture, the floor
30   panels can be provided with an underlay of e.g. floor
board, foam or felt. The underlay should preferably cover
the strip such that the joint between the underlays is
offset in relation to the joint between the floor panels.
     The above and other features and advantages of the
35   invention will appear from the appended claims and the
following description of embodiments of the invention.

WO 94/26999                                          PCT/SE94/00386

11

The invention will now be described in more detail
hereinbelow with reference to the accompanying drawing
Figures.

5  Description of Drawing Figures

Figs 1a and 1b schematically show in two stages
how two floor panels of different thickness are joined
together in floating fashion according to a first embo-
diment of the invention.

10      Figs 2a-c show in three stages a method for mechani-
cally joining two floor panels according to a second
embodiment of the invention.

Figs 3a-c show in three stages another method for
mechanically joining the floor panels of Figs 2a-c.

15      Figs 4a and 4b show a floor panel according to Figs
2a-c as seen from below and from above, respectively.

Fig. 5 illustrates in perspective a method for lay-
ing and joining floor panels according to a third embodi-
ment of the invention.

20      Fig. 6 shows in perspective and from below a first
variant for mounting a strip on a floor panel.

Fig. 7 shows in section a second variant for mount-
ing a strip on a floor panel.

25  Description of Preferred Embodiments

Figs 1a and 1b, to which reference is now made,
illustrate a first floor panel 1, hereinafter termed
strip panel, and a second floor panel 2, hereinafter
termed groove panel. The terms "strip panel" and "groove
30  panel" are merely intended to facilitate the description
of the invention, the panels 1, 2 normally being identi-
cal in practice. The panels 1 and 2 may be made from
compact laminate and may have a thickness of about 3 mm
with a thickness tolerance of about $\pm$ 0.2 mm. Considering
35  this thickness tolerance, the panels 1, 2 are illustrated
with different thicknesses (Fig. 1b), the strip panel 1

12

having a maximum thickness (3.2 mm) and the groove panel
2 having a minimum thickness (2.8 mm).

To enable mechanical joining of the panels 1, 2 at
opposing joint edges, generally designated 3 and 4,
5   respectively, the panels are provided with grooves and
strips as described in the following.

Reference is now made primarily to Figs 1a and 1b,
and secondly to Figs 4a and 4b showing the basic design
of the floor panels from below and from above, respec-
10  tively.

From the joint edge 3 of the strip panel 1, i.e.
the one long side, projects horizontally a flat strip
6 mounted at the factory on the underside of the strip
panel 1 and extending throughout the entire joint edge 3.
15  The strip 6, which is made of flexible, resilient sheet
aluminium, can be fixed mechanically, by means of glue or
in any other suitable way. In Figs 1a and 1b, the strip 6
is glued, while in Figs 4a and 4b it is mounted by means
of a mechanical connection, which will be described in
20  more detail hereinbelow.

Other strip materials can be used, such as sheets of
other metals, as well as aluminium or plastics sections.
Alternatively, the strip 6 may be integrally formed with
the strip panel 1. At any rate, the strip 6 should be
25  integrated with the strip panel 1, i.e. it should not be
mounted on the strip panel 1 in connection with laying.
As a non-restrictive example, the strip 6 may have a
width of about 30 mm and a thickness of about 0.5 mm.

As appears from Figs 4a and 4b, a similar, although
30  shorter strip 6' is provided also at one short side 3' of
the strip panel 1. The shorter strip 6' does however not
extend throughout the entire short side 3' but is other-
wise identical with the strip 6 and, therefore, is not
described in more detail here.

35      The edge of the strip 6 facing away from the joint
edge 3 is formed with a locking element 8 extended
throughout the entire strip 6. The locking element 8 has

13

a locking surface 10 facing the joint edge 3 and having
a height of e.g. 0.5 mm. The locking element 8 is so
designed that when the floor is being laid and the strip
panel 2 of Fig. 1a is pressed with its joint edge 4

5   against the joint edge 3 of the strip panel 1 and is
angled down against the subfloor 12 according to Fig. 1b,
it enters a locking groove 14 formed in the underside 16
of the groove panel 2 and extending parallel to and spac-
ed from the joint edge 4. In Fig. 1b, the locking element

10  8 and the locking groove 14 together form a mechanical
connection locking the panels 1, 2 to each other in the
direction designated D2. More specifically, the locking
surface 10 of the locking element 8 serves as a stop with
respect to the surface of the locking groove 14 closest

15  to the joint edge 4.

When the panels 1 and 2 are joined together, they
can however occupy such a relative position in the direc-
tion D2 that there is a small play Δ between the locking
surface 10 and the locking groove 14. This mechanical

20  connection in the direction D2 allows mutual displacement
of the panels 1, 2 in the direction of the joint, which
considerably facilitates the laying and enables joining
together the short sides by snap action.

As appears from Figs 4a and 4b, each panel in the

25  system has a strip 6 at one long side 3 and a locking
groove 14 at the other long side 4, as well as a strip 6'
at one short side 3' and a locking groove 14' at the
other short side 4'.

Furthermore, the joint edge 3 of the strip panel 1

30  has in its underside 18 a recess 20 extending throughout
the entire joint edge 3 and forming together with the
upper face 22 of the strip 6 a laterally open recess 24.
The joint edge 4 of the groove panel 2 has in its top
side 26 a corresponding recess 28 forming a locking

35  tongue 30 to be accommodated in the recess 24 so as to
form a mechanical connection locking the joint edges 3, 4
to each other in the direction designated D1. This con-

WO 94/26999                                          PCT/SE94/00386

14

nection can be achieved with other designs of the joint
edges 3, 4, for example by a bevel thereof such that the
joint edge 4 of the groove panel 2 passes obliquely in
underneath the joint edge 3 of the strip panel 1 to be
5    locked between that edge and the strip 6.

The panels 1, 2 can be taken up in the reverse order
of laying without causing any damage to the joint, and be
laid again.

The strip 6 is mounted in a tolerance-equalising
10   groove 40 in the underside 18 of the strip panel 1 adja-
cent the joint edge 3. In this embodiment, the width of
the equalising groove 40 is approximately equal to half
the width of the strip 6, i.e. about 15 mm. By means of
the equalising groove 40, it is ensured that there will
15   always exist between the top side 21 of the panel 1 and
the bottom of the groove 40 an exact, predetermined
distance E which is slightly smaller than the minimum
thickness (2.8 mm) of the floor panels 1, 2. The groove
panel 2 has a corresponding tolerance-equalising surface
20   or groove 42 in the underside 16 of the joint edge 4. The
distance between the equalising surface 42 and the top
side 26 of the groove panel 2 is equal to the aforemen-
tioned exact distance E. Further, the thickness of the
strip 6 is so chosen that the underside 44 of the strip
25   is situated slightly below the undersides 18 and 16 of
the floor panels 1 and 2, respectively. In this manner,
the entire joint will rest on the strip 6, and all ver-
tical downwardly-directed forces will be efficiently
transmitted to the subfloor 12 without any stresses being
30   exerted on the joint edges 3, 4. Thanks to the provision
of the equalising grooves 40, 42, an entirely even joint
will be achieved on the top side, despite the thickness
tolerances of the panels 1, 2, without having to perform
any grinding or the like across the whole panels.
35   Especially, this obviates the risk of damage to the
bottom layer of the compact laminate, which might give
rise to bulging of the panels.

15

Reference is now made to the embodiment of Figs 2a-c
showing in a succession substantially the same laying
method as in Figs 1a and 1b. The embodiment of Figs 2a-c
primarily differs from the embodiment of Figs 1a and 1b
5  in that the strip 6 is mounted on the strip panel 1 by
means of a mechanical connection instead of glue. To pro-
vide this mechanical connection, illustrated in more
detail in Fig. 6, a groove 50 is provided in the under-
side 18 of the strip panel 1 at a distance from the
10  recess 24. The groove 50 may be formed either as a con-
tinuous groove extending throughout the entire length of
the panel 1, or as a number of separate grooves. The
groove 50 defines, together with the recess 24, a dove-
tail gripping edge 52, the underside of which exhibits an
15  exact equalising distance E to the top side 21 of the
strip panel 1. The aluminium strip 6 has a number of
punched and bent tongues 54, as well as one or more lips
56 which are bent round opposite sides of the gripping
edge 52 in clamping engagement therewith. This connection
20  is shown in detail from below in the perspective view of
Fig. 6.

Alternatively, a mechanical connection between the
strip 6 and the strip panel 1 can be provided as illu-
strated in Fig. 7 showing in section a cut-away part of
25  the strip panel 1 turned upside down. In Fig. 7, the
mechanical connection comprises a dovetail recess 58 in
the underside 18 of the strip panel 1, as well as
tongues/lips 60 punched and bent from the strip 6 and
clamping against opposing inner sides of the recess 58.
30  The embodiment of Figs 2a-c is further characterised
in that the locking element 8 of the strip 6 is designed
as a component bent from the aluminium sheet and having
an operative locking surface 10 extending at right angles
up from the front side 22 of the strip 6 through a height
35  of e.g. 0.5 mm, and a rounded guide surface 34 facilitat-
ing the insertion of the locking element 8 into the lock-
ing groove 14 when angling down the groove panel 2

WO 94/26999                                          PCT/SE94/00386

16

towards the subfloor 12 (Fig. 2b), as well as a portion
36 which is inclined towards the subfloor 12 and which
is not operative in the laying method illustrated in
Figs 2a-c.

5      Further, it can be seen from Figs 2a-c that the
joint edge 3 of the strip panel 1 has a lower bevel 70
which cooperates during laying with a corresponding upper
bevel 72 of the joint edge 4 of the groove panel 2, such
that the panels 1 and 2 are forced to move vertically
10   towards each other when their joint edges 3, 4 are moved
up to each other and the panels are pressed together
horizontally.

Preferably, the locking surface 10 is so located
relative to the joint edge 3 that when the groove panel
15   2, starting from the joined position in Fig. 2c, is
pressed horizontally in the direction D2 against the
strip panel 1 and is turned angularly up from the strip
6, the maximum distance between the axis of rotation A of
the groove panel 2 and the locking surface 10 of the
20   locking groove is such that the locking element 8 can
leave the locking groove 14 without coming into contact
with it.

Figs 3a-3b show another joining method for mechani-
cally joining together the floor panels of Figs 2a-c. The
25   method illustrated in Figs 3a-c relies on the fact that
the strip 6 is resilient and is especially useful for
joining together the short sides of floor panels which
have already been joined along one long side as illu-
strated in Figs 2a-c. The method of Figs 3a-c is per-
30   formed by first placing the two panels 1 and 2 flat on
the subfloor 12 and then moving them horizontally towards
each other according to Fig. 3b. The inclined portion 36
of the locking element 8 then serves as a guide surface
which guides the joint edge 4 of the groove panel 2 up on
35   to the upper side 22 of the strip 6. The strip 6 will
then be urged downwards while the locking element 8 is
sliding on the equalising surface 42. When the joint

17

edges 3, 4 have been brought into complete engagement
with each other horizontally, the locking element 8 will
snap into the locking groove 14 (Fig. 3c), thereby
providing the same locking as in Fig. 2c. The same
5   locking method can also be used by placing, in the
initial position, the joint edge 4 of the groove panel
with the equalising groove 42 on the locking element 10
(Fig. 3a). The inclined portion 36 of the locking element
10 then is not operative. This technique thus makes it
10  possible to lock the floor panels mechanically in all
directions, and by repeating the laying operations the
whole floor can be laid without using any glue.

      The invention is not restricted to the preferred
embodiments described above and illustrated in the draw-
15  ings, but several variants and modifications thereof are
conceivable within the scope of the appended claims. The
strip 6 can be divided into small sections covering the
major part of the joint length. Further, the thickness of
the strip 6 may vary throughout its width. All strips,
20  locking grooves, locking elements and recesses are so
dimensioned as to enable laying the floor panels with
flat top sides in a manner to rest on the strip 6 in the
joint. If the floor panels consist of compact laminate
and if silicone or any other sealing compound, a rubber
25  strip or any other sealing device is applied prior to
laying between the flat projecting part of the strip 6
and the groove panel 2 and/or in the recess 26, a mois-
ture-proof floor is obtained.

      As appears from Fig. 6, an underlay 46, e.g. of
30  floor board, foam or felt, can be mounted on the under-
side of the panels during the manufacture thereof. In one
embodiment, the underlay 46 covers the strip 6 up to the
locking element 8, such that the joint between the under-
lays 46 becomes offset in relation to the joint between
35  the joint edges 3 and 4.

      In the embodiment of Fig. 5, the strip 6 and its
locking element 8 are integrally formed with the strip

WO 94/26999                                            PCT/SE94/00386

18

panel 1, the projecting part of the strip 6 thus forming
an extension of the lower part of the joint edge 3. The
locking function is the same as in the embodiments
described above. On the underside 18 of the strip panel
5  1, there is provided a separate strip, band or the like
74 extending throughout the entire length of the joint
and having, in this embodiment, a width covering approxi-
mately the same surface as the separate strip 6 of the
previous embodiments. The strip 74 can be provided
10  directly on the rear side 18 or in a recess formed there-
in (not shown), so that the distance from the front side
21, 26 of the floor to the rear side 76, including the
thickness of the strip 74, always is at least equal to
the corresponding distance in the panel having the great-
15  est thickness tolerance. The panels 1, 2 will then rest,
in the joint, on the strip 74 or only on the undersides
18, 16 of the panels, if these sides are made plane.

When using a material which does not permit downward
bending of the strip 6 or the locking element 8, laying
20  can be performed in the way shown in Fig. 5. A floor
panel 2a is moved angled upwardly with its long side 4a
into engagement with the long side 3 of a previously laid
floor panel 1 while at the same time a third floor panel
2b is moved with its short side 4b' into engagement with
25  the short side 3a' of the upwardly-angled floor panel 2a
and is fastened by angling the panel 2b downwards. The
panel 2b is then pushed along the short side 3a' of the
upwardly-angled floor panel 2a until its long side 4b
encounters the long side 3 of the initially-laid panel 1.
30  The two upwardly-angled panels 2a and 2b are therefore
angled down on to the subfloor 12 so as to bring about
locking.

By a reverse procedure the panels can be taken up in
the reverse order of laying without causing any damage to
35  the joint, and be laid again.

WO 94/26999                                                    PCT/SE94/00386

19

      Several variants of preferred laying methods are conceivable. For example, the strip panel can be inserted under the groove panel, thus enabling the laying of panels in all four directions with respect to the initial position.

WO 94/26999                                         PCT/SE94/00386

20

## CLAIMS

1. A system for providing a joint along adjacent
5   joint edges (3, 4) of two building panels (1, 2), espe-
cially floor panels, in which joint:

the adjacent joint edges (3, 4) together form a
first mechanical connection locking the joint edges (3,
4) to each other in a first direction (D1) at right
10  angles to the principal plane of the panels (1, 2), and

a locking device (6, 8, 14) arranged on the rear
side (18, 16) of the panels (1, 2) forms a second mecha-
nical connection locking the panels (1, 2) to each other
in a second direction (D2) parallel to the principal
15  plane and at right angles to the joint edges (3, 4), said
locking device (6, 8, 14) comprising a locking groove
(14) which extends parallel to and spaced from the joint
edge (4) of one (2) of said panels, termed groove panel,
and which is open at the rear side (16) of the groove
20  panel (2), c h a r a c t e r i s e d   i n

that the locking device (6, 8, 14) further comprises
a strip (6) integrated with the other (1) of said panels,
termed strip panel, said strip (6) extending throughout
substantially the entire length of the joint edge (3) of
25  the strip panel (1) and being provided with a locking
element (8) projecting from the strip, such that when the
panels are joined together, the strip (6) projects on the
rear side of the groove panel (2) with its locking ele-
ment (8) received in the locking groove (14) of the
30  groove panel (2),

that the panels, when joined together, can occupy a
relative position in said second direction (D2) where a
play (Δ) exists between the locking groove (14) and a
locking surface (10) on the locking element (8) that is
35  facing the joint edges and is operative in said second
mechanical connection,

21

that the first and the second mechanical connection both allow mutual displacement of the panels (1, 2) in the direction of the joint edges (3, 4), and

that the second mechanical connection is so conceiv-
5    ed as to allow the locking element (8) to leave the lock-
ing groove (14) if the groove panel (2) is turned about its joint edge (4) angularly away from the strip (6).

2. A system as claimed in claim 1,  c h a r a c -
t e r i s e d  in that when the groove panel (2) is press-
10   ed against the strip panel (1) in said second direction (D2) and is turned angularly away from the strip (6), the maximum distance between the axis of rotation of the groove panel (2) and the locking surface of the locking groove (14) closest to the joint edges is such that the
15   locking element (8) can leave the locking groove (14) without contacting the locking surface of the locking groove (14).

3. A system as claimed in claim 1 or 2,  c h a r -
a c t e r i s e d  in that the locking surface (10) of the
20   locking element (8) is extended from the front side (22) of the strip (6) through a height in said first direction that is less than or equal to 2 mm.

4. A system as claimed in any one of the preceding claims,  c h a r a c t e r i s e d  in that the first
25   mechanical connection is provided by the joint edge (4) of the groove panel (2) engaging, in said first direc-
tion, between the joint edge (3) of the strip panel (1) and the front side of the strip (6).

5. A system as claimed in any one of the preceding
30   claims,  c h a r a c t e r i s e d  in that the strip (6) integrated with the strip panel (1) is made of a material different from that of the strip panel (1) and fixedly mounted on the strip panel (1) at the factory.

6. A system as claimed in claim 5,  c h a r a c -
35   t e r i s e d  in that the strip (6), at least for one of the two panels (1, 2), is received in a countersunk

WO 94/26999

PCT/SE94/00386

22

groove (40; 42) in the rear side (18; 16) of this one
panel (1; 2).

7. A system as claimed in claim 5 or 6, c h a r -
a c t e r i s e d  in

5     that the strip (6) is mounted in an equalising
groove (40) which is countersunk in the rear side (18) of
the strip panel (1) and exhibits an exact, predetermined
distance (E) from its bottom to the front side (21) of
the strip panel (1),

10    that the part of the strip (6) projecting behind
the groove panel (2) engages a corresponding equalising
groove (42) which is countersunk in the rear side (16) of
the groove panel (2) and which exhibits the same exact,
predetermined distance (E) from its bottom to the front

15 side (26) of the groove panel (2), and
       that the strip (6) has at least such a thickness
that the rear side (44) of the strip is flush with the
rear sides (18, 16) of the panels.

8. A system as claimed in claim 7, c h a r a c -

20 t e r i s e d  in that the strip (6) has such a thickness
that it is only partly received in the equalising grooves
(40, 42).

9. A system as claimed in any one of claims 5-8,
c h a r a c t e r i s e d  in that the strip (6) is fixed

25 to the strip panel (1) by means of a mechanical connec-
tion.

10. A system as claimed in claim 6, c h a r a c -
t e r i s e d  in that the mechanical connection between
the strip (6) and the strip panel (1) comprises a grip-

30 ping edge (52) defined by two recesses (24, 50) in the
rear side (18) of the strip panel, and tongues, lips or
the like (54, 56) which are bent or punched from the
strip (6) and which press against opposite outer sides of
the gripping edge (52).

35 11. A system as claimed in claim 6, c h a r a c -
t e r i s e d  in that the mechanical connection between
the strip (6) and the strip panel (1) comprises a recess

WO 94/26999                          PCT/SE94/00386

23

(58) in the rear side (18) of the strip panel, and
tongues, lips or the like (60) which are bent or punched
from the strip (6) and which press against opposing inner
sides of the recess (58).

5        12. A system as claimed in any one of claims 5-11,
c h a r a c t e r i s e d  in that the strip (6) is fixed
to the strip panel (1) by means of a binder.

         13. A system as claimed in any one of claims 5-12,
c h a r a c t e r i s e d  in that the strip (6) is made of
10   a flexible, preferably resilient material, such as sheet
aluminium.

         14. A system as claimed in any one of the preceding
claims,  c h a r a c t e r i s e d  in that the locking
element (8) consists of a locking edge extended conti-
15   nuously along the strip (6).

         15. A system as claimed in any one of claims 1-13,
c h a r a c t e r i s e d  in that the locking element (8)
consists of a plurality of spaced-apart locking elements
distributed throughout the length of the strip (6).

20       16. A system as claimed in any one of the preceding
claims,  c h a r a c t e r i s e d  in that the panels (1,
2) are rectangular and intended, at each of their four
edges (3, 4, 3', 4'), to be joined to a similar panel by
a first mechanical connection of the aforementioned type
25   and a second mechanical connection of the aforementioned
type, each panel having a first pair of opposite joint
edges (3, 4), one of which is provided with a strip (6)
of the aforementioned type and the other of which is pro-
vided with a locking groove (14) of the aforementioned
30   type, and a second pair of opposite joint edges (3', 4'),
one of which is provided with a strip (6') of the afore-
mentioned type and the other of which is provided with a
locking groove (14') of the aforementioned type.

         17. A system as claimed in any one of the preceding
35   claims,  c h a r a c t e r i s e d  in that an underlay
(46) of floor boards, foam, felt or the like is fixed to
the rear sides (18, 16) of the panels.

WO 94/26999                                    PCT/SE94/00386

24

18. A system as claimed in claim 17, c h a r a c -
t e r i s e d  in that the underlay (46) is fixed so as to
cover the strip (6) in said second direction at least up
to the locking element (8), such that a joint between the
5   underlays (46) of the two adjacent panels is offset in
said second direction relative to the joint edges (3, 4).

19. A system as claimed in any one of the preceding
claims, c h a r a c t e r i s e d  in that a sealing
means, such as a sealing compound, a rubber strip or the
10   like, is provided on the front side (22) of the strip
between the locking element (8) and the joint edge (3)
of the strip panel to seal against the groove panel (2).

WO 94/26999                                                PCT/SE94/00386

1/6



Fig. 1a

Fig. 1b

WO 94/26999                                      PCT/SE94/00386

2/6

Fig. 2a



Fig. 2b



Fig. 2c



WO 94/26999

PCT/SE94/00386

3/6

Fig. 3a



Fig. 3b



Fig. 3c



WO 94/26999                                              PCT/SE94/00386

4/6

Fig. 4a                          Fig. 4b



WO 94/26999

PCT/SE94/00386

5/6



Fig. 5

WO 94/26999    PCT/SE94/00386

6/6

Fig. 6



Fig. 7



1

## INTERNATIONAL SEARCH REPORT

| International application No. |
|---|
| PCT/SE 94/00386 |

**A. CLASSIFICATION OF SUBJECT MATTER**

IPC5: E04F 15/14, E04F 15/02, E04F 13/08
According to International Patent Classification (IPC) or to both national classification and IPC

**B. FIELDS SEARCHED**

Minimum documentation searched (classification system followed by classification symbols)

IPC5: E04F, A47G

Documentation searched other than minimum documentation to the extent that such documents are included in the fields searched

SE,DK,FI,NO classes as above

Electronic data base consulted during the international search (name of data base and, where practicable, search terms used)


**C. DOCUMENTS CONSIDERED TO BE RELEVANT**

| Category* | Citation of document, with indication, where appropriate, of the relevant passages | Relevant to claim No. |
|---|---|---|
| A,P | WO, A1, 9313280 (JUNCKERS INDUSTRIER A/S), 8 July 1993 (08.07.93), abstract, details 1,2,3,14 <br> -- | 1-19 |
| A | US, A, 3538665 (P. GOHNER), 10 November 1970 (10.11.70), details 7,9 <br> -- | 1-19 |
| A | DE, A1, 2616077 (HEWENER, H.J.), 27 October 1977 (27.10.77), figure 1 <br> -- | 1-19 |

| X | Further documents are listed in the continuation of Box C. | X | See patent family annex. |
|---|---|---|---|

* Special categories of cited documents:
"A" document defining the general state of the art which is not considered to be of particular relevance
"E" erlier document but published on or after the international filing date
"L" document which may throw doubts on priority claim(s) or which is cited to establish the publication date of another citation or other special reason (as specified)
"O" document referring to an oral disclosure, use, exhibition or other means
"P" document published prior to the international filing date but later than the priority date claimed

"T" later document published after the international filing date or priority date and not in conflict with the application but cited to understand the principle or theory underlying the invention
"X" document of particular relevance: the claimed invention cannot be considered novel or cannot be considered to involve an inventive step when the document is taken alone
"Y" document of particular relevance: the claimed invention cannot be considered to involve an inventive step when the document is combined with one or more other such documents, such combination being obvious to a person skilled in the art
"&" document member of the same patent family

| Date of the actual completion of the international search | Date of mailing of the international search report |
|---|---|
| 7 July 1994 | 1 0 -08- 1994 |
| Name and mailing address of the ISA/ <br> Swedish Patent Office <br> Box 5055, S-102 42 STOCKHOLM <br> Facsimile No.  +46 8 666 02 86 | Authorized officer <br><br> Örjan Nylund <br> Telephone No.   +46 8 782 25 00 |

Form PCT/ISA/210 (second sheet) (July 1992)

2

**INTERNATIONAL SEARCH REPORT**

| | International application No.<br>PCT/SE 94/00386 |
|---|---|

C (Continuation). DOCUMENTS CONSIDERED TO BE RELEVANT

| Category* | Citation of document, with indication, where appropriate, of the relevant passages | Relevant to claim No. |
|---|---|---|
| A | FR, A, 1293043 (ETABLISSEMENTS PIRAUD PLASTIQUES),<br>2 April 1962 (02.04.62), figure 2, details 8,9,10,<br>11<br><br>--<br>--------- | 1-19 |

Form PCT/ISA/210 (continuation of second sheet) (July 1992)

## INTERNATIONAL SEARCH REPORT
Information on patent family members

28/05/94

| International application No. |
| --- |
| PCT/SE 94/00386 |

| Patent document cited in search report | Publication date | Patent family member(s) | Publication date |
| --- | --- | --- | --- |
| WO-A1- 9313280 | 08/07/93 | NONE | |
| US-A- 3538665 | 10/11/70 | NONE | |
| DE-A1- 2616077 | 27/10/77 | NONE | |
| FR-A- 1293043 | 02/04/62 | NONE | |

Form PCT/ISA/210 (patent family annex) (July 1992)

PCT/ SE94/ 00386



REC'D 1 6 JUN. 1994

**PATENT- OCH
REGISTRERINGSVERKET**

**Intyg
Certificate**

*Härmed intygas att bifogade kopior överensstämmer med de
handlingar som ursprungligen ingivits till Patent- och
registreringsverket i nedannämnda ansökan.*

*This is to certify that the annexed is a true copy of
the documents as originally filed with the Patent- and
Registration Office in connection with the following
patent application.*

(71) *Sökande        Tony Pervan, Solna SE
     Applicant (s)*

(21) *Patentansökningsnummer    9301595-6
     Patent application number*

(86) *Ingivningsdatum        1993-05-10
     Date of filing*

*Stockholm,  1994-06-02*

*För Patent- och registreringsverket
For the Patent- and Registration Office*

*Åsa Dahlberg*

*Avgift
Fee*

**PRIORITY DOCUMENT**

**PATENT- OCH
REGISTRERINGSVERKET**
SWEDEN

| Postadress/Adress | Telefon/Phone | Telex | Telefax |
|---|---|---|---|
| Box 5055 | +46 8 782 25 00 | 17978 | +46 8 666 02 86 |
| S-102 42 STOCKHOLM | Vx 08-782 25 00 | PATOREG S | 08-666 02 86 |



1

### Fogning av tunna flytande hårda golv.

Föreliggande uppfinning avser fogningsmetoder för tunna flytande
hårda golv med lim, dubbelhäftande tejp och mekanisk låsning,
5 bestående av i golvskivornas undersida slipade spår och lös list som
möjliggör snabb, dold, flytande, exakt och höghållfast fogning av
tunna golvskivor oberoende av golvskivornas tjocklekstoleranser.

### Uppfinningens bakgrund.

10

Laminatgolv har på kort tid tagit en stor del av marknaden för
renoveringsgolv. Samtliga tunna laminatgolv, som läggs som sk.
flytande golv utan fastsättning mot underlaget, består av ett ytskikt
av dekorativt laminat, en bärare av träfiberskiva eller spånskiva och
15 ett balansskikt av laminat eller impregnerat papper. Golvbrädorna
är i regel 200 * 1200 mm och dess lång- och kortsidor är utformade
som not och fjäder. Golvet läggs genom att lim påförs i noten och
golvbrädorna pressas och slås samman (se fig 1).

20 Laminatet, som består av ett slit- och dekorskikt av melamin och en
stomme av fenol, har mycket goda egenskaper då det gäller
slitstyrka, slaghållfasthet och vattenbeständighet. Golvets svaga
punkt är bäraren av spånskiva som har betydligt sämre egenskaper
än laminatet men som behövs för stabilitet och framför allt för att
25 man skall kunna åstadkomma en fog med not och fjäder. Detta
begränsat tjockleken till min 7 mm. Tunnare golv har fördelen att
man vid renovering klarar låga trösklar och slipper hyvla av
dörrarna. Läggningsmetoden är också omständig och tidskrävande
eftersom lim måste påföras i varje not.

30 Ovannämnda nackdelar kan elimineras genom att man tar bort
bäraren och ökar laminattjockleken genom en lämplig modifiering
av fenolstommen. Ett sådant kompaktlaminat har redan vid 3 mm
tjocklek bättre egenskaper än nuvarande laminatgolv. Läggningen
35 skulle underlättas betydligt om dubbelhäftande tejp eller mekanisk
låsning kunde användas. Problemet är att inga av de fogmetoder
som finns idag kan användas på så tunna flytande golv. Not och
fjäder samt lister som sticks in i materialet kan ej användas i tunt
material och speciellt inte tillsammans med dubbelhäftande tejp.

40



Ett annat problem är att kompaktlaminat måste byggas upp
symmetriskt dvs ovan- och undersida bör bestå av likartade
härdplaster och fibrer för att laminatskivorna skall bli plana.
Laminatskivorna får vid tillverkningen en tjocklekstolerans på ca +-
5   0,2 - 0,3 mm. Skivorna kan inte göras jämntjocka genom slipning av
baksidan eftersom man då förstör den symmetriska uppbyggnaden
med kupighet som följd. Olika tjocka skivor ger en mycket hög
belastning i fogkanten om den utformas på traditionellt sätt.

10   Dubbelhäftande tejp är en mycket lämplig häftmetod i många
sammanhang men problemet är att den griper direkt och ger inte
möjlighet att förskjuta materialet som vid vanlig limning, då det är
möjligt att efter det att lim påförts i noten, först trycka ihop not och
fjäder vid långsidan och därefter skjuta golvbrädan längs långsidan
15   så att även not och fjäder vid kortsidan går in i varandra varefter
limmet härdar. Ett annat problem är att stor anläggningsyta och
relativt högt intialtryck krävs för att åstadkomma förband med hög
hållfasthet. Med stor anläggningsyta kan man klara hög belastning i
skjuvriktningen längs tejpen medan avdragshållfastheten vinkelrät
20   mot tejpen är betydligt lägre. Eftersom det finns risk för att
golvskivorna pga ojämn luftfuktighet kan kupa, bör man eftersträva
att utforma fogen så att avdragskraften omvandlas till en skjuvkraft.
Dubbelhäftande tejp fungerar inte i de fogmetoder som användes
idag för flytande fogning.
25
Problemet med mekanisk låsnig är att det är svårt att få tillräcklig
hållfasthet i tunna konstruktioner samt att åstadkomma låsning av
såväl lång- som kortsida. Eftersom golvbrädorna skall vara möjliga
att kapa med handsåg får fogen inte innehålla hårda material. Det
30   finns idag inga fogmetoder för flytande fogning som bygger på
mekanisk låsning av samtliga sidor.


**Uppfinningens ändamål och viktigaste kännetecken.**

35   Ändamålet med uppfinningen är att åstadkomma metoder för
fogning av tunna, olika tjocka, flytande golvskivor som möjliggör
att golvskivorna kan läggas på plats med släta ytskarvar, att

40



hållfastheten i fogen blir hög och att fogning kan ske med lim, dubbelhäftande tejp och mekanisk låsning. Denna uppgift har lösts genom att spår slipats på undersidan av golvskivorna lång- och kortsidor så att avståndet från golvskivornas yta till spåret överdel

5. har ett konstant mått som är något mindre än golvskivornas mintjocklek. Spåret eliminerar tjocklekstoleranser och möjliggör att en list av laminat, plast eller aluminium med tjockleken något större än skillnaden mellan den tunnaste och tjockaste golvskivan och med bredden motsvarande dubbla spårbredden, belagd med

10. lim eller dubbelhäftande tape, kan fästas på undersidan av den ena golvskivan så att halva listbredden sticker ut utanför fogkanten, varvid den andra golvskivan kan läggas på plats på den utstickande delen av listen kant i kant med den förstnämnda golvskivan och golvskivorna vilar i skarven alltid på listen som tar upp all

15. belastning i fogen och som överför de vertikala krafterna till befintligt undergolv. Fogens ovandel blir helt plan oberoende av golvskivornas tjocklekstolerans och golvet flyter utan fäste mot underlaget. Genom lämplig utformning av spår, list och fogkanter på lång- och kortsidor av golvskivorna kan läggning av

20. golvskivorna ske med lim, dubbelhäftande tejp och mekanisk låsning.

**Beskrivning av ritningar.**

25. Fig. 1 visar uppbyggnad av nuvarande laminatgolv.

Fig. 2 visar fogning av tunna flytande hårda golv med lim och dubbelhäftande tejp.

30. Fig. 3 visar fogning av tunna flytande hårda golv med lim och dubbelhäftande tejp där fogkanter snedfasats för överföring av lyftkraft till skjuvkraft.

Fig. 4 visar fogning av tunna flytande hårda golv med lim och
35. dubbelhäftande tejp där spår frästs i fogkanter för mekanisk låsning av uppåtgående rörelse.

Fig. 5 visar fogning av tunna flytande hårda golv med mekanisk låsning i alla riktningar.

40.



### Beskrivning av utföringsexempel.

På ritningarna i fig. 2 - 5 betecknas med 1 en golvskiva  med
5   mintjocklek, med 2 en golvskiva  med maxtjocklek, med 3 slipade
spår på undersida av golvskiva, med 4 en list av laminat, plast eller
aluminium, med 5 ett limskikt, med 6 golvskivornas yta, med 7
snedsågade fogkanter, med 8 fräst spår på undersida av fogkant,
med 9 fräst spår på ovansida av fogkant, med 10 låstapp på list,
10   med 11 låsspår på undersida av golvskiva, med 12 snedfasad kant
på låstapp och med 13 befintligt undergolv.

15

20

25

30

35

40

PRV 93·05· 10 M

## PATENTKRAV.

1. Fogning av tunna flytande hårda golv bestående av spår (3), list
(4) och limskikt av dubbelhäftande tape eller lim (5),
5    *kännetecknad därav,*
att spår (3) görs på undersidan av golvskivornas lång- och
kortsidor så att avståndet från golvskivornas yta (6) till spåret alltid
håller ett konstant mått som är något mindre än golvskivornas
mintjocklek, där en list (4) med ett limskikt (5) och med bredden
10   motsvarande dubbla spårbredden och med tjockleken inklusive
limskiktet något större än maximala skillnaden mellan tunnaste (1)
och tjockaste golvskivan (2) limmas på undersidan av den ena
golvskivan (2) så att halva listbredden, som är belagd med lim eller
dubbelhäftande tejp sticker ut på vilken den andra golvskivan (1)
15   vid golvläggningen läggs på kant i kant så att båda golvskivorna i
fogen vilar enbart på listen

2. Anordning enligt patentkrav 1,
*kännetecknad därav,*
20   att golvskivornas fogkanter (7) snedsågas så att den ena golvskivan
(1) vid läggning skjuts under den andra (2) så att en horisontell
rörelse krävs för att golvskivan (1) skall kunna lossna från
dubbelhäftande tejp och lyfta från listen (4).

25   3. Anordning enl patentkrav 1,
*kännetecknad därav,*
att på den ena golvskivans (2) fogkant (8) görs en urfräsning på
undersidan och på den andra golvskivans (1) fogkant (9) görs en
urfräsning på ovansidan så att den ena golvskivan (1) vid läggning
30   kan skjutas under den andra (2) på ett sådant sätt att mekanisk
låsning mot lyftkraft uppstår.

35   4. Anordning enl patentkrav 3,
*kännetecknad därav,*
att listen (4) som limmas fast i den ena golvskivan (2) görs av
elastiskt material och förses i den utstickande delen med en låstapp
(10) som är anpassad till ett låsspår (11) som görs på undersidan av
den andra golvskivan (1) på ett sådant sätt att låstappen (10) går in i
40   låsspåret (11) då golvskivornas långsidor trycks ihop och låser så



**Sammandrag.**

Fogning av tunna flytande hårda golv. Genom en lämplig
anpassning av stommen i laminat kan man göra högpresterande
5  kompaktlaminatgolv som endast är 3-4 mm tjocka. Problemet är att
det inte finns en lämplig metod för att sammanfoga tunna hårda
golvskivor. Detta problem har lösts genom att spår (3) görs på
undersidan av golvskivornas kort- och långsidor där en list (4) fästs
på de ena golvskivan (1) varefter den andra golvskivan (2) läggs på.
10  Genom en speciell utformning av spår, list och fogkanter kan
golvläggning ske med lim, dubbelhäftande tejp och mekanisk
låsning.

15

20

25

30

35

40

45



att rörelse endast är möjlig längs golvskivornas långändor varvid
golvskivan (1) skjuts i sidled tills den möter kortändan på en annan
golvskiva där fogkanten (9) träffar den snedfasade delen av
låstappen (12) som böjer ned listen (4) en aning så att golvskivorna
5  kan gå emot varandra i kortändan och låsning sker varvid
golvskivan (1) blir mekaniskt låst i alla riktningar och golvläggning
kan ske utan lim.

10

15

20

25

30

35

40

PRV 93·05·10 M



FIGUR 2





PRV 93·05·10 M

Fig 1



Slityta av melamin

Dekor av melamin

Stomme av fenol

Spånskiva

Laminat

Not

Fjäder

Balanspapper

7 mm spånskiva



PRV 93·05·10 M



PRV 93·05·10 M

FIG R 4







# UNITED STATES INTERNATIONAL TRADE COMMISSION
## WASHINGTON, D.C.

### Before the Honorable Paul J. Luckern
### Administrative Law Judge



| | |
|---|---|
| In the Matter of | ) |
| | ) |
| CERTAIN FLOORING PRODUCTS | ) Investigation No. 337-TA-443 |
| | ) |
| | ) |

## RESPONDENT PERGO, INC.'S
## IDENTIFICATION OF PRIOR ART

Pursuant to Order No. 7, Respondent Pergo, Inc. ("Pergo") hereby

idenifies the prior art it may rely upon at the hearing in the above-captioned investigation:

### I.     Patents

| Country | Patent Number | Inventor(s) |
|---------|---------------|-------------|
| CA | 991,373 | Hebgen |
| DE | 33 43 601 A1 | Schroder |
| DE | 32 46 376 A1 | Ballas |
| DE | 31 04 519 | Rischmueller |
| DE | 30 41 781 A1 | Terbrack |
| DE | 29 17 025 | -- |
| DE | 21 59 042 | Hebgen |
| DE | 12 12 275 | Piodi |
| EP | 0 220 389 B1 | Ballas et al. |
| FR | 2,691,491 A1 | Geraud |
| FR | 1,293,043 | -- |
| FR | 1,215,852 | -- |
| FR | 557,844 | Piodi |
| GB | 2,256,023 | Baker |
| GB | 2,168,732 A | Westhaus |
| GB | 2,142,670 A | Westhaus |
| GB | 2,117,813 | Ostrovsky |
| GB | 1,430,423 | Michel |
| GB | 812,671 | Piodi |
| GB | 599,793 | Wynmalen |

1

AL 18349

| Country | Patent Number | Inventor(s) |
|---------|---------------|-------------|
| GB | 448,329 | Elmendorf |
| IT | 444,123 | -- |
| JP | 3-169,967 | Hayashi |
| JP | 6-320,510 | -- |
| JP | 6-146,553 | Inoue Minoru et al. |
| PCT Request | 94/00386 | Pervan, T. |
| SE | 501,014 | Pervan, T. |
| SE | 457,737 | Smedberg |
| SE | 450,141 | Bjöerklund, Christer |
| SE | 8,206,934-5 | Carlsson |
| SE | 7,114,900-9 | Smedberg |
| US | 5,349,796 | Meyerson |
| US | 5,295,341 | Kajiwara |
| US | 5,274,979 | Tsai |
| US | 5,179,812 | Hill |
| US | 5,086,599 | Meyerson |
| US | 5,050,362 | Tal et al. |
| US | 4,845,907 | Meek |
| US | 4,819,932 | Trotter, Jr. |
| US | 4,757,658 | Kaempen |
| US | 4,426,820 | Terbrack et al. |
| US | 4,316,351 | Ting |
| US | 4,242,390 | Nemeth |
| US | 4,186,539 | Harmon et al. |
| US | 4,074,496 | Fischer |
| US | 3,884,328 | Williams |
| US | 3,807,113 | Turner |
| US | 3,798,111 | Lane et al. |
| US | 3,694,983 | Couquet |
| US | 3,657,852 | Worthington et al. |
| US | 3,538,819 | Gould et al. |
| US | 3,373,071 | Fuerst |
| US | 3,253,377 | Schakel |
| US | 3,128,851 | Deridder et al. |
| US | 3,100,556 | Ridder |
| US | 3,090,082 | Bauman |
| US | 2,952,341 | Weiler |
| US | 2,808,624 | Sullivan |
| US | 2,729,584 | Foster |
| US | 2,644,552 | MacDonald |
| US | 2,491,498 | Kähr |
| US | 2,430,200 | Wilson |
| US | 2,282,559 | Byers |
| US | 2,245,497 | Potchen |

AL 18350

| Country | Patent Number | Inventor(s) |
|---------|---------------|-------------|
| US | 2,222,137 | Bruce |
| US | 2,199,938 | Kloote |
| US | 2,142,305 | Davis |
| US | 2,141,708 | Elmendorf |
| US | 2,049,571 | Schuck |
| US | 2,045,067 | Bruce |
| US | 2,027,292 | Rockwell |
| US | 1,991,701 | Roman |
| US | 1,913,342 | Schaffert |
| US | 1,854,396 | Davis |
| US | 1,776,188 | Langbaum |
| US | 1,706,924 | Kane |
| US | 1,319,286 | Johnson et al. |
| US | 1,140,958 | Cowan |
| US | 1,137,197 | Ellis |
| US | 1,097,986 | Moritz |
| US | 898,381 | Mattison |
| US | 877,639 | Galbraith |
| US | 832,003 | Torrence |
| US | 769,355 | Platow |
| US | 714,987 | Wolfe |
| US | 662,458 | Nagel |
| US | 308,313 | Gerike |
| US | 208,036 | Robley |
| WO | 93/13280 | |
| | PCT/DK92/00394 | Jorgensen et al. |
| WO | 84/02155 | |
| | PCT/SE83/00423 | Carlsson |
| WO | 80/02155 | |
| | PCT/JP80/00055 | Hamanaka et al. |

II.    Other References

1.    E. Allen & J. Iano, Fundamentals of Building Construction Materials and Methods (John Wiley & Sons, Inc. 1985).

2.    Automated Program for Designing Snap-Fits, Plastics Engineering, Aug. 1987, at 39-41.

3.    Ronald D. Beck, Plastic Product Design 256-58 (Van Nostrand Reinhold Co. 1970).

4.    John Belle, et al., Traditional Details for Building Restoration, Renovation, and Rehabilitation (John Wiley & Sons, Inc. 1991).

AL 18351

5.  James F. Carley, <u>Whittington's Dictionary of Plastics</u> 443, 461 (Technomic Publishing Co. 1993).

6.  Wolfram Graubner, <u>Encyclopedia of Wood Joints</u> (Taunton Press, Inc. 1992).

7.  Wolfram Graubner, <u>Holzverbindungen: Gegenüberstellungen japanisher und europäisher Lösungen</u> (Deutsche Verlags-Anstalt GmbH, Stutgart 1986).

8.  George T. Halmos, <u>High-Production Roll Forming</u>, (Soc'y of Manufacturing Engineers 1983).

9.  3 Edward H. Knight, <u>Knight's American Mechanical Dictionary</u> 2051 (Hurd & Houghton 1876).

10. E. A. Muccio, <u>Plastic Part Technology</u> 161-62 (ASM Int'l 1991).

11. <u>New Software Simplifies Snap-Fit Design</u>, Design News, Feb. 10, 1992, at 147-48.

12. William L. Roberts, <u>Hot Rolling of Steel</u> 189 (Marcel Dekker, Inc. 1983).

13. <u>Software Speeds Selection of Productive Snap-Fit Options</u>, Modern Plastics, Aug. 1991, at 29-30.

14. Terbrack Kunststoff GmbH & Co. KG, <u>Die mobile Tanzfläche "Planoquick"</u> (product brochure).

15. Træbranchens Oplysningsråd, <u>Træ 19: Trægulve</u> (1968).

16. United Steel Companies Ltd., <u>Elements of Rolling Practice</u> 116-17 (Percy Lund, Humphries and Co., 2d ed., 1963).

17. The depiction at VA00117, and the prior art device(s) and/or references on which it is based.

III. <u>Art Cited to the United States Patent and Trademark Office</u>

1.  All references and prior art cited to the United States Patent Office in the prosecution of U.S. Patent Nos. 5,706,621, 5,860,267, 6,023,907 and 6,182,410, including references and prior art cited in the reissue/reexamination proceeding of US Patent No. 5,706,621.

AL 18352

Respectfully submitted,

Edward V. Filardi, PV

Edward V. Filardi
Daniel A. DeVito
Todd J. Tiberi
SKADDEN, ARPS, SLATE
   MEAGHER & FLOM LLP
Four Times Square
New York, N.Y. 10036-6522
(212) 735-3000

John J. Mangan
Stephen P. Vaughn
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM, L.L.P.
1440 New York Avenue N.W.
Washington, D.C. 20005
(202) 371-7000

Attorneys for Respondent Pergo, Inc.

Dated:  Washington, D.C.
         May 21, 2001

5

AL 18353

## CERTIFICATE OF SERVICE

I, Stephen P. Vaughn, hereby certify that copies of the foregoing document were served this 21st day of May 2001, as follows:

Hon. Donna R. Koehnke                    Original plus six copies by hand
Secretary
U.S. International Trade Commission
500 E Street, S.W.
Room 112
Washington, DC 20436


Hon. Paul J. Luckern                     Two copies by hand
Administrative Law Judge
U.S. International Trade Commission
500 E Street, S.W., Room 317
Washington, DC 20436


*Commission Investigative Attorney*:

James B. Coughlan                        One copy by hand
Office of Unfair Import Investigations
U.S. International Trade Commission
500 E Street, S.W., Room 401-L
Washington, DC 20436


*Counsel for Complainants Alloc, Inc., Berry
Finance, N.V., and Valinge Aluminium, AB*:

Kevin M. O'Brien                         One copy by hand
John W. Polk
Adam C. Underwood
Baker & McKenzie
815 Connecticut Avenue, N.W.
Washington, DC 20006-4078


Daniel J. O'Connor                       One copy by Federal Express
David I. Roche
Baker & McKenzie
130 E. Randolph Drive
Chicago, IL 60601


AL 18354

*Counsel for Respondents Unilin Decor N.V.,*
*BHK of America, Inc., and Meister-Leisten Schulte GmbH:*

Cecilia H. Gonzalez                                One copy by hand
Howrey Simon Arnold & White, LLP
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004

John M. DiMatteo                                  One copy by Federal Express
Benjamin Levi
Stuart E. Pollack
Patterson, Belknap, Webb & Tyler, LLP
1133 Avenue of the Americas
New York, NY 10036-6710

*Counsel for Respondents Tarkett, Inc. and*
*Akzenta Paneele+Profile GmbH:*

Ward B. Coe, III                                  One copy by Federal Express
Steven E. Tiller
Gregory M. Stone
Whiteford, Taylor & Preston, LLP
7 Saint Paul Street
Baltimore, MD  21202-1626

Victor M. Wigman                                  One copy by hand
George C. Myers, Jr.
Blank Rome Comisky & McCauley, LLP
900 17th Street, N.W.
Suite 1000
Washington, DC 20006

**AL 18355**

*Counsel for Respondent Roysol:*

Douglas V. Rigler                                One copy by hand
Andrews & Kurth, LLP
1701 Pennsylvania Avenue, N.W.
Suite 300
Washington, DC 20006

Andrew J. Patch                                 One copy by Federal Express
Young & Thompson
745 South 23rd Street – Suite 200
Arlington, VA 22202

Claude Rémont                                   One copy by Federal Express
Novamark Téchnologies
122, rue Edouard Vaillant
92593 Levallois-Perret Cedex
France

Stephen P. Vaughn

AL 18356

# PATENT SPECIFICATION



**812,671**

*Date of Application and filing Complete
Specification: May 24, 1957.*

*No. 16585/57*

*Application made in Italy on June 27, 1956*

*Complete Specification Published: April 29, 1959*

Index at Acceptance:—**Class 87(1)**, B4(C3B:F1B:G1:G2:H1B).
**International Classification:**—**E04c.**

## COMPLETE SPECIFICATION

### A New or Improved Flooring

I, Roberto Piodi, an Italian citizen, of 12, via Porro, Turin, Italy, do hereby declare the invention, for which I pray that a patent may be granted to me, and the method by
5 which it is to be performed, to be particularly described in and by the following statement:—

This invention relates to a flooring of the type comprising equal quadrangular mem-
10 bers of rubber or similar material, which are provided with two tenons and two mortises for interengagement of their edges, and in which said tenons are provided on two adjacent edges and said mortises on the
15 other adjacent edges and are of undercut shape in cross-section.

According to the invention each tenon has its one end flush with the bottom of the mortise provided in the edge of the member
20 which intersects the edge carrying said tenon and its other end spaced from the corner of the member at which the two edges of the latter carrying its two tenons meet.

25 In order that this invention may more readily be understood and further features thereof appreciated, several embodiments of the same will now be described by way of example only, with reference to the accom-
30 panying drawings in which:—

Figure 1 is a plan view of one of the flooring members according to the invention;

Figure 2 is a view from below of a floor-
35 ing member according to the invention;

Figure 3 is a sectional view on the line III-III of Figure 2;

Figure 4 is a plan view of a plurality of interconnected members;
40 Figure 5 is a sectional view on line V-V of Figure 4;

Figure 6 shows a modification of Figure 5 on an enlarged scale;

Figure 7 is a plan view of a modified
45 member construction;

Figure 8 is a part cross-sectional view on an enlarged scale of two contiguous members according to Figure 7 ready for assembly;

50 Figure 9 is a cross-sectional view of a member on a middle horizontal plane at the corner of said member at which the ends of its mortises meet;

Figure 10 is a plan view of a plurality of
55 assembled elements; and

Figure 11 is a plan view of a modified element construction.

Referring to the drawings, the improved flooring comprises rubber members of
60 quadrangular, preferably rectangular or square, shape. The members are formed on two adjacent sides with an undercut tenon 2 and on their two other sides with slots or mortises 3 matching the tenons for inter-
65 engagement of the members to form a continuous surface (Figure 4).

The upper portion or layer 1 of the member is made of hard wearing rubber withstanding the action of atmospheric agents,
70 ultra-violet rays and ageing generally, whilst its lower portion or face 4,is made substantially thinner than the upper portion 1, preferably of softer, even spongy rubber in order to confer to the flooring a high adapt-
75 ability to bearing surfaces which are not truly smooth and a satisfactory adherence thereto.

If desired, the lower portion can be made from an inexpensive rubber mix including
80 a filler of cotton or other material for the sake of economy.

Grooves 5 can be cut at the base of the flooring member and these confine lugs 6 for the purpose of improving aeration of the
85 lower flooring portion.

In the construction shown in Figure 6, the members are formed at their edges with top seatings accommodating strips 7 for sealing the joints.

90 The members can be of any colour and



2                                                    812,671

even of different materials, provided they are similar in properties to rubber.

In the construction shown in Figure 7 the flooring is made of a plurality of rectangu-
5 lar rubber members 10 preferably made up of two rubber layers interconnected on moulding.

Each member is conveniently of a length twice its width. This special sizing of the
10 individual members has been deliberately selected in view of the fact that, on cooling, the moulded rubber shrinks to varying extents in different directions, partly as a consequence of the direction of calendering on
15 the raw mix.

In fact, a member moulded in a square mould would on cooing become rectangular, which would entail considerable difficulties in distinguishing the larger from the smaller
20 side in laying owing to the slight difference in size. Where the direction of calendering of the raw rubber is not taken care of in placing it into the mould, the mortises and tenons might result arbitrarily on non-
25 matching longer and shorter sides.

The rectangular form of the element fully avoids these drawbacks as it clearly distinguishes both on moulding and laying the longer side of the individual members with-
30 out the need for a particular mark, whereby variations in size of the members, where the blanks have been all calendered in the same direction, are minimised.

As in the previously described construc-
35 tions, the members 10 are formed with tenons 11 and 12 on two adjacent sides interchanging with the contiguous elements and with mortises 13, 14 in their remaining two sides.

40 Generally, with elements of the preferred rectangular form shown in Figure 7, the tenon on the longer side of one member is fitted into the mortise in the longer side of the adjacent member by relatively sliding
45 the members in a longitudinal direction, interengagement of two adjacent members by their shorter sides being effected by snap action by a pressure directed perpendicularly to the joint line.

50 The tenons on the members are shaped in cross section to an arrow point 12A provided with a stem 12B connecting it to the edge of the member. The point 12A is slightly smaller in size than the mortise
55 portion 13A adapted to receive it in the co-operating member. Moreover, the stem is of a length b slightly exceeding the length a of the co-operating mortise portion 13B. This particular sizing of the mortises and
60 tenons was deliberately selected in order to facilitate snapping of the members into one another, which might fail if both mortises and tenons were made of the same size.

The surfaces of the member edge above
65 and below the tenon, denoted by 15 in

Figure 8, forms, with a horizontal plane extending through the tenon, an angle c slightly less than 90° in order to ensure an exact contact of the edges of adjacent members. 70

It will be seen from Figure 7 that the tenons are slightly shorter in length than the edge of the member from which they extend.

As shown in Figure 9, which is a horizontal section view of a member at the 75 region adjacent the corner 17 at which the mortises of said member meet, the ends of said mortises are closed, whereby the rubber-filled angle 10A is strengthened against yielding. 80

According to the construction shown in Figure 11 the tenons comprise projections such at 22A, 22B, 22C etc. and 21A, 21B, 21C etc. separatd by gaps or recesses.

This structure is more particularly suit- 85 able for the shorter sides of the members which are assembled by snap action under pressure instead of by sliding the tenon along the mortise. The mortise may preferably be made continuous in the longer side 90 and discontinuous in the shorter side of the member for the sake of assembly of the latter under pressure in a perpendicular direction between two members with respect to the edge to be connected as well as of a 95 firm assembly against lateral displacements.

WHAT I CLAIM IS:

1. Flooring comprising equal quadrangular members of rubber or similar material, such members being provided with 100 two tenons and two mortises for interengagement of their edges, said tenons being provided on two adjacent edges and said mortises on the other adjacent edges of each member and being of undercut shape in 105 cross-section, wherein each tenon has its one end flush with the bottom of the mortise provided in the edge of the member intersecting the edge carrying said tenon and its other end spaced from the corner of the 110 member at which the two edges of the latter carrying said two tenons meet.

2. Flooring according to Claim 1, wherein an upper portion of each member is made of hard-wear rubber, its lower portion being 115 made of softer rubber, such as spongy rubber.

3. Flooring according to any of the preceding claims, wherein the members are formed on their lower faces with grooves for 120 aeration purposes.

4. Flooring according to any of the preceding claims, wherein seatings are formed along the edges of the members for accommodating strips sealing the joints. 125

5. Flooring according to Claim 1, wherein the tenons on the members are shaped to an arrow-point, provided with a stem connecting with the edges of the member, said arrow-point being slightly smaller in size 130

than the portion of the co-operating mortise in adjacent member, the stem slightly exceeding in length the portion of its co-operating mortise.

6. Flooring according to claim 5, wherein a portion of the edge of the member above and below the tenon is somewhat outwardly inclined towards the latter to provide accurate juxtaposition of the top edges of adjacent members.

7. Flooring according to claim 1, wherein the adjacent ends of the mortises in two adjacent edges of the same member are closed.

8. Flooring as claimed in claim 1, wherein the tenons are interrupted by gaps.

9. Flooring according to any of the preceding claims, wherein the members are rectangular in shape, their length being twice their width.

10. Flooring substantially as hereinbefore described with reference to and as shown by Figures 1 to 5 of the accompanying drawings.

11. Flooring according to claim 10, modified substantially as hereinbefore described with reference to and as shown by Figure 6 of the accompanying drawings.

12. Flooring according to claim 10, modified substantially as hereinbefore described with reference to and as shown by Figures 7, 8 and 10, or Figures 7, 9 and 10 of the accompanying drawings.

13. Flooring according to any of claims 10 to 12, modified substantially as hereinbefore described with reference to and as shown by Figure 11 of the accompanying drawings.

FORRESTER, KETLEY & CO.,
Chartered Patent Agents,
Jessel Chambers, 88-90 Chancery Lane,
London, W.C.2,
and Central House, 75, New Street,
Birmingham, 2.
Agents for the Applicants.

Berwick-upon-Tweed: Printed for Her Majesty's Stationery Office, by The Tweeddale Press Ltd.—1959
Published at The Patent Office, 25, Southampton Buildings, London, W.C.2., from which copies may be obtained.



812,671     COMPLETE SPECIFICATION
2 SHEETS     This drawing is a reproduction of
the Original on a reduced scale.
SHEETS  1 & 2







POOR QUALITY

# PRODUCTION OF BUILDING DECORATIVE LAMINATE

| | |
|---|---|
| Patent Number: | JP6320510 |
| Publication date: | 1994-11-22 |
| Inventor(s): | AOKI HIDEKAZU; others: 02 |
| Applicant(s):: | DAIKEN TRADE & IND CO LTD |
| Requested Patent: | ☐ JP6320510 |
| Application Number: | JP19930139352 19930517 |
| Priority Number(s): | |
| IPC Classification: | B27M3/00 ; E04F13/10 ; E04F15/04 |
| EC Classification: | |
| Equivalents: | |

## Abstract

PURPOSE:To raise productivity and obtain a decorative laminate of a high accuracy by a method wherein a fitting projection edge part and a cutout part fittable to the fitting projection edge part are formed on both the end parts of a rectangular substrate formed by laminating a rubber layer or a synthetic resin plate on a wood decorative laminate.
CONSTITUTION:In a method for producing a building decorative laminate A, firstly a rectangular substrate 1 having a fixed width is formed by laminating a lower surface board 1b made of a thin-wall rubber plate or an elastic synthetic resin plate on a lower surface of a wood decorative laminate 1a made of a laminated lumber or the like. After that, a fitting projection edge part 2 of a fixed width having a step part at least on its lower surface is formed by cutting one edge part of the rectangular substrate 1. An engaging groove 5 of an appropriate depth is cut on a lower base end part of the fitting projection edge part 2 to its full length. A cutout part 3 having a crosssectional shape fittable to the fitting projection edge part 2 is formed by similarly cutting the other edge part of the substrate 1. An engaging protuberance 8 of an appropriate depth fittable to the engaging groove 5 is cut on the other of the cutout part 3.

Data supplied from the **esp@cenet** database - I2

**AL 5413**

(19)日本国特許庁（ＪＰ）　　(12) 公 開 特 許 公 報 （Ａ）　　(11)特許出願公開番号

# 特開平6−320510

(43)公開日　平成 6 年(1994)11月22日

| (51)Int.Cl.⁵ | | 識別記号 | 庁内整理番号 | ＦＩ | 技術表示箇所 |
|---|---|---|---|---|---|
| Ｂ２７Ｍ | 3/00 | | Ｈ | 2101−2Ｂ | |
| Ｅ０４Ｆ | 13/10 | | Ｂ | 9127−2Ｅ | |
| | 15/04 | | Ｆ | 7805−2Ｅ | |

審査請求　未請求　請求項の数1　ＦＤ　（全 5 頁）

(21)出願番号　　特願平5−139352

(22)出願日　　　平成 5 年(1993) 5 月17日

(71)出願人　000204985
　　大建工業株式会社
　　富山県東砺波郡井波町井波 1 番地の 1
(72)発明者　青木　英一
　　大阪市北区中之島 2 − 3 − 18　大建工業株
　　式会社内
(72)発明者　井上　稔
　　大阪市北区中之島 2 − 3 − 18　大建工業株
　　式会社内
(72)発明者　林　晋司
　　大阪市北区中之島 2 − 3 − 18　大建工業株
　　式会社内
(74)代理人　弁理士　山本　孝

(54)【発明の名称】　建築用化粧材の製造方法

(57)【要約】

【目的】　床材等の建築用化粧材を簡単且つ精度よく製造する。

【構成】　木質化粧材1aの下面に弾性材料からなる下面板1bを貼着してなる一定厚みを有する長方形状の基材 1 において、その基材 1 の一側端部を切削刃によって該一側端面の中央部から水平方向に突出した水平突条部 4 を削成すると共に下面を一定厚さだけ段状に切除2cしてその基端に下向きに開口した一定深さの係止溝 5 を削成することにより、基材 1 の一側部側に該係止溝 5 と上記水平突条部 4 とを有する一定幅の嵌合突縁部 2 を形成する一方、基材 1 の他側縁部を同じく切削刃によって上記嵌合突縁部 2 が嵌合可能な切欠部 3 を形成し、この切欠部 3 の切削加工時に、その一側端面に上記水平突条部 4 が嵌入可能な水平条溝 6 を削成すると共に、他側端に上記係止溝 5 が係止可能な係合突条部 8 を削成する。



1　基材
2　嵌合突縁部
2a　下向き突条部
2c　切欠部
4　水平突条部
5　係止溝
6　水平条溝
7　嵌入溝
8　係合突条部

AL 5414

1

【特許請求の範囲】

【請求項1】　一定厚みの木質化粧板の中間層ないしは下層に少なくとも一層のゴム又は合成樹脂板を層着して一定幅を有する長方形基材を形成したのち、この長方形基材の一側縁部に切削加工によって少なくとも下面側に段部を有する一定幅の嵌合突縁部を形成すると共に該嵌合突縁部の下面基端部に適宜深さの係止溝を全長に亘って削成し、一方、基材の他側縁部に同じく切削加工によって上記嵌合突縁部が嵌合可能な断面形状を有する切欠部を削成すると共に該切欠部の他側端に上記係止溝が嵌合可能な係合突条部を削成することを特徴とする建築用化粧材の製造方法。

【発明の詳細な説明】

【0001】

【産業上の利用分野】本発明は床材や内装材等の建築用化粧材を簡単且つ精度よく製造し得る方法に関するものである。

【0002】

【従来の技術】従来から、合板などの床下地パネルやコンクリートスラブ等の床下地材上に施工する床材、或いは、建物の内装材として用いられる建築用化粧材Aとしては、図12に示すように、一側端面に雄実部aを突設する一方、他側端面に該雄実部aが嵌合可能な雌実部bを形成してなる構造のものが広く知られている。また、雄雌実部同士の嵌合では、化粧材が互いに離間する方向にズレが生じるので、同図に示すように、化粧材Aの雌実部b側下面に係合溝cを設ける一方、雄実部a側の下面に該雄実部aから小間隔を存して上記係合溝cが嵌合可能な突条部dを形成したものが採用されている。

【0003】このような化粧材Aを得るには、雄実部aの突出側に突条部dが設けられているために、切削工具によって雄実部aと突条部dを削成するには特殊な刃物を要すると共にその切削加工に困難をきたし、熟練を要するものである。この為、図13に示すように、両側端面に雌実部a、bを形成し、且つ一側端下面に側端面から小間隔を存して係合溝cを刻設してなる化粧材基板A₁と、他側端に前記係合溝cに係合可能な突条部dを突設してなる下面板bとを作成したのち、該下面板b上に接着剤eを介して化粧材基板A₁を載置し、プレス盤P、P間に挿入して圧着することにより製造している。

【0004】

【発明が解決しようとする課題】しかしながら、このような製造方法によると、化粧材基板A₁と下面板A₂との位置合わせを正確に行うことが困難である上に、プレス盤P、Pによって圧縮、接着させる際にズレが生じて精度のよい化粧材を製造することができず、雌雄実部a、bとの係合、および係合溝cと突条部dとの係止が円滑に行えない場合が生じるものである。本発明はこのような問題点を解消し得る建築化粧材の製造方法の提供を目的とするものである。

2

【0005】

【課題を解決するための手段】上記目的を達成するために、本発明の建築化粧材の製造方法は、まず、一定厚みの木質化粧板の中間層ないしは下層に少なくとも一層のゴム又は合成樹脂板を層着して一定幅を有する長方形基材を形成する。次いで、この長方形基材の一側縁部に切削加工によって少なくとも下面側に逆L字状の段部を有する一定幅の嵌合突縁部を形成すると共に該嵌合突縁部の下面基端部に適宜深さの係止溝を全長に亘って削成する一方、基材の他側縁部に同じく切削加工によって上記嵌合突縁部が嵌合可能な断面形状を有する切欠部を削成すると共に該切欠部の他側端に上記係合突条部が嵌合可能な係合突条部を削成することを特徴とするものである。

【0006】

【作用】一定厚みと幅を有する長方形基材の両側端部に、適宜な切削工具を使用して嵌合突縁部と該嵌合突縁部が嵌合可能な切欠部とをそれぞれ削成する。この際、基材の一側端面に対しては、少なくともその下端部を断面逆L字状に切除することにより嵌合突縁部が形成され、他側端面に対しては少なくとも一定厚みの下端部を残して断面L字状に削成する。この切削加工は、基材の両側端面に対して水平方向から切削刃を切り込むことにより容易に行える。

【0007】次いで、嵌合突縁部の下面基端部に該嵌合突縁部の突出端面から一定間隔を存して一定幅を有する係止溝を削成する一方、他側端面に削成した断面L字状の切欠部の底部を基材の他端面から一定幅部分を残して溝状に削成することにより、上記嵌合突縁部が嵌合可能な切欠部と上記係止溝が嵌合可能な突条部とが同時に形成される。これらの係止溝や切欠部及び突条部は、切削工具の切削刃を基材の下方及び上方から基材を掘削することにより正確な部位に精度よく形成し得る。

【0008】

【実施例】本発明の実施例を図面に基づいて説明すると、まず、図1に示すように集成材や合板、パーティクルボード、MDF等からなる木質化粧材1aの下面に薄肉のゴム板又は弾性合成樹脂板よりなる下面板1bを接着、一体化して一定幅と厚みを有する長方形状の基材1を形成する。次いで、適宜な切削工具（図示せず）によって基材1の一側に全長に亘って嵌合突縁部2を削成すると共に他側に該嵌合突縁部2が嵌合可能な断面形状を有する切欠部3を削成する。

【0009】これらの嵌合突縁部2と切欠部3を削成する手順を述べると、基材1の一側面においては図2に示すように、中央部を一定厚み残すようにしてその上下部を基材1の側端面から一定幅でもって断面L字状、逆L字状に切除2a、2bすることにより、これらの切除部2a、2b間に側端面中央から一定長外側方に突出した一定幅を有する水平突条部4を形成すると共に、下側の逆L字状切除部2bの基端下部から下面板1bおよびその上側の木質

（3）　　　　　　　　　特開平6－320510

化粧材1aの下層部をさらに一定幅、水平方向に切除して段部2cを削成し、前記水平突条部4の突出端面から段部2cの基端までの部分を嵌合突縁部2に形成するものである。

【0010】なお、上記切除部2a、2b及び段部2cは切削工具の切削刃を基material1の板幅方向（水平方向）に切り込むことによって容易に形成することができる。さらに、この嵌合突縁部2の下面基端部、即ち、上記段部2cの基端部に、図3に示すように、下面から一定深さに達する一定幅を有する係止溝5を削成する。図3に示す係止溝5は切削工具の切削刃を上向きにして切り込むことによって容易に形成し得る。係止溝5の削成によって水平突条部4の下面基端と該係止溝5との間の嵌合突縁部2の下部に下向き突条部2dが形成される。

【0011】一方、基material1の他側部においては、図2に示すように、上記嵌合突縁部2の水平突条部4の基端面と段部2cの基端面との間の幅寸法に等しく、且つ基material1の上面から係止溝5の上端面に達する厚みに略等しい欠除部となるように切削工具の切削刃で他側端面から断面L字状に切刃3aとのち、図3に示すように該切削部3aの内側端面の下部をさらに基material1の中央部に向かって水平に切込むことにより上記嵌合突縁部2の水平突条部4が嵌入可能な水平条溝6を掘削する。

【0012】次いで、切削部3aの削成によって残存させた基material1の他側部下部にその他側端面から上記係止溝5の幅寸法を残して上記下向き突条部2dの幅に略等しい幅部分を上方から上記切削工具の切削刃でもって、下面板1b近傍部に達する深さの嵌入溝7を掘削する。この嵌入溝7の形成によって基material1の他側部に嵌合可能な切欠部3が形成されると共に該嵌入溝7と基material1の他側端面間に上記係止溝5に嵌合可能な係合突条部8が形成されるものである。尚、上記方法では嵌合突縁部2を形成して係止溝5を削成した後、切欠部3を形成し、嵌入溝7を掘削しているが、嵌合突縁部2と切欠部3を先に形成し、各々係止溝5と嵌入溝7を形成するなど、切削装置の配置により順序は決定される。

【0013】このようにして製作した床材Aを施工するには、図4、図5に示すように、先に床下地material上に敷設、固定した床材A₁の他側端面に対して次に施工すべき床材A₂をその嵌合突縁部2側が下向き状態となるように傾斜させて該嵌合突縁部2を既に敷設した床材A₁の切欠部3に嵌め込む。この際、嵌合突縁部2から突設した水平突条部4を固定床材A₁の切欠部3の内側面に形成している水平条溝6に挿入させながら嵌合突縁部2の下面に突設している下向き突条部2dを切欠部3の底面に凹設した嵌入溝7に嵌入させると共に係止溝5を係合突条部に係止させ、床材A₂を徐々に水平状態となる方向に伏動させて固定した床材A₁の他側係合突条部8に床材A₂の一側端部下面に凹設している係止溝5を被嵌させるものである。

【0014】このように床材Aを次々と接続して床を形成するものであるが、上記のように両床材A₁、A₂を接続させると、水平条溝6と水平突条部4との嵌合によって上下方向の変動が規制される一方、下向き突条部2dと嵌入溝7との嵌合によって互いに離間する方向の動きを拘束され、目隙等が生じない精度のよい施工が可能となるものである。なお、ゴム板や弾性合成樹脂板よりなる下面板1bを貼着したことによって下地面との密着を良好にして不陸の発生をなくすると共に係合突条部8を補強することができる。

【0015】図6～図8は本発明の別な実施例を示すもので、図6に示すように、化粧単板貼合板、パーティクルボード、MDF、WPC単板貼合板等よりなる一定厚みの木質化粧material1aに下面板1cとして上記実施例における下面板1bよりも肉厚の軟質ないしは半硬質の合成樹脂板を一体に屑着してなる基material1を使用し、この基material1の一側部に上記実施例と同様にして図7に示すように水平突条部4と下向き突条部2dおよび係止溝5を設けた嵌合突縁部2を削成する一方、他側部に水平条溝6、嵌入溝7、係合突条部8を設けた切欠部3を削成するものである。この場合、嵌合突縁部2は木質化粧material1aのみによって形成すると共に切欠部3の底面に設けた嵌入溝7は下面板1cの上面に達する深さまで設けて下面板1cを溝底面に形成している。

【0016】また、図8に示す化粧板（床板）は、上記図6、図7に示した構造において、木質化粧material1aの厚みを薄くする一方、軟質ないしは半硬質合成樹脂板よりなる下面板1dの厚みを大きくして該下面板1dの両側部を切削加工することにより上記嵌合突縁部2や切欠部3等を形成してなるものである。

【0017】図9、図10は本発明のさらに別な実施例を示すもので、図9に示すように、長方形状基material1を3層の板材によって形成し、この基material1を切削加工して図10に示すような化粧板（床板）を製作したものである。即ち、基material1として厚みの大なる軟質ないは半硬質合成樹脂板を主material1dとし、該主material1dの上面に薄肉の化粧単板貼合板、パーティクルボード、MDF、WPC単板貼合板等よりなる木質化粧material1aを一体に貼着すると共に、下面に製作された化粧material の反りを防止するための薄肉の合板、パーティクルボード、発泡合成樹脂板等の板状material1eを貼着した構造のものを使用している。このように3層からなるような基material1の両側部における主として主板material1dを上記実施例と同様に切削加工して図10に示すように、上記嵌合突縁部2や切欠部3等を形成するものである。

【0018】図11は上記3層の基material1の下面に緩衝性を有するクッションmaterial1fを貼着して4層の基material1を形成し、この基material1の両側部を切削加工して嵌合突縁部2や切欠部3等を形成したものである。この場合、嵌合突縁部2の下面に突設した下向き突条部2dを板状material1eによって形成し、また、切欠部3の底面に設けた嵌入溝7も該

(4)　　　　　　　　　　　特開平6－320510

5

板状材1e部分に形成すると共にその溝底はクッション材1fに達しない深さとしている。なお、以上のいずれの実施例においても、嵌合突縁部2の突出端面に水平突条部4を形成する一方、切欠部3側に該水平突条部4が嵌入可能な水平条溝6を形成しているが、これらは必ずしも設けなくてもよい。

【0019】
【発明の効果】以上のように本発明の建築化粧板の製造方法によれば、一定厚みの木質化粧板の中間層ないしは下層に少なくとも一層の合成樹脂板を層着して一定幅を有する長方形基材を形成したのち、この長方形基材の一側縁部に切削加工によって少なくとも下面側に段部を有する一定幅の嵌合突縁部を形成すると共に該嵌合突縁部の下面基端部に適宜深さの係止溝を全長に亘って削成し、一方、基材の他側縁部に同じく切削加工によって上記嵌合突縁部が嵌合可能な断面形状を有する切欠部を削成すると共に該切欠部の他側端に上記係止溝が嵌合可能な係合突条部を削成することを特徴とするものであるから、長方形の基材の一側縁部に対しては、少なくともその下端部を断面逆L字状に切除することにより嵌合突縁部を容易に削成し得ると共に該嵌合突縁部の基端部に下面からの切削によって所定幅と深さを有する係止溝を正確に切削し得るものである。

【0020】一方、基材の他側縁部に対しては、下部の所定厚みを残して上記嵌合突縁部の厚みと幅に相当する部分を切除することによって該嵌合突縁部が嵌合可能な切欠部を簡単に削成することができ、その際、基材の他側端面から上記係止溝の幅に略等しい幅を残して切欠部を掘削することにより、係止溝が嵌合可能な形状を有する係合突条部を同時に形成することができるものである。

【0021】さらに、上記のような嵌合突縁部とその下面基端に設けた係止溝、及びこれらの嵌合突縁部や係止溝がそれぞれ係合可能な切欠部と突条部は、適宜な切削

6

工具の切削刃を水平方向及び垂直方向に操作して基材の両側部を切削加工することによって容易に形成することができて生産性の向上を図ることができると共に、嵌合突縁部と係止溝の寸法に応じてそれぞれ切欠部と突条部の寸法を正確に設定できるので、精度のよい化粧材を得ることができるものである。

【図面の簡単な説明】
【図1】基材の一部斜視図、
【図2】その切削加工を説明するための斜視図、
【図3】削成した化粧材の一部斜視図、
【図4】施工状態を示す簡略斜視図、
【図5】施工後の係合状態を示す簡略斜視図、
【図6】本発明の別な実施例を示す基材の断面図、
【図7】該基材を切削加工して得られた化粧材の断面図、
【図8】化粧材の変形例を示す断面図、
【図9】本発明のさらに別な実施例を示す基材の断面図、
【図10】該基材を切削加工して得られた化粧材の断面図、
【図11】下面に緩衝材を層着した化粧材の断面図、
【図12】従来の化粧材の断面図、
【図13】その製造方法を説明するための断面図。

【符号の説明】
1　基材
2　嵌合突縁部
2d　下向き突条部
3　切欠部
4　水平突条部
5　係止溝
6　水平条溝
7　嵌入溝
8　係合突条部

【図1】　　　　　　【図2】　　　　　　【図3】



【図5】　　　　　　【図6】

【図9】

－64－

AL 5417

（5）　　　　　　　　　　特開平6−320510

【図4】　　　　　　　　【図7】　　　　　　　　【図8】



【図10】　　　　　　　【図11】　　　　　【図12】　　　　　　【図13】



**AL 5418**

English translation of

the Japanese patent application

nr. 6-320510

AL 5419

- 1 -

Japanese Unexamined Patent Publication No. 6-320510

Publication Date: November 22, 1994

Application No.: 5-139352

Application Date: May 17, 1993

Inventors: Aoki et al.

Applicant: Daiken Co., Ltd.

Title of the Invention:

METHOD FOR MANUFACTURING FACING MATERIAL FOR CONSTRUCTION

[Abstract]

[Object] To manufacture facing material for construction such as floor material and the like, easily and precisely.

[Configuration]

Regarding a rectangular base material 1 having a constant thickness comprises am elastic material lower plane plate 1b applied to the lower plane of a wood-quality facing material 1a, a horizontal protrusion 4 protruding in the horizontal direction from the center portion of the one side edge plane of the base material 1 is formed by cutting, and the lower plane is cut 2c in a stepped form to a certain thickness to carve a downward-facing retaining groove 5 of a certain thickness on the lower plane, thereby forming a fitting protrusion 2 of a certain width having the retaining groove 5 and horizontal protrusion 4 on the one side portion

AL 5420

— 2 —

of the base material 1, while on the other hand the same cutting is used for the other side portion of the base material 1 to cut a notch 3 to which the fitting protrusion 2 is capable of fitting, and at the time of cutting this notch 3, a horizontal groove 6 to which the horizontal protrusion 4 can fit is carved at one side edge plane thereof, and a retaining protrusion portion 8 to which the retaining groove 5 can be retained with is carved at the other side edge.

[Claims]

1. A method for manufacturing facing material for construction, wherein at least one layer of rubber or synthetic resin plate is layered at an intermediate layer or lower layer of a wood-quality facing plate having a constant thickness so as to form a rectangular base material having a constant width, following which a fitting protrusion portion of a constant width having a stepped portion on the lower plane side is formed on the edge portion of said rectangular base material by means of a cutting process, and also cutting a retaining groove at an appropriate depth at the lower plane base edge portion of said fitting protrusion portion over the entire length thereof, and on the other hand using the same cutting process for the other side portion of said base material to cut a cross-sectional form

AL 5421

— 3 —

to which said fitting protrusion is capable of fitting, and also cutting an engaging protrusion portion at the other side edge of said cut portion to which said retaining groove is capable of fitting.

[Detailed Description of the Invention]

[0001]

[Industrial Field of the Invention]    The present invention relates to a method whereby facing material for construction such as floor material or interior material can be manufactured easily and with precision..

[0002]

[Description of the Related Art]    Conventionally, regarding construction facing material A such as floor material installed on a sub-floor of plywood or on sub-floor material such as a concrete slab or the like, or to be used as interior material for buildings, a construction such as shown in Fig. 12 is widely known, wherein a tongue portion "a" is erected on one side edge plane and a groove "b" capable of fitting to the tongue "a" is provided to the other side edge plane. Also, regarding the fitting between the tongue-and groove, slippage occurs in the direction of the facing material pieces being separated one from another, so as shown in the Figure, a retaining groove "c" is provided to the lower plane at the side of the groove "b" of the facing material A, and a protrusion d is formed to which

AL 5422

- 4 -

the above engaging groove "c" can fit with a small gap from the tongue "a" at the power plane at the tongue "a" side.

[0003]

In order to obtain such facing material A, a special blade is required in order to cut out the tongue "a" and protrusion "d" with a cutting tool, since the protrusion "d" is provided to the protruding side of the tongue "a", meaning difficulty in the cutting task, consequently requiring experience. Accordingly, as shown in Fig. 13, as shown in Fig. 13 a facing material piece A1 is formed with tongue-and-groove portions "a" and "b" formed on both side edges, and with an engaging groove "c" formed across a small gap from the side edge plane on the lower plane of one side portion, and a lower plane plate A2 having the protrusion "d" capable of engaging the engaging groove "c" is formed, following which the facing material piece A1 is placed upon the lower plane plate A1 with an adhesive agent "e" introduced therebewteen, inserted between presses P and P and pressing, thus fabricating the article.

[0004]

[Problems to be Solved by the Invention]    However, with such a manufacturing method, precise positioning of the facing material piece A1 and lower plane plate A2 is difficult, and further, the pressing and adhesion using the presses P and P causes slippage so facing material with good

AL 5423

- 5 -

precision cannot be manufactured, which may result in cases wherein the engaging of the tongue-and-groove "a" and "b", and the retaining between the retaining groove "c" and the protrusion "d" cannot be performed smoothly.  It is an object of the present invention to provide a method for manufacturing facing material for construction which is capable of solving such problems.

[0005]

[Means for Solving the Problems]   In order to achieve the above object, regarding the method for manufacturing facing material for construction according to the present invention, first, at least one layer of rubber or synthetic resin plate is layered at an intermediate layer or lower layer of a wood-quality facing plate having a constant thickness so as to form a rectangular base material having a constant width. Next, a fitting protrusion portion of a constant width having a reverse-L-shaped cross-sectional form stepped portion on the lower plane side at least is formed on the edge portion of the rectangular base material by means of a cutting process, and also a retaining groove is cut at an appropriate depth at the lower plane base edge portion of the fitting protrusion portion over the entire length thereof, and on the other hand, the same cutting process is used for the other side portion of the base material to cut a cross-sectional form to which the fitting protrusion is

AL 5424

- 6 -

capable of fitting, and also cutting an engaging protrusion portion at the other side edge of the cut portion to which the retaining groove is capable of fitting.

[0006]

[Operation]   A fitting protrusion portion and a notch portion to which the fitting protrusion can fit are cut in the both side edge portions of rectangular base material having a constant thickness and width, using an appropriate cutting tool.  At this time, regarding the one side edge portion of the base material, the fitting protrusion portion is formed by cutting away at least the lower edge portion thereof in a reverse-L-shaped cross-sectional form, and regarding the other side edge portion, at least the lower edge portion of a certain thickness is left and cut into an L-shaped cross-sectional form.  Thus cutting can be easily performed by cutting with a cutting blade from the horizontal direction to the side edge portions of the base material.

[0007]

Next, a retaining groove having a constant width is cut in the lower plane base edge portion of the fitting protrusion portion, across from a certain gap from the protrusion edge plane, while cutting the bottom of the notched portion cut into an L-shaped cross-sectional form at the other side edge plane into a groove form so as to leave

AL 5425

- 7 -

a constant width portion, thereby simultaneously forming a
notch to which the fitting protrusion portion can fit and a
protrusion portion to which the retaining groove and fit..
These retaining grooves, notches, and protrusions can be
formed at accurate positions with high precision, by carving
out the base material from the lower side and upper side of
the base material

[0008]

[Embodiments] Describing an embodiment of the present
invention based on the drawings, first, as shown in Fig. 1,
a lower plane plate 1b formed of a thin rubber plate or an
elastic synthetic resin plate is integrally adhere to the
lower plane of a wood-quality facing plate 1a formed of
laminated lumber, plywood, particle board, MDF, etc.,
thereby forming a rectangular base material 1 of a constant
width and thickness. Next, a fitting protrusion portion 2
is cut over the entire length of the base material 1 using
an appropriate cutting tool (not shown), and a notch 3
having a cross-sectional form to which the fitting
protrusion portion 2 can fit is cut out.

[0009]

Describing the procedures for cutting out the fitting
protrusion portion 2 and notch 3; as shown in Fig. 2, at one
side portion of the base material 1 cuts 2a and 2b are made
from the side edge plane of the base material at a constant

AL 5426

- 8 -

width in an L-shaped cross-sectional form and a reverse-L-shaped cross-sectional form above and below the center portion leaving a certain thickness therebetween, thereby forming a horizontal protrusion portion 4 having a constant width protruding in the outward direction for a constant length from the center of the side edge between these cut portions 2a and 2b, and also cutting horizontally at a constant width at the lower plane plate 1b and the lower player portion of the wood-quality material 1a above, from the lower portion of the base edge of the cut portion 2b at the lower side having a reverse-L-shaped form, thereby cutting out a step portion 2c, and thus forming the portion from the protruding surface of the horizontal protrusion 4 to the base edge of the step portion 2c into a fitting protrusion portion 2.

[0010]

Also, cutting of the above cut portion 2a and 2b, and the step 2c can be easily performed by cutting with a cutting blade of a cutting tool from the direction of plate width (horizontal direction) of the base material. Further, at the lower plane base edge portion of the fitting protrusion 2, that is to say, as shown in Fig. 3, at the base edge portion of the above step 2c, a retaining groove 5 having a constant width and reaching to a constant depth from the lower plane is cut out. This retaining groove 5

AL 5427

- 9 -

can be easily cut by cutting with the cutting blade of a cutting tool pointed upwards. The cutting of this retaining groove 5 forms a downward-facing protrusion portion 2d at the lower portion of the fitting protrusion portion between the lower plane base edge of the horizontal protrusion 4 and the retaining groove 5.

[0011]

On the other hand, at the other side of the base material 1, as shown in Fig. 2, a cut 3a is made in an L-shaped cross-sectional form with the cutting blade of a cutting tool so as to be equal to the width dimensions between the base edge plane of the horizontal protrusion portion 4 of the fitting protrusion portion 2 and the base edge plane of the step 2c thereof, and also so as to be a notch which is generally equal to the thickness reaching from the upper surface of the base material 1 to the upper edge plane of the retaining groove 5, following which as shown in Fig. 3, the lower portion of the inner side edge plane of the cut 3a is further cut in a horizontal direction toward the center portion of the base material 1, thereby carving out a horizontal groove 6 into which the horizontal protrusion portion 4 of the above fitting protrusion 2 is capable of fitting.

[0012]

Next, regarding the other side lower portion of the

AL 5428

– 10 –

base material which was left remaining by the cutting of the cut 3a is cut from the other side edge plane at a width generally equal to the width of the above downward-facing protrusion 2d leaving the width dimension of the retaining groove 5 using the cutting blade of the cutting tool form above, thereby carving out a fitting groove 7 of a depth reaching near to the lower plane plate 1b.  The formation of this fitting groove 7 forms a notch 3 in the other side portion of the base material 1 into which the fitting protrusion 2 can fit, and forms an engaging protrusion portion 8 between the fitting groove 7 and the other side edge plane of the base material 1, capable of fitting to the retaining groove 5.  Incidentally, with the above method, following forming of the fitting protrusion 2 and cutting out of the retaining groove 5, a notch 3 is formed and a fitting groove 7 is carved out, but the order thereof is determined according to the positioning of the cutting apparatus, such as forming the fitting protrusion 2 and notch 3 first and then forming the retaining groove 5 and fitting groove 7.

[0013]

In order to install the floor material A thus manufactured, as shown in Fig. 4 and Fig. 5, the floor material A2 to be laid next is inclined as to the floor material A1 already laid and fixed onto a sub-floor, so that

AL 5429

– 11 –

the fitting protrusion portion 2 thereof faces downwards and the fitting protrusion portion 2 of the floor material A2 fits into the notch 3 of the already-lain floor material A1. At this time, the horizontal protrusion 4 protruding from the fitting protrusion 2 is inserted and fit into the horizontal groove 6 which is formed at the inner side portion of the notch 3 of the floor material A1, and the downward-facing protrusion 2d erected at the lower plane of the fitting protrusion 2 is fit into the fitting groove 7 recessed at the bottom of the notch 3 and the retaining groove 5 is retained at the retaining protrusion, and the floor material A2 is gradually laid down in the horizontal direction so as to fit the engaging groove 5 recessed at one side edge portion of the floor material A2 over the retaining protrusion portion 8 at the other edge of the fixed floor material A1.

[0014]

  The floor material A is thus successively connected so as to form the floor, and connecting the floor material pieces A1 and A2 as described above causes the vertical movement to be restricted by the fitting of the horizontal groove 6 and the horizontal protrusion 4, and the movement in the direction of separating one from another to be stopped by the fitting of the downward-facing protrusion 2d and fitting groove 7, so installation with enough precision

**AL 5430**

- 12 -

that gaps and the like do not occur can be performed.  Also, the adhesion of the lower plane plate 1b formed of a rubber plate or elastic synthetic resin plate or the like allows the close contact with the sub-floor to be suitable, without unevenness occurring, and also the engaging protrusion portion 8 can be strengthened.

[0015]

   Fig. 6 through Fig. 8 illustrate another embodiment of the present invention, wherein, as shown in Fig. 6, a base material 14 is used which is formed of a lower plane plate 1c of a soft or a half-hard synthetic resin plate that is thicker than the lower plane plate 1b in the above embodiment being integrally adhered onto a wood-quality facing plate 1a of a constant thickness, formed of decorative laminated veneer, particle board, MDF, WPC laminated veneer, etc., and a horizontal protrusion 4 and downward-facing protrusion 2d and retaining groove 5 provided to a fitting protrusion are formed on the one side portion of this base material 1 in the same manner as with the above embodiment as shown in Fig. 7, and on the other side portion are formed a horizontal groove 6, insertion groove, and engaging protrusion 8 of a notch 3.  In this case, the fitting protrusion 2 is formed only of the wood-quality facing plate 1a, and the fitting groove 7 provided to the bottom of the notch 3 is provided to a depth reaching

AL 5431

- 13 -

the upper plane of the lower plane plate 1c, thereby forming the lower plane plate 1c at the bottom of the groove.

[0016]

Also, the facing plate (floorboard) shown in Fig. 8 is, in regard to the construction shown in Fig. 6 and Fig. 7, such that the thickness of the wood quality facing plate 1a is made thinner, and the thickness of the lower plane plate 1d formed of a soft or a half-hard synthetic resin plate is made thicker, and the both edge portions of the lower plane plate 1d are cut and worked to form the above fitting protrusion 2, notch 3, and the like.

[0017]

Fig. 9 and Fig. 10 illustrate yet another embodiment of the present invention, and as shown in Fig. 9, a rectangular base material 1 is formed of a tri-layer board material, and this base material 1 is cut and worked to manufacture facing plates (floorboards) such as shown in Fig. 10. That is, for the base material 1, a main plate 1d formed of a soft or a half-hard synthetic resin plate is formed so as to be thick, a thin wood-quality facing plate 1a formed of decorative laminated veneer, particle board, MDF, WPC laminated veneer, etc., is adhered upon the main plate 1d, and a plate-like material piece 1e formed of thin plywood, particle board, synthetic resin forma, etc., is adhered in order to prevent the facing plate formed to the lower plane from bowing.

AL 5432

- 14 -

Even in the event that the base material 1 thus formed of three layers is worked mainly regarding the main plate 1d at the edge portions thereof in the same manner as with the above embodiments as shown in Fig. 10, the above fitting protrusion 2, groove 3, etc., can be formed.

[0018]

Fig. 11 is an arrangement wherein a cushion material 1f having buffering properties is applied to the lower plane of the above tri-layer base material 1 so as to form a base material 1 of four layers, wherein the edge portions of the base material 1 are cut to form the above fitting protrusion 2, groove 3, etc. In this case, the downward-facing protrusion 2d erected on the lower plane of the fitting protrusion 2 is formed of the plate-like material piece 1e, and the fitting groove 7 provided to the bottom of the notch 3 is also formed in the plate-like material piece 1e and the bottom of the groove is not so deep as to reach the cushion material 1f. Incidentally, though all of the above embodiments are provided with a horizontal protrusion 4 at the protrusion edge plane of the fitting protrusion 2, and a horizontal groove 6 in the notch 3 into which the horizontal protrusion 4 can fit, but this does not necessarily have to be provided.

[0019]

[Advantages]

AL 5433

– 15 –

According to the method for manufacturing facing material for construction according to the present invention, at least one layer of rubber or synthetic resin plate is layered at an intermediate layer or lower layer of a wood-quality facing plate having a constant thickness so as to form a rectangular base material having a constant width, following which a fitting protrusion portion of a constant width having a stepped portion on the lower plane side is formed on the edge portion of the rectangular base material by means of a cutting process, and also a retaining groove is cut at an appropriate depth at the lower plane base edge portion of the fitting protrusion portion over the entire length thereof, and on the other hand the same cutting process is used for the other side portion of the base material to cut a cross-sectional form to which the fitting protrusion is capable of fitting, and also an engaging protrusion portion is cut at the other side edge of the cut portion to which the retaining groove is capable of fitting, so regarding one edge side of the rectangular base material, a fitting protrusion can be easily formed by cutting the lower edge portion thereof in a reverse-L-shaped cross-sectional form, and a retaining groove having a certain width and depth can be accurately cut out from the lower plane of the base edge of the fitting protrusion.

[0020]

**AL 5434**

- 16 -

On the other hand, regarding the other side edge portion of the base material, a portion equivalent to the thickness and width of the fitting protrusion is cut out leaving a predetermined thickness at the lower portion, thereby easily cutting out a notch to which the fitting protrusion can fit. At this time, the notch is carved out of the other side edge plane of the base material leaving a width which is generally the same as the width of the above retaining groove, so that a form to which the retaining groove can bit is formed at the same time.

[0021]

Further, the fitting protrusion and the retaining groove provided to the lower plane base edge thereof, and the notch and protrusion capable of fitting to the fitting protrusion and the retaining groove can be easily cut by operating the cutting blade of an appropriate cutting tool in the horizontal and vertical directions, so productivity can be improved, and also the dimensions of the notch and protrusion can be precisely set according to the dimensions of the fitting protrusion and the retaining groove, thus obtaining facing material with good precision.

[Brief Description of the Drawings]

[Fig. 1]  Fig. 1 is a partial perspective view of the base material.

[Fig. 2]  Fig. 2 is a perspective view for describing the

AL 5435

– 17 –

cutting process thereof.

[Fig. 3]  Fig. 3 is a partial perspective view of the cut facing material.

[Fig. 4]  Fig. 4 is a simplified perspective view illustrating the state of installation.

[Fig. 5]  Fig. 5 is a simplified perspective view illustrating the state of junction following installation.

[Fig. 6]  Fig. 6 is a cross-sectional view of base material illustrating another embodiment of the present invention.

[Fig. 7]  Fig. 7 is a cross-sectional view of facing material obtained by cutting and working the base material.

[Fig. 8]  Fig. 8 is a cross-sectional view of base material illustrating a variation of the facing material.

[Fig. 9]  Fig. 9 is a cross-sectional view of base material illustrating yet another embodiment of the present invention.

[Fig. 10] Fig. 10 is a cross-sectional view of the facing material obtained by cutting and working the base material.

[Fig. 11] Fig. 11 is a cross-sectional view of the facing material with buffering material applied to the lower face thereof.

[Fig. 12] Fig. 12 is a cross-sectional view of conventional facing material.

[Fig. 13] Fig. 13 is a cross-sectional view for describing the manufacturing method thereof.

[Reference Numerals]

AL 5436

- 18 -

| 1  | Base material |
|----|---------------|
| 2  | fitting protrusion |
| 2d | downward-facing protrusion |
| 3  | Notch |
| 4  | Horizontal protrusion |
| 5  | Retaining groove |
| 6  | Horizontal groove |
| 7  | Fitting groove |
| 8  | Engaging protrusion |

AL 5437

【図1】

【図2】

【図3】

木質板

【図5】

【図6】

【図9】

木質板
合板相核板
相核板

(5)

特開平6−320510



【図4】

【図7】

【図8】

木質板

合板相核板

【図10】

【図11】

【図12】従来例

【図13】

AL 5438

28. Juni 2000

## Notice of Opposition to a European Patent

To the
European Patent Office

Tabulation marks

| | | for EPO use only |
|---|---|---|
| **I.** Patent opposed | **Zur Kasse** | Opp. No. \| OPPO (1) |
| | DT 1118,92 | |
| | Patent No. | 0 855 482 B1 |
| | Application No. | 98 106 535.2 2303qqq |
| Date of mention of the grant in the European Patent Bulletin (Art. 97(4), 99(1) EPC) | | December 1, 1999 |

Title of the invention:
A method for laying and mechanically joining building panels

**II.    Proprietor of the Patent**

Välinge Aluminium AB

first named in the patent specification

| Opponent's or representative's reference (max. 15 spaces) | 82 738 v1/v5 | OREF |
|---|---|---|

**III.    Opponent**

| | | OPPO (2) |
|---|---|---|
| Name | Perstorp AB | |
| Address | S-284 80 Perstorp | |
| State of residence or of principal place of business | Sweden | |
| Telephone/Telex/Fax | | |
| Multiple opponents | ☐ further opponents see additional sheet | |

**IV.    Authorisation**

| | OPPO (9) |
|---|---|

1. **Representative**
(Name only one representative to whom notification is to be made)

Name

Address of place of business

**HOFFMANN · EITLE**
PATENT- UND RECHTSANWÄLTE
D-81925 MÜNCHEN    ARABELLASTRASSE 4

Association No. 151

| Telephone/Telex/Fax | Tel.: 089/92409-0 | Fax: 089/918356 | |
|---|---|---|---|
| Additional representative(s) | ☐ (on additional sheet/see authorisation) | | OPPO (5) |

2. **Employee(s)** of the opponent authorised for these opposition proceedings under Art. 133(3) EPC

Name(s):

**AL 5387**

Authorisation(s)

| X | not considered necessary |
| ☐ | has/have been registered under No. |
| ☐ | is/are enclosed |

To 1./2.

| | for EPO use only |
|---|---|

**V.    Opposition is filed against**

— the patent as a whole                    [X]

— claim(s) No(s).

**VI.    Grounds for opposition:**

Opposition is based on the following grounds:

(a) the subject-matter of the European patent opposed is not patentable (Art. 100(a) EPC)
because:

— it is not new (Art. 52(1); 54 EPC)                                      [X]

— it does not involve an inventive step (Art. 52(1); 56 EPC)              [X]

— patentability is excluded
on other grounds, i. e.    | Art. |                                      [ ]

(b) the patent opposed does not disclose the invention in a manner sufficiently clear and complete
for it to be carried out by a person skilled in the art (Art. 100(b) EPC; see Art. 83 EPC).   [ ]

(c) the subject-matter of the patent opposed extends beyond the content of the application/
of the earlier application as filed (Art. 100(c) EPC, see Art. 123(2) EPC).                   [X]

**VII.    Facts and arguments**
(Rule 55(c) EPC)
presented in support of the opposition are submitted herewith on a separate sheet (annex 1)   [X]

**VIII.    Other requests:**

Oral proceedings are requested in case the patent is not revoked
in written proceedings.

O. P.

AL 5388

EPO Form 2300.2  04.92

IX.    **Evidence presented**

    see the attached Annex "Facts and Arguments"

| | | for EPO use only |
|---|---|---|
| | Enclosed = X | |
| | will be filed at a later date = | |

A.    **Publications:**

| | | Publication date |
|---|---|---|
| 1  DE 33 43 601 | | |
| Particular relevance (page, column, line, fig.): | | |
| 2  US 4,426,820 | | |
| Particular relevance (page, column, line, fig.): | | |
| 3  DE-A-22 38 660 | | |
| Particular relevance (page, column, line, fig.): | | |
| 4  GB-A-2256023 | | |
| Particular relevance (page, column, line, fig.): | | |
| 5  JP-3-169967 | | |
| Particular relevance (page, column, line, fig.): | | |
| 6  DE 12 12 275 | | |
| Particular relevance (page, column, line, fig.): | | |
| 7 | | |
| Particular relevance (page, column, line, fig.): | | |
| | Continued on additional sheet | |

B.    **Other evidence**

**AL 5389**

Continued on additional sheet

| | | for EPO use only |
|---|---|---|

**X.    Payment of the opposition fee is made**

[X] as indicated in the enclosed voucher for payment of fees and costs (EPO Form 1010)

[ ]

---

**XI.    List of documents**

Enclosure No.

No. of copies

| 0 | ⊠ Form for notice of opposition | [ 3 ] (min. 2) |
|---|---|---|
| 1 | ⊠ Facts and arguments (see VII.) | [ 3 ] (min. 2) |
| 2 | Copies of documents presented as evidence (see IX.) | |
| 2a | [X] — Publications | [ 3 ] (min. 2 of each) |
| 2b | [ ] — Other documents | [ ] (min. 2 of each) |
| 3 | [ ] Signed authorisation(s) (see IV.) | [ ] |
| 4 | [X] Voucher for payment of fees and costs (see X.) | [ 1 ] |
| 5 | [ ] Cheque | [ ] |
| 6 | [ ] Additional sheet(s) | [ ] (min. 2 of each) |
| 7 | [ ] Other (please specify here): | [ ] |

---

**XII.    Signature**
**of opponent or representative**

Place    Munich,

Date    June 28, 2000

*[signature]*

Christopher Furlong                                    **AL 5390**

Please type name under signature. In the case of legal persons, the position which the person signing holds within the company should also be typed.

EPO Form 2300.4  04.93

EP 0 855 482 B1                                    82 738 v1/v5/kl/vh
Välinge Aluminium AB                               June 28, 2000
Opposition by Perstorp AB

# Facts and Arguments

1.    **Subject matter of EP 0 855 482 B1**

EP 0 855 482 B1 (the Opposed Patent in the following) is a divisional application from an European patent application 94915725.9/0698162 claiming the priority of SE 9301595 of May 10, 1993.

The patent relates to a method for laying and mechanically joining rectangular building panels in parallel rows, especially floor panels, said panels being provided with means for mechanically locking together their long edges as well as their short edges in a first direction at right angles to the principal plane of the panels. As pointed out in column 1, lines 19 to 20, the method is especially well-suited for use in joining thin laminated floors. In column 2, lines 6 to 55, eight distinct disadvantages of known laminated floors using glued tongue and tongue–groove joints are listed. For example it is pointed out that the laying of a floor with glued tongue and tongue–groove joints is time-consuming in that glue must be applied to every panel on both long and short sides thereof. Moreover, it is pointed out that it is not possible to disassemble a glued floor once laid without having to break up the joints. Another disadvantage resides in the fact that an overall thickness of at least 7 mm is required which entails an undesirable restraint in connection with the laying of the floor because it is easier to cope with low threshholds when using thin floor panels, and doors must often be adjusted in height to come clear of the floor laid. Moreover, the manufacturing costs are directly linked with the consumption of material (see column 2, lines 6 to 13 of the Opposed Patent).

AL 5391

The **technical problem** to be solved by the Opposed Patent is described at column 3, lines 48 to column 4, line 21 and particularly resides in providing a method for joining together building panels, especially floor panels for hard, floating floors, which allows using floor panels of smaller overall thickness than present-day floor panels. The solution of this problem is defined by a method for laying rectangular building panels comprising the features of claim 1. A feature analysis of claim 1 is presented in the following:

Feature analysis of claim 1:

1) A method for laying and mechanically joining rectangular building panels (1, 2) in parallel rows, especially floor panels,

2) said panels (1, 2) being provided with means for mechanically locking together their long edges as well as their short edges in a first direction (D1) at right angels to the principal plane of the panels (1, 2),

   **characterised in that**

3) each panel (1, 2), at a rear side thereof, being provided with

i) a locking strip (6, 6') at one long edge (3) and at one short edge (3'), each locking strip (6, 6') being either a separate element connected to the panel or an extension of a lower part of the joint edge (3, 3') and extending throughout substantially the entire length of the corresponding edge (3, 3')

4) and being provided with a locking element (8) projecting from the strip (6, 6') and each panel (1, 2), at a rear side thereof, being provided with

5) ii) a locking groove (14, 14') at an opposite long edge (4) and at an opposite short edge (4') for receiving a locking element (8) of an adjacent panel,

6) each locking groove (14, 14') extending parallel to and spaced from the corresponding edge (4, 4') and being open at a rear side of the panel; and in that said method includes the following two main locking steps S1 and S2 for laying a new panel:

AL 5392

7) S1:   mechanically connecting a long edge (4 or 3) of the new panel to a long edge (3 or 4) of a previously laid first panel in a first row in such a way that the new panel and the first panel, as a result of said first main locking step S1, are mechanically locked to each other in said first direction (D1) as well as in a second direction (D2) parallel to said principal plane and at right angles to the locked long edges (3, 4), wherein said first main locking step S1 to this end includes

either:

7.1   -   the substep of placing the new panel in a second row adjacent to said first row with the long edge (4) of the new panel provided with a locking groove (14) being placed upon and in contact with a locking strip (6) at the adjacent long edge (3) of the first panel, while holding the new panel at an angle relative to a principal plane of the first panel and at a distance from its final longitudinal position relative to a previously laid second panel in said second row, and

-   the substep of subsequently angling down the new panel so as to accommodate the locking element (8) of said strip (6) of the first panel in said locking groove (14) of the new panel,

or

7.2   -   the substep of placing the new panel in a second row adjacent to said first row with the locking strip (6) being provided at a long edge (3) of the new panel being inserted under the adjacent long edge (4) of the first panel being provided with a locking groove (14), while holding the new panel at an angle relative to a principal plane of the first panel and at a distance from its final longitudinal position relative to a previously laid second panel in said second row, and

-   the substep of subsequently angling down the new panel so as to accommodate the locking element (8) of said strip (6) of the new panel in said locking groove (14) of the first panel,

AL 5393

and

8)  S2    mechanically connecting a short edge of the new panel to a short
          edge of said previously laid second panel in the second row in such
          a way that the new panel and the second panel, as a result of said
          second main locking step S2, are mechanically locked to each
          other at said short edges (3', 4') in said first direction (D1) as well
          as in a third direction (D3) parallel to said principal plane and at
          right angles to the short edges (3', 4'), wherein said second main
          locking step S2 is performed by a linear displacement of the new
          panel in its longitudinal direction relative to the first panel towards
          said final longitudinal position until the locking element (8) of the
          strip (6') at one (4') of the short edges is received in the locking
          groove (14') at the other one (4') of the short edges,

9)        whereby the new panel, in its final laid position, is mechanically
          connected in two directions (D1, D2) at its long edge to the first
          panel and in two directions (D1, D3) at its short edge to the second
          panel.

2.    Article 123 (2) and (3) EPC

Claim 1 of the Opposed Patent contravenes Art. 123 (2) EPC because it includes
features which extend beyond the application as originally filed. In the present
case, the Opposed Patent is based on the original Swedish application 9301595-6.
However, reference to the original application will be made to the PCT-application
with the publication number WO 94/26999.

2.1    Feature 2 in claim 1 of the Opposed Patent refers to a locking strip at one long
       edge and at one short edge of each panel. According to one alternative, each
       locking strip is an extension of a lower part of the joint edge.

In the paragraph bridging pages 17 and 18 of the WO document, reference is made
to the embodiment of Fig. 5.

AL 5394

"In the embodiment of Fig. 5, the strip 6 and its locking element 8 are integrally formed with the strip panel 1, the projecting part of the strip 6 thus being an extension of the lower part of the joint edge 3".

The design with the locking strip being an extension; i.e. being integrally formed with the strip panel is an alternative to the locking strip being a separate element connected to the panel. This definition of the locking strip does not find support in the original application. On page 12, lines 23 to 24, it is stated "Alternatively, the strip 6 may be integrally formed with the strip panel 1". There are only two distinct embodiments described in the original application, on the one end, the locking strip being provided as a separate element connected to the panel and on the other hand, the locking strip being integrally formed of the strip panel. However, the alternative of the strip being integrally formed of the strip panel cannot be read in isolation or taken as support for the feature in granted claim 1. The original disclosure must be considered as a whole in determining whether this feature of claim 1 is sufficiently supported. It will be noted that the statement on page 12 appears in the context of the description of Figs. 1a and 1b and, more specifically, in the description of the strip shown in these figures. The illustrated strip is a strip which is separate from the strip panel. Also on page 12, lines 15 to 17 and 24 to 26, it is clearly stated that the separate strip is flexible and resilient and that it should be integrated with the strip panel, i.e. it should not be mounted on the strip panel in connection with laying. Further, it should be noted that this embodiment of Fig. 1 as well as those of Figs. 2 and 3 specifically relate to separate strips and these strips are always those which are described as being flexible and resilient. See, for example, page 12, line 15 and page 16, lines 24 to 26. Therefore, the disclosure at page 12, lines 23 and 24, with respect to the strip being integrally formed with the strip panel, is only made as an aside in the description of embodiments with separate strips, which are flexible and resilient. If an integral strip is to be used, other passages of the description clearly teach that further essential features must be provided.

This is taught in the description of the embodiment described with reference to Fig. 5 on page 17, line 37 to page 18, line 35 of the original WO document. At the bottom of page 17 and the top of page 18, it is stated that in the embodiment of Fig. 5, the strip 6 and its locking element are integrally formed with the strip panel 1 . However, it is further stated that: "On the underside of the strip panel 1, there is provided a separate strip, band or the like 74 extending throughout the entire

length of the joint and having, in this embodiment, a width covering approximately the same surface as <u>the separate strip 6 of the previous embodiments</u>." Here, a clear distinction is made between a strip panel having an integral strip 6 and a strip panel having a separate strip 6. This distinction is the provision of an additional, separate strip, band or the like 74 in addition to the integral strip, as shown in Fig. 5, as opposed to a separate strip 6 of the previous embodiments, namely those described with reference to Fig. 1 to 4.

The case law of the EPO Boards of Appeal on amendments should also be considered. Decisions T 157/90 and T 397/89 state that formal support in the original application is insufficient for the generalisation of a feature. If the original application only describes specific embodiments and the general applicability of the feature was not evident to the skilled person, then a generalisation is inadmissible under Art. 123 (2). In the present case, there are many indications in the original application, which clearly and unambiguously teach the skilled person that an integral strip alone was not intended or feasible without the provision of the additional separate strip, band or the like 74. As previously stated, the embodiments Figs. 1 to 4, 6 and 7 describe a separate locking strip which is flexible and resilient. Only the embodiment of Fig. 5 illustrates an integral strip, but with the additional separate strip, band or the like 74. Most importantly, however, the description makes a clear distinction between the method of laying the panels when the locking strip can be bent or not. On page 18, lines 18 to 30 of the original application, it is stated that: "When using a material which does <u>not permit downward bending</u> of the strip 6 or the locking element 8, laying can be performed in the way shown in <u>Fig. 5</u>." A floor panel 2a is moved angled upwardly with is long side 4a into engagement with the long side 3 of a previously laid floor panel 1 while at the same time a third floor panel 2b is moved with its short side 4b' into engagement with the short side 3a' of the upwardly-angled floor panel 2a and is fastened by angling the panel 2b downwards. The panel 2b is then pushed along the short side 3a' of the upwardly-angled floor panel 2a until its long side 4b encounters the long side 3 of the initially-laid panel 1. The two upwardly-angled panels 2a and 2b are therefore angled down on to the subfloor 12 so as to bring about locking. The laying method of Fig. 5 involves the positioning at an angle of one panel with respect to the other and the subsequent angling down of the angled panel into the same plane as the other panel to create the mechanical connection by means of the locking strip and the locking groove. This is because the locking strip does not bend. The only bendable locking strips disclosed in the

original application are those which are stated to be resilient and flexible and these are the separate strips described with reference to Figs. 1 to 4, 6 and 7. It must also be noted that the entire description refers to the panels being thin, compact and hard. See, for example, the definition of the object of the invention on page 5, lines 14 to 18, the advantages of such thin, compact panels (page 4, lines 11 to 18 and page 5, lines 26 to 30) and emphasizes the advantage of the invention with respect to hard, thin floors (page 8, lines 1 to 3). Therefore, the skilled person clearly and unambigously understands that the provision of an integral strip in a thin, hard and compact panel requires an additional separate strip, band or the like which would also preferably extend over the same surface as embodiments with a separate locking strip (page 18, lines 7 to 9), so that sufficient reinforcement is provided. As already stated, an additional limitation is made with respect to the fact that a special laying method should be used for locking strips which are not flexible.

In summary, claim 1 includes a generalisation in terms of the definition of an integral locking strip without defining the additional essential feature of the further strip, band or the like 74. Therefore, in accordance with the case law of the Boards of Appeal, this generalised feature represents an inadmissible extension which goes beyond the original application as filed and contravenes Art. 123 (2) EPC.

2.2.    Moreover, the two alternative method steps (features 7.1 and 7.2) are not related to the two specific alternatives of a locking strip being provided as a separate element or being an extension of a lower part of the joint edge. According to the scope of protection of claim 1, both alternative configurations of the locking strip can be combined with either method of laying the panels. Therefore, there are altogether 4 different alternatives in claim 1: panels with a separately provided locking strip can be mounted in two different ways and panels with an integrally formed locking strip can also be mounted in two different ways. As outlined above, a strip which forms an extension of the lower part of the joint edge is described in the embodiment of Fig. 5 for which the specific method described on page 18, lines 18 to 35 applies.

2.3.    Claim 1 of the Opposed Patent includes a further inadmissible extension. According to the originally filed claim 1, the panels when joined together can occupy a relative position in the second direction (D2) where a play exists

AL 5397

between the locking groove (14) and a locking surface (10) on the locking element (8).

Such a play is an essential feature of the claimed method. Firstly, in column 4, a particular object of the invention is given according to which it is possible to repeatedly disassemble and reassemble a floor previously laid without causing damage to the panels. In the original WO document on page 9, lines 12 to 15, it is described that disassembly can be achieved even if the afore-mentioned play between a locking groove and a locking surface is not greater than 0.2 mm. Therefore, the existence of a small play is indispensable for the desired repeated disassembly and reassembly of the flooring system. Moreover, feature 8 calls for a linear displacement of the new panel in its longitudinal direction relative to the first panel, after locking these two panels together. Such a displacement is only possible if there is a play between the locking groove and the locking surface between the element. Finally, the Examining Division of the EPO came to the same conclusion in the official action dated March 24, 1999, section 3. It was correctly pointed out that there is no disclosure in the originally filed application that this feature (the panels when joined together have a play) is not an essential feature. In the letter of response of June 7, 1999, section 3, the Applicant simply stated that the feature in question is not an essential feature to the inventive laying method claimed in the present application. The laying method can be clearly defined without this feature. No further arguments were given in support of the admissible deletion of this feature.

2.4.    Claim 2 of the Opposed Patent includes a further inadmissible extension.

As becomes apparent from the discussion above in relation to an integral locking strip, the fact that this strip can be flexible and resilient has only been described in relation to the embodiments of Figs. 1 to 4, 6 and 7. However, these embodiments all relate to a separate locking strip and not to an integral locking strip. Further, the only method of laying panels with an integral locking strip is disclosed with reference to Fig. 5 at page 18, lines 18 to 32. There is no disclosure of a panel which, at the short edges is provided with a separate locking strip (which is flexible and resilient and snaps in) and an integral locking strip at a long side of the panel. However, claim 2 which refers back to claim 1 and, therefore, refers back to all possible feature combinations of claim 1, also covers this case for which there is no disclosure in the originally filed documents.

2.5    Sub-claims 3 to 8 all depend directly in indirectly on one of the claims 1 or 2 which contain an inadmissible extension. Therefore, all these claims cover feature combinations for which there is no support in the originally filed application.

Finally, the subject matter of claims 4, 5, 6 and 8 have no support in the originally filed documents. For example, claims 6 and 8 call for an "upper corner part". This expression is not to be found in the originally filed application.

**3.**    **Lack of novelty and inventive step**

The subject matter of all claims 1 to 8 of the opposed patent are not patentable in view of the following prior art documents:

| | |
|---|---|
| O1 | DE 33 43 601 |
| O2 | US 4,426,820 |
| O3 | DE-A-22 38 660 |
| O4 | GB-A-2256023 |
| O5 | JP-3-169967 |
| O6 | DE 12 12 275 |

All of the above mentioned documents O1 to O6 are published before the priority date of May 10, 1993.

**1.**    **Lack of Novelty**

With reference to the previously elaborated feature analysis of claim 1 and using the reference signs of DE 33 43 601, O1, this prior art document discloses a method for laying and mechanically joining rectangular building panels 1, 2 and 3', 4' in parallel rows (see Fig. 3 of O1), especially floor panels (see claim 1, lines 3 to 5) (Feature 1). The panels 1, 2 and 3', 4' are provided with means for mechanically locking together their long edges 25 (see e.g. Fig. 1) in a first direction perpendicular to the principal plane of the panels. This locking in the first direction follows directly from the groove-tongue-system and the shape depicted in the cross sectional views of Figs. 1 and 2 (Feature 2).

AL 5399

Each panel described in O1 is provided at a rear side with a locking strip 12. See Figs. 1, 2 and 4 and the description at column 4, lines 1 to 3. The locking strip is provided at the long edge 25 of the panels. See patent claim 1, feature b). Moreover, the paragraph bridging column 4 and column 5 of O1 discloses the additional provision of locking strips according to Fig. 4 at the short edges of the panels. From Figs. 1, 2 and 4 and the description in column 4, lines 1 to 3 follows that each locking strip is provided as a separate element 12 connected to the panel by screws, nails or by gluing (Feature 3, first alternative).

The locking strips are provided with a locking element which project from the strip (feature 4).

As can be derived from Figs. 1 and 4, which represent an embodiment of the locking connection at a long edge and at a short edge of two panels, respectively, each panel is additionally provided at the rear side thereof with a locking groove at an opposite long edge and at an opposite short edge for receiving a locking element of an adjacent panel (feature 5).

As can be seen from Figs. 1 and 4, each locking groove 19 in contact with the tongue 15 extends parallel to and spaced from the corresponding edge 25, 26. Moreover, the locking groves 19 open to the rear side of the panel (Feature 6).

In claim 1, lines 30 to 34 and 44 to 46 of O1 as well as in column 4, starting with line 10, the steps for laying a new panel are described.

In column 4, lines 10 to 18, the mechanically connecting of a long edge of a new panel to a long edge of a previously laid first panel is described. This first connection step leads to a locking to each other of the two panels (see claim 1, lines 44 to the end of claim 1). After the two panels have been locked along the long edges, they can neither be moved relative to each other in the direction perpendicular to the flooring surface nor in the direction to the right and to the left in the plane of drawing 1 (feature 7).

The first main locking step includes the sub-step of placing the new panel in a second row adjacent to the first row in contact with a locking strip while the new panel is held at an angle relative to the principal plane of the first panel. When the panel 10 at the right side of Fig. 1 is angled down, the panels are locked to each

**AL 5400**

other (see column 4, line 16 to 18). However, in a direction perpendicular to the sectional plane according to Fig. 1, the panels can be shifted relative to each other, as can be derived from column 4, lines 34 and 35. As will be discussed in more detail in connection with feature 8 below, a mechanical connection at the short edges between the panels is disclosed. This connection at the short edges is shown in Fig. 4 of O1.

The only feasible way of laying a floor from panels, which are locked both at their long and short sides is to carry out the step of connecting a new panel along its longitudinal edge displaced from its final longitudinal position relative to the previously laid panel or panels. Only in this way, the mutual interlocking along the long end short edges can be reached. First the new panel has to be connected longitudinally offset, then it has to be shifted while locked at its longitudinal side until the short edge becomes locked, too (Feature 7.1).

Since feature 7.1 can only be fully understood when looking at the overall method of laying a floor from mutually interconnected panels, it was already pointed out when discussing feature 7.1, that document O1 also discloses the linear displacement of the new panel in its longitudinal direction relative to the first panel towards its final longitudinal position. Moreover, it was already discussed that Fig. 4 of O1 represents the locking structure along the short edges of the panels. Patent figures are schematic drawings which should not be considered to be at an exact scale. In the case of document O1, the play between the locking strips has been shown in a somewhat exaggerated dimension. However, providing a technically sensible play between the locking strips, those skilled in the art are taught from Fig. 4 of O1 that the two panels 1, 2 being connected together are mechanically locked to each other in the first direction, that is in a direction perpendicular to the upper flooring surface, as well as in a third direction which runs parallel to the flooring surface in the plane of the drawing Fig. 4.

Document 01 does not distinguish whether the newly laid second panel is brought into contact with the already laid first panel with the tongue first or groove first. Therefore, both alternatives according to features 7.1 and 7.2 of claim 1 are covered.

Two adjacent panels which have been locked to each other along their long edges (and considering a locking structure according to Fig. 1 of O1) can only be

AL 5401

displaced linearly until the newly connected locking element snap-fits with the adjacent panel at the short edge of the newly laid panel (Feature 8).

As a result, the flooring system according to O1 leads to a mechanical connection in two directions at its long edge and in two directions at its short edge. It was explained in more detail above, that there is a mechanical connection in two directions along the long edges and along the short edges. The flooring system depicted in Fig. 3 of O1 has connecting structures along the long edges 25 and short edges 26, so that feature 9 of claim 1 of the opposed patent is also fulfilled.

In summary, document O1 discloses all features of claim 1 of the opposed patent. Therefore, claim 1 lacks novelty.

2.     Lack of inventive step of claim 1 of EP 0 855 482 B1

Claim 1 of the opposed patent calls for different alternatives. Apart from the fact that claim 1 already lacks novelty in view of O1, also a combination of document O1 and other prior art documents will be considered in the following.

2.1    Lack of inventive step in view of documents O1 and O2.

Document O2, US 4,426,830, also relates to a flooring system with interconnectable panels including a locking structure at at least one set of opposite edges (see abstract). Therefore, it follows already from the abstract, that O2 also relates to a flooring system and its method of laying where all long and short edges of the panels can be locked to each other.

As can be best derived from Figs. 17, 18 to 20 and 24 to 25, the method of laying the panels includes a groove-and-tongue joint where a protruding nose is provided which enters in a correspondingly shaped recess in the adjacent panel. The joining of the panels is described in column 3, lines 10 to 19 and includes the initially providing a separate panel, then inserting the second panel in inclined position into the groove of the first panel, subsequently engaging a third panel into said second panel, while maintaining the inclined position (for the clerical error "included" reference is made to the correct wording in claim 10) and lowering the panels into a horizontal position. The same method steps are described with reference to Figs.

AL 5402



17 in column 5, lines 35 to 51 and in claim 10 of O2. Therefore, O2 exactly relates to the same technical field as O1. In addition, O2 discloses the same method as shown in Fig. 5 of the opposed patent.

Starting from O1 and with the objective problem in mind to provide a more simple structure of the individual panels, those skilled in the art could derive from O2 the suggestion to provide the locking strips integrally with the floor panels. Moreover, as can be seen from Fig. 23, this extension of the joint edge extends throughout substantially the entire length of the corresponding edge.

Therefore, claim 1 including the second alternative of feature 3 is rendered obvious by a combination of prior art documents O1 and O2.

2.2    Lack of inventive step in view of documents O1 and O3

Documents O3 also relates to flooring panels (see page 4, second full paragraph) in which the panels are connected to each other by angularly inserting a second panel 2 into a corresponding receiving structure of a first panel 1 and then the angling down of the new panels 2 so as to accommodate its locking element into the corresponding locking groove of the first panel 1.

Starting from O1 and with the objective problem in mind to simplify the structure of the individual panels, those skilled in the art found in O3 the solution to use flooring panels with a unitary structure, i.e. with locking strips which are integrally formed with the panels.

Therefore, also a combination of prior art documents O1 and O3 rendered obvious the subject matter of claim 1 of the opposed patent, in the feature combination of the second alternative of feature 3.

2.3    Lack of inventive step in view of prior art documents O1 and O4.

Document O4, GB 2256023, describes the groove-tongue-joint between laminated flooring panels. As can be derived from Figs. 1 to 5 and the overall disclosure of this document, the locking strips are integrally formed with the panels. In order to avoid a repetition of the arguments brought forward in the two preceding sections

14

2.1 and 2.2, reference is made to the objective problem recited above when discussing a combination of prior art documents O1 and O2, as well as O1 and O3, which also apply here. It can be concluded that also a combination of prior art documents O1 and O4 rendered obvious the subject matter of claim 1 with regard to the second alternative of feature 3.

Moreover, O4 also discloses the different possibilities to connect two adjacent panels interlocking engagement with each other. Firstly, on page 3, second paragraph of O4, the connection of two panels is described. As a result of the shape of the tongue and opposed chamfer faces, the panels may be tilted relative to each other with the tongue partially engaged in the groove for locating the rib in the recess when assembling the joint. This corresponds to the connection method according to feature 7.2 of the Opposed Patent.

Moreover, on page 5, starting with the last paragraph, the pushing together of the panels 1, 1- is described. During the snap-fit connection, a relative tilting of the panels occurs. However, there is no limitation as to whether flooring panel 1- has to be connected to the already laid panel 1 or vice versa. Therefore, both alternatives according to feature 7.1 and 7.2 are also covered by O4.

In summary, a combination of prior art documents over O1 and O4 renders obvious the subject matter of claim 1 according to the second alternative of claim 3.

2.4.    Lack of inventive step of claim 1 in view of prior art documents O1 and O5.

As there is no family member of document O5, JP 3-169967, a translation of this prior art document is enclosed to O5.

This prior art document describes a flooring system in which both the short edges and long edges of the flooring members are interconnected. Thus, it can be derived from Fig. 1 of O5 and the corresponding description on translation page 7, first paragraph, that the panel 2 can be made from wood and is laminated and adhered to the base member 1, which is made of a synthetic resin molding. Therefore, the locking strip forms an extension of a lower part of the joint edge according to the second alternative of feature 3 of claim 1 of the Opposed Patent. Moreover, this piece of prior art shows the linear displacement of the new panel in its longitudinal

direction relative to the first panel according to feature 8 of claim 1. This longitudinal direction is described on page 9 of the translation and indicated by an arrow designated by an open square in Figs. 2 and 3.

Also a combination of prior art documents O1 and O6 render obvious the subject matter of claim 1 of the Opposed Patent.

3.    Subclaims:

The subject matter of **claim 2** follows from O5 which discloses a snap-fit between the flooring panels. As is pointed out on page 9, starting with line 8 of the translation, at the time of the coupling, the lower piece 4b of the fitting portion 4 elastically deforms downwardly in accordance with the fitting movement of the fitting projection 3. This downward movement is indicated by an arrow in Fig. 1. Therefore, the feature of claim 2 is previously known from prior art document O5.

Moreover, the prior art document O6, DE 1212275, describes such a snap-in connection in which the receiving recess spreads to allow the passage of a barbed connection tongue into the recess. See Fig. 2 and the corresponding description.

Therefore, the feature of claim 2 is also previously known from document O1. Therefore, claim 2 lacks an inventive step new over combination of prior art documents O1 and O5 or O1 and O6.

According to **claim 3**, the short edge of the newly-laid panel to be connected to an already laid panel has a locking groove. Upon laying a three-dimensional floor by using individual flooring elements, those skilled in the art carrying out the method according to claim 1 with flooring panel with two sides, i.e. a short side and a long side, being provided with tongues, and with the two remaining sides provided with a groove, would automatically follow the teaching of claim 3. According to claim 1, a new panel can be connected to the existing flooring panels either with a tongue or a groove heading for the locking element of the already laid panel (step 1). Then, a linear displacement of the new panel in its longitudinal direction relative to the first panel is carried out (step 2). Following the teaching of claim 1 and keeping in mind the different alternative moving directions possible, the subject matter of claim 3 is already covered by claim 1 and contains no additional

feature. Therefore, claim 3, which is already covered by claim 1, is not patentable in view of the arguments provided with respect to claim 1 or claim 2.

The feature of claim 4 has been discussed above in connection with document O2 (see for example, Fig. 17 and the description on column 3, lines 10 to 19). Therefore, claim 4 lacks an inventive step in view of prior art documents O1 and O2. With regard to claim 4 being dependent on claims 3 and claims 2, a snapping engagement also follows from document O2 in form of a clamp 21 which snaps into a groove 20 for connecting adjacent panels (see Fig. 8).

Claim 5 reverts the feature of claim 3. In this context, reference is made to our arguments with regard to claim 3 above.

According to claim 6, the step of angling down the new panel is performed while an upper corner part of the long edge of the new panel is held in contact with an upper corner part of the long edge of the first panel. This feature is known from document O2, see Fig. 19 or Fig. 25. Thus, the feature of claim 6 lacks an inventive step in view of a combination of prior art document O1 and O2. With regard to claim 6 being dependent on claim 2, again reference is made to the embodiment of O2 which include an elastic deformable clamp which provides a snap-in engagement between two adjacent panels.

Claim 7 describes the disassembly of previously connected panels.

Firstly, this claim does not give a clear teaching as to how to disassemble a connection with a snap-in fit according to subclaim 2, on which inter alia claim 7 depends.

It is the essential point of the method for laying floor panels according to the Opposed Patent and all cited prior art documents O1-O6 that no glue has to be used. For example, document O1 calls for a removeable flooring system (see claim 1, first line) which cannot only be laid, but subsequently removed again.

Therefore, claim 7 as dependent on one of the claims 1, 3 and 5, lacks novelty and dependent on any of the other claims lacks an inventive step.

Finally, method **claim 8** repeats the feature of claim 6 in connection with claim 7, i.e., during the step of loosening and removing of the panels. The connecting and disconnecting of the panels is a process which is completely reversible. Therefore, the sequence of connection steps according to Figs. 18 to 20 or 24 to 25 of O2 also applies to the removing of the panel from an already laid flooring surface. Therefore, the same conclusions as made above for claim 6 also apply.

3.    **Summary**

3.1.    The subject matter of claims 1 and 2 of the Opposed Patent extends over the originally filed documents. Therefore, claims 1 and 2 of the Opposed Patent contravene Article 123 (EPC).

3.2.    Claim 1 of the Opposed Patent lacks novelty in view of prior art document O1, DE 3343601.

3.3.    Claim 1 of the Opposed Patent lacks an inventive step in view of a plurality of prior art combinations, like documents 1 and 2, 1 and 3, 1 and 4 and 1 and 5.

4.    The subclaims do not contain subject matter which renders this claim patentable over the prior art documents.

The request to revoke the patent in its entirety has been reasoned in full.

Christopher Furlong
European Patent Attorney
Assoc. No. 151

⑲ BUNDESREPUBLIK    ⑫ **Patentschrift**    ㉛ Int. Cl. 4:

DEUTSCHLAND    ⑪ **DE 3343601 C2**    E 04 F 15/04



DEUTSCHES

PATENTAMT

㉑ Aktenzeichen:      P 33 43 601.0-25
㉒ Anmeldetag:        2. 12. 83
㊸ Offenlegungstag:   13. 6. 85
㊺ Veröffentlichungstag    12. 2. 87
     der Patenterteilung:



DE 3343601 C2

Innerhalb von 3 Monaten nach Veröffentlichung der Erteilung kann Einspruch erhoben werden

�73 Patentinhaber:

Bütec Gesellschaft für bühnentechnische
Einrichtungen mbH, 4010 Hilden, DE

⑭ Vertreter:

Kuborn, W., Dipl.-Ing.; Palgen, P., Dipl.-Phys.
Dr.rer.nat., Pat.-Anw., 4000 Düsseldorf

⑫ Erfinder:

Schröder, Gerhard, 4010 Hilden, DE

㊴ Im Prüfungsverfahren entgegengehaltene
Druckschriften nach § 44 PatG:

DE-OS    21 39 283
DE-OS    15 09 841
DE-GM    19 26 399
FR       21 02 505
FR       11 75 582

�554 Entfernbarer Bodenbelag

**AL 5408**

DE 3343601 C2

BUNDESDRUCKEREI   12. 86   608 167/360    70

**1**

### Patentansprüche

1. Entfernbarer Bodenbelag aus einzelnen an den Rändern miteinander verbundenen rechteckigen untereinander gleichgroßen Platten aus Holz, Holzspan- oder Fasermaterial oder dergleichen, bei denen an den unter einander zu verbindenden Rändern benachbarter Platten jeweils ein über die Länge des Randes durchgehender Profilstab eines Paars zusammenwirkender Profilstäbe befestigt ist, die in Querrichtung miteinander verbindbar sind, gekennzeichnet durch folgende Merkmale:

a) die Platten (1, 2) sind parallel zu einer Rechteckseite in einer Reihe (23) hintereinander, in der in Querrichtung benachbarten Reihe (24) jedoch in Richtung der Reihe versetzt angeordnet;

b) an den zur Richtung der Reihen (23, 24) parallelen Rändern (25) der Platten (1, 2) sind Verbindungsanordnungen (100) vorgesehen, bei denen der erste Profilstab (10) eine nach außen offene, in Längsrichtung verlaufende, sowohl in der von der Stirnseite (7) der Platte (1) hinwegweisenden Richtung eine Hinterschneidung (19) als auch in der zur Plattenebene senkrechten Richtung eine Unterschneidung (17) bildende Ausnehmung (14) und der zweite Profilstab (10') an der Platte (2) eine Zunge (15) aufweist, die formschlüssig unter Schwenkung der Platte (2) um eine zu den Profilstäben (10, 10') parallele Achse sowohl hinter die Hinterschneidung (19) als auch unter die Unterschneidung (17) einfügbar ist und sich in den entgegengesetzten Richtungen an dem ersten Profilstab abstützt, so daß die Platten (1, 2) in beiden zur Profilrichtung senkrechten Richtungen also parallel und auch senkrecht zur Plattenebene miteinander gekoppelt sind;

c) an den zu den Rändern (25) senkrechten Rändern (26) sind Verbindungsanordnungen (200) mit zusammenwirkenden Profilstäben (10, 10'') vorgesehen, die durch Einfügen senkrecht zur Plattenebene beim Herunterschwenken der Platte (2) derart zum Eingriff bringbar sind, daß sie parallel zur Plattenebene miteinander gekoppelt sind.

2. Bodenbelag nach Anspruch 1, dadurch gekennzeichnet, daß die Profilstäbe (10, 10', 10'') mittels eines etwa in der Mitte der Plattendicke vorgesehenen, flachen, auf mindestens einer Flachseite eine widerhakenartige Längsprofilierung (11) tragenden, in einen Längsschlitz (8) in der Stirnseite (7) der Platte (1, 2) unter Spannung eingreifenden Profilsteges (9) und mittels eines in der Nähe der Plattenunterseite vorgesehenen, flachen, zur Plattenebene parallelen, den Plattenrand übergreifenden Profilsteges (12) befestigt sind.

### Beschreibung

Die Erfindung bezieht sich auf einen entfernbaren Bodenbelag der dem Oberbegriff des Anspruchs 1 entsprechenden Art.

Ausgangspunkt für die Erfindung sind Probleme gewesen, die bei entfernbaren Tanzflächen auftreten, die vorübergehend bei Veranstaltungen auf vorhandene

**2**

Böden, zum Beispiel Teppichböden oder Böden in Turnhallen und dergleichen aufgelegt werden, um nach der Veranstaltung wieder entfernt zu werden. Derartige Tanzflächen bestehen aus rechteckigen Platten, die an ihren Rändern zusammengefügt werden. Sie müssen ohne nach außen wirkende Verbindungsmittel zu einer spaltenfreien, homogenen Gesamtfläche zusammenhalten. Es ist also nicht möglich, in den vorhandenen Boden etwa Schrauben oder ähnliche Befestigungsmittel einzubringen.

Bekannt ist es, die einzelnen Platten durch eine einfache Nut- und Federverbindung zusammenzufügen. Hierbei besteht jedoch stets die Gefahr, daß die Platten etwas auseinanderrutschen und einen Spalt bilden, welcher beim Tanzen zu Unfällen führen kann. Es sind auch bereits Verbindungsanordnungen bekannt, die die Platten in ihrer Ebene zusammenhalten. Bei einer bekannten Ausführungsform wird quer durch die Nut- und Federverbindung eine Madenschraube hindurchgeführt. Deren Wirksamkeit ist jedoch begrenzt, weil die Kräfte nur punktuell übertragen werden und die Ränder der in Betracht kommenden Platten aus Holz oder Holzspanmaterial, besonders wenn Nut und Feder ausgearbeitet sind, zur Übertragung nennenswerter Kräfte ungeeignet sind. Eine weiterentwickelte Ausführungsform sieht in der Plattenebene nach außen vorgreifende Haken vor, die in die benachbarte Platte eingreifen und sie unter Betätigung eines Exzenters gegen die erste Platte ziehen. Auch hier ist wieder nur eine punktuelle Krafteinleitung gegeben und ist außerdem ein erheblicher Aufwand notwendig, denn die Exzenterglieder müssen in die Ränder der Platten eingelassen werden. In beiden Fällen sind die Zugangslochungen zu den Schrauben bzw. zum Exzenter von außen sichtbar und können sich mit Schmutz zusetzen.

Ein entfernbarer Bodenbelag der dem Oberbegriff des Anspruchs 1 entsprechenden Art ist aus der DE-OS 21 39 283 bekannt. Hierbei erfolgt die Verbindung der Platten mittels längs der Ränder der Platten verlaufender Profilstäbe, also schon auf einer Strecke und nicht mehr punktuell. Die Profilstäbe lassen sich durch Zusammenfügen in der zur Plattenebene senkrechten Richtung miteinander verbinden. Die Verbindung kann jedoch durch eine Belastung einer der benachbarten Platten in der gleichen Richtung teilweise oder sogar ganz wieder gelöst werden, wenn der Untergrund weich oder nicht eben ist. Es können vorübergehend oder dauernd Stufen entstehen, was bei einem Einsatz des Bodenbelages als Tanzfläche unbedingt vermieden werden muß.

Der Erfindung liegt die Aufgabe zugrunde, einen Bodenbelag der dem Oberbegriff des Anspruchs 1 entsprechenden Art dahingehend auszugestalten, daß die Platten zu einer glatten Gesamtfläche ohne Zuhilfenahme von Werkzeugen derart zusammengefügt werden können, daß die Bildung von Stufen an den Kanten benachbarter Platten unterbunden ist.

Diese Aufgabe wird erfindungsgemäß durch die im Kennzeichen des Anspruchs 1 wiedergegebenen Merkmale gelöst.

Bei der wiedergegebenen Anordnung der Platten reicht es aus, die für die Festlegung senkrecht und parallel zur Plattenebene ermöglichenden Verbindungsanordnungen jeweils nur an zwei einander gegenüberliegenden Rechteckseiten vorzusehen. Durch die Versetzung der Platten werden diese bei der erfindungsgemäßen Verbindungsanordnung dennoch auf ihrer ganzen Fläche verbunden und niedergehalten, so daß es nicht etwa

**AL 5409**

3

zum Hochstehen einer einzelnen Plattenecke oder zur Bildung von Stufen kommen kann.

Eine senkrecht und parallel zur Plattenebene wirksame Profilausbildung zur Verbindung von Plattenrändern ist für sich genommen aus der DE-OS 22 38 660 bekannt.

Es ist natürlich wichtig, daß die Profilstäbe auf eine Weise mit den eigentlichen Platten verbunden werden, die deren Ränder nicht belastet, da andernfalls der Vorteil, daß die Ränder an der eigentlichen Verbindung nicht teilnehmen, nicht zum Tragen kommt und das Problem nur weiter nach innen verlagert wird.

Eine für die Zwecke der Erfindung vorteilhafte Verbindungsart ist in Anspruch 2 wiedergegeben.

Der die widerhakenartige Längsprofilierung tragende Profilsteg, der im allgemeinen als sogenannter "Tannenbaum" ausgebildet sein wird, übernimmt den überwiegenden Anteil der Festlegung der Profilstäbe senkrecht zur Plattenebene. Den den Plattenrand übergreifende Profilsteg, der bei Bodenbelagsplatten natürlich auf der Unterseite der Platten anzuordnen ist, gibt die Möglichkeit, den Profilstab gegen Herausziehen aus der Nut zu sichern, in die der mit der widerhakenartigen Längsprofilierung versehene Profilsteg eingreift. Außerdem trägt der andere Profilsteg natürlich auch zur zusätzlichen Festlegung senkrecht zur Plattenebene bei.

In der Zeichnung sind zwei Ausführungsbeispiele eines erfindungsgemäßen als Tanzflächenbelag dienenden Bodenbelages wiedergegeben.

Fig. 1 und 2 zeigen vertikale Teilschnitte senkrecht zur Erstreckung des Randes;

Fig. 3 zeigt einen Ausschnitt aus einem erfindungsgemäßen Tanzflächenbelag in Draufsicht;

Fig. 4 zeigt einen vertikalen Teilschnitt senkrecht zur Erstreckung des Randes mit einer ergänzenden Verbindungsanordnung.

Die Platten 1, 2 eines Tanzflächenbelages sind an ihren Rändern durch Verbindungsanordnungen 100, 200 miteinander verbunden (Fig. 3). Die Platten 1, 2 sind mehrschichtig ausgebildet und besitzen auf ihrer Oberseite eine Parkettschicht 3, die auf eine Mittelschicht 4 aus einer Tischlerplatte, einer Spanplatte oder dergleichen aufgebracht ist. Die Unterseite wird durch eine Sperrholzschicht 5 gebildet.

Die Verbindungsanordnung 100 umfaßt zwei Profilstäbe 10, 10', die an den Stirnseiten der Platten 1, 2 angebracht sind. Die Profilstäbe 10, 10' erstrecken sich etwa über die Höhe der mittleren Schicht 4 und der unteren Schicht 5 und schließen mit der Oberseite der mittleren Schicht 4 ab, so daß sich die Parkettschichten 3 bis über die Profilstäbe 10, 10' hinwegerstrecken kann und die Parkettschichten 3 benachbarter Platten 1, 2 an der Linie 6 unmittelbar aneinanderstoßen, so daß die Profilstäbe 10, 10' von oben nicht zu sehen sind.

Die mittlere Schicht 4 und die untere Schicht 5 bilden jeweils eine gemeinsame Stirnfläche 7, in die eine rechteckige Nut 8 eingefräst ist, die sich etwa in der Mitte der Gesamtdicke der Schichten 4, 5 befindet. Die Profilstäbe 10, 10' liegen auf ihrer Rückseite gegen die Stirnfläche 7 an und besitzen einen in die Nut 8 eingreifenden flachen Profilsteg 9, der auf beiden Seiten mit einer Längsprofilierung 11 in Gestalt von Rippen dreieckigen Querschnitts versehen ist. Der Profilsteg 9 sitzt unter Spannung in der Nut 8. Im Hinblick auf den Profilsteg 9 ist die Ausbildung beider Profilstäbe 10, 11 gleich. Dies gilt auch hinsichtlich eines weiteren Profilsteges 12 in Gestalt eines flachen Profilansatzes, der unter die Platten 1, 2 greift und sich noch ein Stück über die Profil-

4

steg 9 hinaus erstreckt. Der Profilsteg 12 kann durch Schrauben, Nägel oder durch Kleben mit der Unterseite der Platten 1, 2 verbunden sein. Er steht um seine Dicke 13 über die Unterseite der Platten vor. Dieser Höhenunterschied wird dadurch ausgeglichen, daß die Platten 1, 2 auf Filzstreifen oder ähnlichen Unterlagen auf der tragenden Fläche aufliegen.

Die Profilstäbe 10, M sind unterschiedlich ausgebildet. Der Profilstab 10 besitzt eine Ausnehmung 14, in die eine Zunge 15 des Profilstabes 10' eingreift. Wie aus Fig. 1 ersichtlich ist, kann das Zusammenfügen der Platten 1, 2 dadurch erfolgen, daß, wenn die linke Platte 1 auf dem Boden liegt, die Platte 2 schräggestellt, d. h. auf der gemäß Fig. 1 rechten Seite angehoben wird und dann die Zunge 15 in die Ausnehmung 4 eingeführt wird. Wenn dann die Platte 2 rechts abgesenkt und auf der tragenden Fläche abgelegt wird, verriegeln sich die Profilstäbe 10, 10' aneinander.

Dies wird im einzelnen anhand der Profilstäbe 10, 10' der Fig. 2 erläutert. Der Profilstab 10 bildet mit dem die Ausnehmung 14 nach oben begrenzenden Profilsteg 16 eine Unterschneidung 7, die von der Zunge 15 in der aus Fig. 2 ersichtlichen Weise untergriffen wird. Der Profilsteg 18 begrenzt die Ausnehmung 14 gemäß Fig. 2 nach rechts und bildet eine Hinterschneidung 19, gegen die sich die Rückseite der Zunge 15 legt. Die Zunge 15 kann also weder gemäß Fig. 2 nach oben noch nach rechts aus der Ausnehmung 14 herausgezogen werden. In der umgekehrten Richtung, d. h. nach unten und nach links, stößt der Profilstab 10' ebenfalls an dem Profilstab 10 bzw. dem Profilsteg 18 desselben an, so daß in der gezeigten Stellung eine allseitige Festlegung in der Zeichenebene der Fig. 1, 2 gegeben ist.

Senkrecht zur Zeichenebene jedoch können die Profilstäbe 10, 10' gegeneinander verschoben werden. Falls dies verhindert werden soll, können beide Profilstäbe 10, 10' durchsetzende Bohrungen 20 vorgesehen sein (Fig. 1), in die ein Arretierungsstift 21 einsetzbar ist.

Im Hinblick auf die Ausbildung der Profilstäbe 10, 10' sind die Ausführungen der Fig. 1 und 2 gleich. Die Ausführungsform nach Fig. 2 unterscheidet sich jedoch dadurch von der nach Fig. 1, daß die Parkettschicht 3 die Profilstäbe 10, 10' nicht überdeckt, sondern nur bis an die Stirnfläche 22 reicht. Die Oberseite der Parkettschicht und die Oberseite beider Profilstäbe 10, 10' liegen in einer Ebene.

An der Unterseite stehen die Profilstäbe 10, 10' mit den flachen Profilstegen 12 nicht über die Unterseite der Sperrholzschicht 5' vor, sondern fluchten mit dieser. In die Sperrholzschicht 5' muß also eine die Profilstege 12 aufnehmende Ausnehmung eingefräst werden.

In Fig. 3 ist erkennbar, daß zur Bildung eines Tanzflächenbelages die Platten 1, 2 jeweils in Reihen 23, 24 hintereinander angeordnet werden und daß die Platten 1, 2 der benachbarten Reihen 23, 24 in Richtung der Reihen versetzt angeordnet sind. Die Verbindungsanordnungen 100 brauchen hierbei nur an den parallel zur Richtung der Reihen 23, 24 verlaufenden Rändern 25 der Platten 1, 2 vorgesehen zu sein. Auch wenn die Platten 1 bzw. an den dazu senkrechten Rändern 26 nicht verbunden sind, ist schon ein für manche Zwecke ausreichender Zusammenhalt des Tanzflächenbelages gegeben.

Bei hohen Ansprüchen an die Verbindung der Platten jedoch, insbesondere wenn diese auf einem nachgiebigen Untergrund wie einem Teppich liegen, müssen auch die Ränder 26 verbunden sein, um ein Auseinanderrutschen längs der Ränder 25 zu vermeiden. Hierzu dient

AL 5410

5

6

die vereinfachte Verbindungsanordnung 200 nach Fig. 4, die einen Profilstab 10 nach den Fig. 1 und 2 und einen Profilstab 10″ umfaßt, der sich von dem Profilstab 10′ dadurch unterscheidet, daß er keine die Unterschneidung 17 untergreifende Zunge 15 besitzt, sondern eine senkrecht zur Plattenebene verlaufende äußere Begrenzungsfläche 27 aufweist. Aus diesem Grund können die Profilstäbe 10, 10″ in der aus Fig. 4 ersichtlichen Weise durch eine ausschließlich senkrecht zur Plattenebene verlaufende Bewegung zum Eingriff gebracht werden, wie es aus geometrischen Gründen erforderlich ist, wenn die Platten 1, 2 ringsum verbunden sein und an den Rändern 25 die Verbindungsanordnung 100 aufweisen sollen.

5

10

Hierzu 1 Blatt Zeichnungen

15

20

25

30

35

40

45

50

55

60

65

**AL 5411**

Int. Cl.: E 04 F 15/04
Veröffentlichungstag: 12. Februar 1987



Fig. 1

Fig. 4

Fig. 3

Fig. 2

AL 5412

608 167/360